```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE
                        EASTERN DISTRICT OF VIRGINIA
 2                          Alexandria Division

 3

      ROBERT DONNERT, et al.,                    )
 4                                               )
                                  Plaintiffs,    )
 5                                               )
      v.                                         ) CIVIL ACTION
 6                                               )
      FELD ENTERTAINMENT, INCORPORATED,          ) 1:13-cv-40
 7                                               )
                                  Defendant.     )
 8    _____)

 9                        REPORTER'S TRANSCRIPT

10                           Volume 3

11

12                    Thursday, November 14, 2013

                                ---
13    BEFORE:       THE HONORABLE T.S. ELLIS, III
                    Presiding
14
      APPEARANCES:
15                  JASON SETTY, ESQ.
                    ROBERT W. PIERCE, ESQ.
16                  The Pierce Law Firm
                    133 Defense Highway, Suite 106
17                  Annapolis, MD 21401

18                      For the Plaintiffs

19                          ---
                    WILLIAM B. PORTER, ESQ.
20                  LAURIE L. PROCTOR, ESQ.
                    Blankingship & Keith, PC
21                  4020 University Dr., Suite 300
                    Fairfax, VA 22030
22
                        For the Defendant
23
                MICHAEL A. RODRIQUEZ, RPR/CM/RMR
24                   Official Court Reporter
                USDC, Eastern District of Virginia
25                     Alexandria Division
                             INDEX
```

1

2                            INDEX

3   WITNESSES:              Direct   Cross  Redirect  Recross

4   Robert Stipka              6       34      63       67

5   Rule 50 Motion            81

6   Rule 50 Motion Taken under advisement           107

7   JURY INSTRUCTION CONFERENCE      117

8   CLOSING ARGUMENTS BY PLAINTIFF   117

9   CLOSING ARGUMENTS BY DEFENDANT   136

10  JURY INSTRUCTIONS                166

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2
 3
 4
 5
 6                    (Court called to order at 9:41 a.m.)
 7              THE COURT:  All right.  This is Robert
 8   Donnert, et al. against Feld Entertainment, doing
 9   business as Ringling Bros.  And the record will reflect
10   that counsel and the parties are present, are prepared
11   to proceed.
12              What we're going to do is we're going to
13   take first this last witness.  Following that, I'll hear
14   any argument on Rule 50.  And then we'll proceed to a
15   hearing on the instructions.  And if appropriate, if I
16   deny Rule 50, then we'll proceed to closing arguments
17   and final instructions.  So you will know what the final
18   instructions are before you make your closing arguments
19   to the jury.
20              In essence, the order is, first of all, the
21   witness, then the Rule 50 argument, then the
22   instructions, and then closing arguments and final
23   instructions to the jury.
24              All right.  You may bring the jury in.
25              ATTORNEY PORTER:  I had one small issue that
```

1    dealt with exhibits.  I don't know if you want to do

2    this with or without the jury, just two that we

3    inadvertently forgot to move in yesterday I wanted to

4    move in.

5              THE COURT:  Well, your case isn't over.

6              ATTORNEY PORTER:  No, sir.  I just didn't

7    know if you wanted to do it first.

8              THE COURT:  No.  Let's get the witness done.

9              Have you told Mr. Pierce about those two?

10             ATTORNEY PORTER:  We've talked about them.

11   I just didn't move them in.  They were played and they

12   were used.  I just never asked you to move them.

13             (Jury impaneled at 9:43 a.m.)

14             THE COURT:  All right.  You may be seated.

15             Good morning, ladies and gentlemen.  Again,

16   let me confirm that you were all able to follow the

17   Court's instructions to refrain from discussing the

18   matter.

19             Good.

20             All right.  This morning, we're going to

21   here a final witness.  And then I will tell you how

22   we'll proceed after that.  But we'll begin with the

23   taking of the roll.  Even though I can tell all of you

24   are here, we will do it for the purposes of the record.

25             (Roll call.)

```
1              THE COURT:  All right.  Mr. Porter, you may
2    call your final witness.
3              ATTORNEY PORTER:  Robert Stipka.
4              THE COURT:  Now, let me -- as he's coming
5    forward, let me tell the jury that we're going to be
6    using an interpreter here because this witness is not
7    fluent in English.  And if you have any difficulty
8    following it, I want you to hold up your hand or stop so
9    that I can take steps to ensure that you're able to
10   follow everything.  We'll have an interpreter, and I'm
11   going to have the interpreter sworn again this morning
12   in front of you.
13             All right.  Come forward, please.
14             Now, to begin with, Ms. Owensova, good
15   morning.
16             THE INTERPRETER:  Good morning.
17             THE COURT:  Let's have the deputy clerk
18   administer the oath of the interpreter to you.
19             (Interpreter sworn by clerk.)
20             THE COURT:  And Ms. Owensova, I'm correct
21   that you are an experienced interpreter in English and
22   Czech.
23             THE INTERPRETER:  Yes, your Honor, you are
24   correct.
25             THE COURT:  Now, if you'd step aside and let
```

1    the witness come right next to you.  You need to be next

2    to him.  We'll administer the oath to the witness.

3                 (Witness sworn.)

4                 THE COURT:  We have the -- let's give

5    Ms. Owensova the microphone.

6                 You may not hear the witness, but that's not

7    as important as hearing what the interpreter says.

8                 All right.  Mr. Porter, you may proceed.

9                 ATTORNEY PORTER:  Thank you, sir.

10                    DIRECT EXAMINATION

11   BY ATTORNEY PORTER:

12   Q.    Good morning.

13                 Will you introduce yourself to the jury,

14   please.

15   A.    Good morning.  My name is Robert Stipka.

16   Q.    What is your occupation, your job?

17   A.    I am a horse trainer.  I perform -- live perform

18   with horses in shows, and I am the head of the horse

19   department.

20   Q.    Where are you employed?

21   A.    Feld Entertainment.

22   Q.    So you're head of the horse department at Feld?

23   A.    Yes, and the Ringling Bros. Circus.

24   Q.    Do you work on a particular unit of the Ringling

25   Bros. Circus?

1    A.    Yes.  The red unit.

2    Q.    How long have you been employed by Feld?

3    A.    Since February 2012.

4    Q.    You train horses for Ringling?

5    A.    Yes.

6    Q.    Do you present acts in the circus for Ringling?

7    A.    Yes.

8    Q.    What acts do you present in the circus?

9    A.    Liberty horse act.

10   Q.    Could you just tell the jury briefly what a

11   liberty horse act is.

12   A.    The horse trainer takes a certain number of horses

13   and performs a certain number of tricks, and there is

14   absolutely no physical contact between the trainer and

15   the horse.

16   Q.    Is the training all done by voice command or

17   signals?

18   A.    Yes.

19   Q.    Now, the process of learning to perform and do

20   tricks in the circus, is that a skill that you learn in

21   school?

22   A.    No.

23   Q.    Are you aware of any school in the world that

24   teaches people how to become horse trainers for circus

25   animals?

1   **A.**    No.

2   **Q.**    How, in your experience, do people learn these

3   types of skills?

4   **A.**    In circus, it's usually passed over from

5   generation to generation, from grandfather to father and

6   father to son.

7   **Q.**    How long have you been involved in the circus

8   industry?

9   **A.**    My whole life.

10  **Q.**    Do you come from a circus family?

11  **A.**    Yes.  I am the seventh generation.

12  **Q.**    Does your family have a history of training horses

13  for circus -- circuses?

14  **A.**    Yes, we do.

15  **Q.**    From whom did you learn to become a horse trainer?

16  **A.**    My grandfather and my father.

17  **Q.**    Can you give us just a general sense of your

18  father and your grandfather's background in training

19  horses.

20  **A.**    Yes, sir.  It was actually the same from

21  generation to generation.  My grandfather learned from

22  his father.  And for his whole life, my grandfather was

23  a government employee.

24  **Q.**    Does that mean your grandfather worked for a

25  State-owned circus?

1  **A.**    Yes.

2  **Q.**    Did you work with your father and your grandfather

3  in some of these jobs that he worked on?

4  **A.**    I only worked with my father.

5  **Q.**    In which circus productions did you work on with

6  your father?

7  **A.**    I worked with my father in the Czech National

8  Circus.  That's when I was a little boy.  Then when I

9  grew up, I worked with my father in the Hungarian

10 National Circus.  Then I also helped my father to

11 provide private lessons for horses and trained private

12 horses.

13 **Q.**    When you worked with your father on these

14 assignments you just talked about, did your father pay

15 you for that?

16 **A.**    Yes, he paid me.

17 **Q.**    So who had the contracts in that situation, you or

18 your father?

19 **A.**    When I worked with my father, it was my father who

20 had the contract.

21 **Q.**    As well as learning from your father, have you had

22 the opportunity to discuss horse training and horse

23 training specifically in the circus environment with

24 other people who do that type of work?

25 **A.**    Yes.  I do have a number of friends in Europe who

1    are experts in their areas, and we often discuss

2    problems and issues that happen during training.

3    Q.    Does part of the process of you becoming a horse

4    trainer come from discussions with your peers and

5    colleagues?

6    A.    Yes, it can be stated that way.

7    Q.    Where did most of your training take place,

8    meaning what country or continent?

9    A.    Mostly at home in Europe.

10   Q.    Do you hold any certificates or license --

11   licenses from the Czech Republic?

12   A.    Yes.  I do have a horse transport license, and I

13   have a certificate for horse nourishment and physiology.

14   Q.    I think I neglected to ask this earlier.

15         What's your home country?

16   A.    Czech Republic.

17   Q.    And how would are you?

18   A.    I'm 29 years old.

19   Q.    How old were you when you presented your first act

20   in the Czech Republic?

21   A.    I was 12 years old.

22   Q.    Have you been involved in presenting and training

23   horses since that time?

24   A.    Yes.

25   Q.    Have you worked for circuses other than Ringling?

1   A.   Yes.

2   Q.   What other circuses have you worked for?

3        THE COURT:  You --

4        Go ahead.  I'm sorry.

5        THE WITNESS:  I worked in the Czech National

6   Circus with my father, then I worked in the Hungarian

7   National Circus together with my father and then later

8   on my own.  I also worked in the Coronas Circus and in

9   the Louis Knie Circus.

10       THE COURT:  You indicated that you had held

11  two certificates from the Czech Government in horse

12  transport and horse physiology and that sort of thing.

13       Does the Czech Government issue any

14  certificates for horse training or circus performances?

15       THE WITNESS:  No.

16       THE COURT:  Next question.

17  BY ATTORNEY PORTER:

18  Q.   Do you hold all the certificates that relate to

19  horse training that the Czech Republic offers?

20  A.   The Czech Republic does not offer any certificates

21  for horse training for circus environment.

22  Q.   Have you won any awards for training horses?

23  A.   Yes.  I was a member of a group that won the

24  highest award, the Golden Clown, in Monte Carlo, and

25  that group performed horseback acrobatics.

1    **Q.**    That was an award that you won as part of a group?

2    Is that what I understand you to have said?

3    **A.**    Yes.

4    **Q.**    Have you been involving in training horses for

5    entertainment events other than circuses?

6    **A.**    Yes.  We did train our private horses for several

7    movies.

8    **Q.**    Have you ever taught other people how to train

9    horses?

10   **A.**    Yes.

11   **Q.**    How many horses do you think you've trained over

12   the course of your career?

13   **A.**    About 50.

14   **Q.**    Does any part of that training involve acclimating

15   a horse to a circus environment?

16   **A.**    Yes, definitely.

17   **Q.**    Mr. Stipka today, I'm going to ask you your

18   opinion on a number of topics.

19                  Of the opinions I ask you, do you hold them

20   to a reasonable degree of professional certainty?

21   **A.**    Yes.

22                  THE COURT:  Now, at this point, ladies and

23   gentlemen, ordinarily witnesses are not permitted to

24   offer their opinions as to matters.  However, an

25   exception to that is persons who by dint of their

1    experience or training have specialized knowledge in a

2    particular area.  Those persons are permitted to offer

3    their opinions on certain matters.

4              However, the extent to which you accept

5    their opinions and the extent to which you accept the

6    witness as an expert in those areas are matters left

7    entirely to you.  All I'm doing is allowing him to offer

8    his opinions.

9              Yes.

10             ATTORNEY PIERCE:  Your Honor, I believe it

11   would be appropriate for me to renew my objection from

12   last night.

13             THE COURT:  Yes, under Daubert.  And I ruled

14   on that.

15             All right.  Let's proceed.

16             Now, if you ask him to give opinions on the

17   basis of facts, you need to set out those facts.

18             ATTORNEY PORTER:  Yes, sir.

19             THE COURT:  All right.  Proceed.

20   BY ATTORNEY PORTER:

21   Q.    Prior to this case, were you aware of the Donnert

22   family?

23   A.    I knew the family, but I don't know specifically

24   these gentlemen.

25             THE COURT:  All right.  Before -- let me ask

1    so that it's clear.

2              Well, you can establish.  He doesn't know --

3    he was not involved in the facts of this case.

4              ATTORNEY PORTER:  That's what I was going to

5    ask him next, yes, sir.

6              THE COURT:  He was not personally present or

7    involved in the facts.  And the questions you're going

8    to ask will be hypotheticals based on facts.

9              ATTORNEY PORTER:  Yes, sir.

10             THE COURT:  All right.  Proceed.

11   BY ATTORNEY PORTER:

12   Q.   You don't have any personal knowledge of the facts

13   in this case; correct?

14             THE COURT:  Do you have any personal

15   knowledge?

16   BY ATTORNEY PORTER:

17   Q.   Do you have any personal knowledge of the facts in

18   this case?

19   A.   No.

20   Q.   Were you employed by Feld in 2010 and 2011?

21   A.   No.

22   Q.   Generally, if you could, describe for the jury the

23   facts upon which the opinions you're going to give today

24   are based.

25             THE COURT:  You state the facts, and he

1    opines on the facts.  You set the hypothetical.

2                ATTORNEY PORTER:  Okay.

3    BY ATTORNEY PORTER:

4    Q.   Mr. Stipka, I want to give you a series of facts

5    upon which I ask you to base your opinions here today.

6    I want you to assume that the Donnerts were hired by the

7    circus and they were to perform two acts, a juggling act

8    and a comedy act.  The issue in this case has to do with

9    the comedy act and Cornbread, the horse Cornbread.

10               THE COURT:  Just a moment.

11               THE INTERPRETER:  That was too fast.  Can

12   you please go back to the brothers were hired.

13               ATTORNEY PORTER:  Yes, ma'am.

14   BY ATTORNEY PORTER:

15   Q.   The Donnerts were hired by the circus, Ringling

16   Bros., to perform two acts, a juggling and a comedy act.

17   The hypotheticals I'm going to ask you about today

18   relate to the comedy act.  The Donnerts were on one unit

19   of the circus, then they were transferred to the red

20   unit.  They went to winter quarters with the red unit.

21   The original show order had the comedy horse doing a

22   series of passes throughout the show.  And in Part 2 of

23   the show, Act 2 of the show, one of the passes had the

24   comedy horse going by a tiger cage and then performing.

25   And then the heart of the act was performed at another

1   time.

2              And then the order of the show was changed

3   such that the pass that came after the tiger act was

4   combined with the body of the act and performed

5   sequentially.  The horse Cornbread had trouble laying

6   down towards the end of the routine.  And Cornbread

7   started to have trouble lying down after the order of

8   the show had been changed.

9              Do you understand those facts that I've

10  described to you?

11  **A.**    Yes.

12             THE COURT:  You want To also ask him whether

13  he's seen --

14             ATTORNEY PORTER:  That was my next question.

15             THE COURT:  All right.  Go on.

16  BY ATTORNEY PORTER:

17  **Q.**    And also, in forming your opinions that you'll

18  give today, have you seen videos of performances that

19  Cornbread did during winter quarters in December of

20  2010?

21  **A.**    Yes.

22  **Q.**    Apart from lying down at the end of the

23  performance, in your opinion did Cornbread have any

24  other troubles performing the act?

25             ATTORNEY PIERCE:  Objection; foundation,

1    your Honor.

2              THE COURT:  Overruled.

3              THE WITNESS:  No.

4    BY ATTORNEY PORTER:

5    Q.    Do you know how long the comedy act ran?

6    A.    If I recall correctly, about six minutes.

7    Q.    And do you recall when the horse and the comedy

8    routine actually did the trick where it laid down on the

9    ground?

10   A.    Yes.

11   Q.    Now, this factual background that we've talked

12   today -- talked about this morning, where did you learn

13   that?

14   A.    From Mr. Porter.

15   Q.    From me?

16   A.    Yes.

17   Q.    Okay.  If you will, if you could just explain to

18   the jury, what's the general process in training a horse

19   to perform in a circus?

20   A.    At first, you need to train the horse to know the

21   act, to master the performance.  And once the horse

22   knows how to do that, you start getting him used to all

23   the environmental effects that he will be exposed to in

24   a circus.  That means you start with music.  Then when

25   the horse is comfortable, you add lights and other

1   effects.  And so it's a gradual process of getting the

2   horse used to the circus environment.

3   Q.    So the first part is -- do I understand that the

4   first part is technically teaching the horse how to do

5   the trick or the performance that it's going to give?

6   A.    Yes, that's the first part.

7   Q.    And then the second part -- is the second part

8   acclimating the horse to the circus environment?

9   A.    Yes.

10  Q.    Now, once a horse learns a trick and becomes

11  acclimated to a circus environment, is the training

12  over?

13  A.    No.  It's the same as with athletes.  Athletes

14  have to train for their whole life, and the same applies

15  for horses.  They need to be trained permanently.

16  Q.    The training you've just described, is that the

17  training that goes into training a new horse for a

18  circus environment?

19  A.    Yes.

20  Q.    Do you understand -- do you know whether or not

21  Cornbread had any prior experience performing in a

22  circus before he came to Feld?

23  A.    Yes, I do know.

24  Q.    What do you know?

25  A.    I know that Cornbread performed in a circus for

1    several years with his previous owner.

2    **Q.**    Now, in your opinion, is it common for a horse who

3    performs in a circus to get distracted or nervous from

4    the circus environment?

5    **A.**    Yes, it happens.

6    **Q.**    What types of things in a circus environment can

7    make a horse nervous or distracted?

8    **A.**    It is a number of factors.  Generally, the same

9    that apply to acclimatization of horse.  It can be music

10   or lights or effects or it may be a human error of

11   somebody who did something differently than the horse is

12   used to or it can be even little battery lights that the

13   audience has.

14   BY ATTORNEY PORTER:

15   **Q.**    When an issue such as a distraction or nervousness

16   arises, how is something like that addressed by a circus

17   trainer?

18   **A.**    Repeated training, repeated performance, and also

19   the trainer tried to save the situation during the

20   performance itself when it happened.

21   **Q.**    The plaintiffs, the Donnerts, have taken the

22   position in this case that Cornbread stopped performing

23   because he was scared from the sound of a tiger cage

24   that was being taken apart and from the scent of tigers.

25   They also take the position that the failure to perform

1    had to deal with the change in the show order.

2              Based on the facts of this case as you

3    understand them to be and the videos that you have

4    watched, do you agree with the plaintiffs' conclusions?

5    **A.**    I disagree.

6    **Q.**    In your opinion, do you think that the fact that a

7    circus horse may become nervous from the sound of a

8    tiger cage strike or any other sound is a problem that

9    can't be solved?

10   **A.**    Yes, it definitely can be solved.

11   **Q.**    What steps can be taken to solve a problem of that

12   type?

13   **A.**    It has to be solved by repeated training with the

14   same disturbance that happened during the performance.

15   It means you have to train the horse and to produce the

16   same tiger cage noises and try to calm to the horse and

17   try to explain to the horse that it's no problem.

18   **Q.**    What if the stage crew could be instructed to take

19   the tiger cage down in a quieter fashion?  In your

20   opinion, would that help the situation?

21   **A.**     It could be probably tried.  But if the horse is

22   scared of the engine noise, because the cage is put up

23   by an engine, then it still has to be trained with the

24   horse and the engine sound.

25   **Q.**    Is that an issue that, in your opinion, can be

1    solved as well?

2    **A.**    Yes, definitely.

3    **Q.**    Based on the facts, as you understand them, and

4    the videos that you have observed, in your opinion, did

5    the sound made from the tiger cage strike cause

6    Cornbread to become nervous or have any impact on his

7    performance?

8               ATTORNEY PIERCE:  Objection.

9               THE COURT:  What's the objection?

10               Stand when you make an objection.  Yes,

11    Mr. Pierce?

12               ATTORNEY PIERCE:  All he knows about the

13    case is what he was told by Mr. Porter and some videos

14    that you can't see anything on.

15               THE COURT:  All right.  I'll overrule the

16    objection, but you can certainly bring out that he knows

17    what this sounds like.  He's in the red --

18               Go ahead.

19               ATTORNEY PORTER:  Right.

20    BY ATTORNEY PORTER:

21    **Q.**    Sir, do you perform on the red unit?

22    **A.**    Yes.

23    **Q.**    Are you familiar with the tiger cage setup on the

24    red unit?

25    **A.**    Yes.

1    Q.    Have you been around it when it's been either set

2    up or taken down?

3    A.    Yes.  I was there several times.

4    Q.    Are you familiar with the sound -- the sounds that

5    are made when the tiger cage is set up and taken down?

6    A.    Yes.

7    Q.    Is the opinion that you just gave based, in part,

8    on your knowledge of the sound that a tiger cage makes

9    when it's taken apart?

10   A.    Yes.

11   Q.    Based on your review of the rehearsal videos that

12   you've seen, did you observe Cornbread exhibit any

13   behavior on those videos that suggests to you, in your

14   opinion, that safety was ever an issue as part of that

15   routine?

16   A.    No.

17   Q.    Just talking about the videos for a moment, how

18   many videos of the performances have you seen?

19   A.    I think it was four.

20   Q.    In the videos that you saw, can you see the tiger

21   cage going up and down?

22   A.    Yes.

23   Q.    Can you see the horse performing?

24   A.    Yes.

25   Q.    Where does the comedy act take place in relation

1    to where the tiger cage is being taken down?

2    **A.**    The comedy horse act is performed in Ring No. 1,

3    and the tiger cage is in Ring No. 2.

4    **Q.**    Let's talk just a bit about the scent of the

5    tigers and on the same topic with the videos.

6              In the videos that you watched, where are

7    the tigers when Cornbread begins to perform both the

8    Donnert pass and the comedy act?

9    **A.**    They were in transport carts, and they were being

10   taken out.

11   **Q.**    Being taken out as -- were the tiger cages being

12   taken out as Cornbread was entering the ring for the

13   first time?

14   **A.**    Yes.

15   **Q.**    Were the tigers completely out of the arena before

16   the Donnert pass started?

17   **A.**    They were in the transport carts, and they were

18   being taken out.  They were not totally out.

19   **Q.**    That's as the horse enters the arena?

20   **A.**    Yes.

21   **Q.**    The Donnerts have taken the position in this case

22   that a comedy act shouldn't follow a tiger act and that

23   to do so is unsafe.

24              Do you agree with that conclusion?

25   **A.**    No.

1    Q.     In your opinion, is there anything inherently

2    unsafe about a horse act following a tiger act?

3    A.     No.

4    Q.     In your experience, are there any industry

5    standards that say a horse act should never follow a

6    tiger act?

7    A.     No.

8    Q.     Are you aware of any instances when horses and

9    tigers actually perform in the same ring?

10   A.     Yes, definitely.  In Europe, it's a matter of

11   course because we only have one ring.

12   Q.     And have you actually seen tigers and horses in

13   the same ring?  Are you aware -- let me strike that and

14   ask one question instead of a compound one.

15          Are you aware of situations where tigers and

16   horses have performed together in the same ring?

17   A.     Yes.

18   Q.     But that's not what was happening in this case; is

19   that right?

20   A.     That's correct.

21   Q.     In your expert opinion, is training a horse to

22   overcome a fear of a scent of a tiger any different than

23   training a horse to overcome any other issue that a

24   horse may have in a circus?

25   A.     No, it's no difference.

1    **Q.**    Do you have any experience training horses in the

2    same ring where tigers have been previously?

3    **A.**    Yes.

4    **Q.**    Have you ever trained a horse in the same ring

5    right after tigers have left?

6    **A.**    Yes.

7    **Q.**    Have you experienced any problems with horses

8    training in that same ring after tigers have left the

9    ring?

10   **A.**    No.

11   **Q.**    Do you know if in Cornbread's pass he had any

12   experience performing in the same ring that another cat

13   act had performed?

14   **A.**    Yes.  In the gold unit.

15   **Q.**    What other cat, if you know, did Cornbread perform

16   not at the same time, but either after or before?

17              ATTORNEY PIERCE:  Objection.

18              THE COURT:  Yes.  Just a moment.

19              ATTORNEY PIERCE:  Given that all he knows

20   about these prior events comes from counsel, counsel is

21   now testifying through his own witnesses.  I object to

22   that.

23              THE COURT:  I don't -- I'm not I understand

24   what -- tell me what you mean, Mr. Pierce.

25              Do you need to come to the bench?

1          ATTORNEY PIERCE:  I don't think so, your

2     Honor.

3          THE COURT:  All right.  Go on.

4          ATTORNEY PIERCE:  Mr. Stipka has indicated

5     all he knows about this case is what he was told by

6     Mr. Porter and watching the videos.  Obviously, any

7     testimony he give now is going to come from Mr. Porter.

8     So Mr. Porter is now asking his witness to tell him what

9     he was told by Mr. Porter.

10          THE COURT:  No, I don't think that's what

11     you were doing, Mr. Porter.

12          Did you tell him about cats and Cornbread?

13          ATTORNEY PORTER:  I think that he does

14     know -- maybe the point is a fair one, that he does know

15     from me that Cornbread performed on another Ringling

16     circus unit in the same ring as -- not at the same time,

17     as another cat.  So perhaps I can ask it in another way.

18          THE COURT:  Then that would be hearsay in

19     that you can -- but you don't have other evidence in the

20     record of that, so you'll have to move on.

21          ATTORNEY PORTER:  Yes.  That's fine.  I was

22     going to ask it as a predicate to his factual

23     conclusions in the case.

24          THE COURT:  All right.  Go on.

25     BY ATTORNEY PORTER:

1    **Q.**   In the facts that you're aware of that form your

2    opinions about Cornbread and how Cornbread performed in

3    the red unit, did you become aware of instances in which

4    Cornbread performed in the same ring, not at the same

5    time, as another big cat?

6          ATTORNEY PIERCE:  Same objection.

7          THE COURT:  I think it is, Mr. Porter,

8    because that evidence isn't otherwise in the record

9    except through you.

10          ATTORNEY PORTER:  That's fine.  I'll move

11    on.

12          THE COURT:  So I'll sustain the objection.

13    Let's move on.

14    BY ATTORNEY PORTER:

15    **Q.**   Now, in this case, was Cornbread performing in the

16    same ring as the tiger act?

17    **A.**   No.

18    **Q.**   Was Cornbread performing at the same time as the

19    tiger act?

20    **A.**   No.

21    **Q.**   In the videos that you watched, in your opinion,

22    did Cornbread show any signs of fear as the horse came

23    into the ring by the tiger cage transports?

24          ATTORNEY PIERCE:  Objection; foundation.

25          THE COURT:  Overruled.

1          THE WITNESS:  No, I did not observe any

2    fear.

3    BY ATTORNEY PORTER:

4    Q.     To the extent that Cornbread or another horse has

5    a fear of tigers, is that an issue that, in your

6    opinion, can be addressed by a trainer?

7          THE INTERPRETER:  Your Honor, may I have

8    this question repeated, please.

9          THE COURT:  Yes.  Repeat it, Mr. Porter.

10          ATTORNEY PORTER:  Yes, sir.

11    BY ATTORNEY PORTER:

12    Q.     To the extent Cornbread or some other horse

13    displays some fear of tigers, is that the type of issue

14    that can be addressed by a trainer?

15    A.     Yes, definitely.

16    Q.     How could an issue like that be addressed?

17    A.     As I explained before, training is the only way.

18    I would solve the situation by taking the horse in the

19    vicinity of the tigers and let him smell the tigers and

20    see that nothing is going on and that everything is

21    okay.

22    Q.     In your expert opinion, can a horse act

23    successfully follow a tiger act?

24    A.     Yes.

25    Q.     We've talked about the issue that Cornbread had,

1    which is that it had trouble lying down at the end of

2    the act.

3              In your opinion, if a horse won't lie down,

4    does that mean there's a safety issue?

5    A.    No.

6    Q.    In your opinion, if a horse won't lie down, does

7    that mean that they're scared or afraid?

8    A.    Yes, the horse may be afraid.

9    Q.    What -- could there be other reasons why a horse

10   won't lie down or has trouble lying down?

11   A.    It could be medical reasons.

12             THE COURT:  Well, are you going to cover --

13   I think the horse would lay down, but it would get up

14   prematurely.

15             Is that what the testimony was?

16             ATTORNEY PORTER:  I think it was -- my

17   recollection --

18             THE COURT:  You may ask about both, then.

19             ATTORNEY PORTER:  Yes.

20   BY ATTORNEY PORTER:

21   Q.    If the horse either won't lie down or pops up when

22   it's down, does that necessarily mean that the horse is

23   afraid?

24   A.    No.

25   Q.    Could there be other reasons why a horse either

1   won't lie down or pops up after it's been down?

2   **A.**   Yeah.  It can be just reasons on the side of the

3   horse.  He just may not want to lie down.

4   **Q.**   Do you mean that a horse could be stubborn or

5   something like that?

6   **A.**   Yes, definitely.

7   **Q.**   Is that something that happens with animals?

8   **A.**   Yes, on an everyday basis.

9   **Q.**   What about the fact that a horse hasn't performed

10  in a period of time?  Could that, in your opinion,

11  create an issue where a horse has trouble either lying

12  down or popping up after it's been down?

13  **A.**   Yes, definitely.

14  **Q.**   In this case, Cornbread was injured in September

15  of 2010 and didn't rehearse or train again until winter

16  quarters in November or December.

17          Could a lag of time like that, in your

18  opinion, cause a horse to have trouble performing an

19  element of his routine?

20  **A.**   Yes.

21  **Q.**   What about the fact that a horse has not performed

22  before a live audience in a period of time?

23  **A.**   That also can be a problem.

24          THE COURT:  Can those problems be solved?

25          THE WITNESS:  Yes, definitely.

1          THE COURT:  Next --

2          How?

3          THE WITNESS:  Training and -- repeated

4    training.  And also during that live performance, you

5    need to try to save the situation.

6    BY ATTORNEY PORTER:

7    Q.    Is it -- let's talk about that for a moment.  Is

8    it possible for a trainer to train an animal in a live

9    performance?

10   A.    Not train, but correct.

11   Q.    Is it common to have an animal perform one way in

12   practice and a different way in a live performance?

13   A.    Yes.

14   Q.    In your opinion, what could be the cause for

15   something like that?

16   A.    Horses are very intelligent animals.  So they

17   know -- they can distinguish between training and live

18   performance.  So in training, they know they have more

19   time.  They can repeat the routine.  But they also know

20   that when it's live performance, they only have limited

21   amount of time.

22   Q.    What about the fact that a horse may defecate

23   during a performance?  In your opinion, does that mean

24   that there's a safety issue?

25   A.    No.

1   Q.    In your experience, is it common for circus

2   animals to defecate in a performance?

3             THE COURT:  Rather than circus animals,

4   we're only interested in horses.

5             ATTORNEY PORTER:  That's true.  You're

6   right.

7             THE COURT:  So ask your question again --

8             ATTORNEY PORTER:  Yes, sir.

9             THE COURT:  -- with just horses.

10  BY ATTORNEY PORTER:

11  Q.    In your experience, have you seen situations where

12  horses defecate during a circus performance?

13  A.    Yes.  I have the same problem.

14  Q.    In your opinion, do horses have instinctual fears?

15  A.    Yes.

16  Q.    What types of instinctual fears do you think

17  horses have?

18  A.    As I mentioned before, all kinds of noises, loud

19  noises or just less noises.  They have instinctive fears

20  of those.

21  Q.    Do they have instinctual fear of other animals as

22  well?

23  A.    Yes, they can.

24  Q.    In your opinion, are those types of instinctual

25  fears things that can be overcome through training?

1   **A.**   Yes.

2   **Q.**   In your expert opinion, did you see any safety

3   issue with respect to the comedy act following the tiger

4   act in this situation?

5   **A.**   No.

6   **Q.**   Based on what you've learned from me and what

7   you've observed in the videotapes, what does the fact

8   that Cornbread had trouble lying down or popped up

9   occasionally during the end of the routine suggest to

10   you?

11   **A.**   I did not see any safety issues or any anxiety in

12   the horse.  In my opinion, the horse just was stubborn,

13   just did not want to lie down.

14   **Q.**   Do you think that's the type of issues that can be

15   solved by a trainer?

16   **A.**   Yes.

17   **Q.**   In your opinion, based on what you've heard from

18   me and seen in the videotapes, did you see anything that

19   suggested to you that the show order should be changed?

20                ATTORNEY PIERCE:  Objection.

21                THE COURT:  I'll sustain that.

22                "What you've heard from me" is a bit broad.

23                ATTORNEY PORTER:  I was trying to address

24   Mr. Pierce's objection.

25                THE COURT:  It doesn't matter what you were

1    trying to do.

2              ATTORNEY PORTER:  I understand.

3    BY ATTORNEY PORTER:

4    Q.    Do you think any of the issues that you observed

5    Cornbread having necessitated any change in the show

6    order?

7    A.    No.

8              ATTORNEY PORTER:  Thank you, Mr. Stipka.

9    Those are my questions, sir.

10                   CROSS-EXAMINATION

11   BY ATTORNEY PIERCE:

12   Q.    Good morning, Mr. Stipka.

13   A.    Good morning.

14   Q.    Now, you first started working on your own when

15   you were 22 years old; correct?

16   A.    Yes.

17   Q.    That was in the Year 2007, six years ago; correct?

18   A.    Yes.

19   Q.    And it's only in that six-year time span that

20   you've been actually getting contracts or work on your

21   own; correct?

22   A.    Yes.

23   Q.    When you came to this country to work for

24   Ringling, this was the first time you've actually been

25   in the U.S.; correct?

1    **A.**    No.  I was invited here before last year to see

2    Ringling and to know what it was all about.

3    **Q.**    Before you got hired to Ringling, you visited with

4    them.

5              Is that what you're saying?

6    **A.**    Yes.

7    **Q.**    And your current employment relationship with

8    Ringling is a two-year long-term contract; correct?

9    **A.**    Yes.

10   **Q.**    And they --

11             THE COURT:  If it's two years, I don't

12   know -- what do you mean by -- how long is the contract

13   you have with Ringling Bros.

14             THE WITNESS:  For two years.

15             THE COURT:  So it doesn't go beyond two

16   years.

17             THE WITNESS:  There is an option to extend

18   the contract.

19             THE COURT:  Next question.

20   BY ATTORNEY PIERCE:

21   **Q.**    And that option runs out for an additional eight

22   years making a total of ten years of employment with

23   Ringling.

24   **A.**    I'm not exactly sure about the number.  It may be

25   six or eight years.

1    Q.    In your country of Czechoslovakia, there is a

2    well-known saying that goes like this:  "Whose bread I

3    eat, his song I sing"; correct?

4            ATTORNEY PORTER:  Objection; argumentative.

5            THE COURT:  I'll permit it.

6            THE WITNESS:  Yes.

7    BY ATTORNEY PIERCE:

8    Q.    And the purpose of that saying in your country is

9    that if you work for somebody, you're going to support

10   them; correct?

11   A.    Yes.

12   Q.    It's also true, Mr. Stipka, that you have never

13   trained any horse to overcome a fear of tigers; is that

14   correct?

15   A.    That is correct.

16   Q.    You have never trained a comedy horse; correct?

17   A.    That's correct.

18   Q.    Sir, you also dropped out of formal schooling in

19   the 9th grade; correct?

20   A.    Yes.  I completed mandatory nine years, and then I

21   started to study at the high school.  But I had to drop

22   out after two years because I was unable to attend due

23   to my work.

24   Q.    And these certifications that you talked about

25   getting in your home country, that was a three-week

1      course involving 120 study hours; correct?

2      A.     That's correct.

3      Q.     When Mr. Porter asked you just now whether there

4      were any standards that supported one of your opinions,

5      it's true that there are no standards whatsoever that

6      govern horse training; correct?

7                    THE COURT:  You're talking about standards

8      issued by an agency or government?

9                    ATTORNEY PIERCE:  Anyone.  I don't think

10     it's going to change his answer, as I understand it.

11                   THE COURT:  Well, we'll see.  I'm not sure.

12                   THE WITNESS:  There are no standards.

13                   THE COURT:  Do you personally have standards

14     in the work that you do?

15                   THE WITNESS:  Yes, definitely.

16                   THE COURT:  Next question.

17     BY ATTORNEY PIERCE:

18     Q.     It's also true, is it not, Mr. Stipka, there's no

19     place that you can go to like a school or a library or

20     any other place to get authoritative answers on how to

21     train horses.

22     A.     That is correct.  There is no public institution

23     like that.

24     Q.     And you talked a little bit about some time you

25     spent at the Hungarian Circus school.

1              It's true, is it not, that your father had

2     held a position there, he became injured, and you took

3     over training of his trained horses?  Correct?

4     **A.**    That is not accurate.  The situation was that my

5     father worked for the Hungarian State Circus.  I worked

6     with him.  And then there was a disagreement between him

7     and the circus director, so my father ended his

8     employment.  And later on, I came back to the circus and

9     I trained the horses.  There were a few of those horses

10    that I trained together with my father, but there were

11    also many new horses that were purchased after that.

12    **Q.**    As you understand it, Mr. Stipka, your purpose

13    today is to tell the jury how you personally train

14    horses; correct?

15              ATTORNEY PORTER:  I object, your Honor.  I

16    think he's qualified.

17              You want me to wait?

18              THE COURT:  What's your objection.

19              ATTORNEY PORTER:  He's been qualified as an

20    expert.  He's not here to talk about him personally.

21    He's here to talk about, in his expert opinion, what he

22    understands the standard is in the industry.

23              THE COURT:  I'll permit it.  Go ahead.

24    Overruled.

25              THE INTERPRETER:  Can that question be

1    repeated for Mr. Stipka, please.

2              THE COURT:  Yes.  Repeat the question.

3    BY ATTORNEY PIERCE:

4    Q.    Mr. Stipka, as you understand it, your purpose

5    today is to explain to the jury how you personally train

6    horses.

7    A.    Yes.

8    Q.    So what you're doing today is telling us the

9    Robert Stipka way of training.

10   A.    Yes, as the Stipka family trained horses.

11   Q.    There's a lot of other families in the horse

12   training business, aren't there?

13   A.    Yes.

14   Q.    Do they all agree on every last detail?

15   A.    This is a question that is really difficult to

16   answer.  They may not agree; they may agree.

17             THE COURT:  Are there general rules of horse

18   training, in your experience, that would apply to all

19   horse trainers who are trying to train horses for a

20   circus?

21             THE WITNESS:  I would say the rules are

22   generally the same.  There are different systems.

23   Everybody has slightly different system, but there must

24   be a system.

25             THE COURT:  Next question.

BY ATTORNEY PIERCE:

**Q.**    Now, Mr. Stipka, you have testified as to whether there were any safety issues, and I now want to ask you some questions about that testimony.

You've agreed that you were not physically present at any time when Cornbread was exhibiting the changes in its behavior; correct?

THE COURT:  I think the proper question is -- because you're testifying about changes in behavior.  I think the question is, "You were not present during any of the rehearsals or performances?"

ATTORNEY PIERCE:  I'll state that, your Honor.

THE COURT:  Go ahead.

BY ATTORNEY PIERCE:

**Q.**    You would agree, Mr. Stipka, that you were not present during any of the practices or rehearsals that Cornbread was having in the latter part of December 2010.

**A.**    That's correct, I was not present.

**Q.**    And the only thing that you know is what you were told by Mr. Porter, and you say there were four of the videos that you watched; correct?

**A.**    Yes.

**Q.**    And which of the four videos did you watch?

1          THE COURT:  I thought he said he watched

2    four videos.

3          ATTORNEY PIERCE:  I thought he said he

4    watched four videos as well.  I thought that was the

5    question.

6          THE COURT:  Well, the question is which of

7    the four videos.  I thought he watched four.

8          Is that correct?

9          ATTORNEY PIERCE:  I thought he said that as

10   well.  I was trying to get the dates of them.

11         THE COURT:  I think there might be some

12   confusion.  If someone says, "I watched four videos" and

13   you say, "Which ones did you watch?" how do you expect

14   him to designate which among the four?

15         So the first question is did you watch four

16   videos?

17         THE WITNESS:  Yes.

18         THE COURT:  And what did these video depict?

19         THE WITNESS:  The comical horse act of

20   Cornbread.

21         THE COURT:  And were they four distinct

22   performances?

23         THE WITNESS:  Yes.

24         THE COURT:  And do you know the dates of

25   those?

1          THE WITNESS:  It was approximately at the

2     beginning of December, but I do not recall exact date.

3          THE COURT:  All right.  He watched four

4     videos that were in December, and they were of the

5     performance of Cornbread.

6          Next question.

7     BY ATTORNEY PIERCE:

8     Q.   And how many of those videos were before the order

9     changed?

10    A.   I'm not exactly sure, but I think I saw one before

11    the change and three after the change.  But I'm not a

12    hundred percent sure about that.

13    Q.   The reason why you're not sure is because you're

14    not sure when the show order changed?

15    A.   The main reason is I saw the video several months

16    ago, so I do not exactly recall.

17    Q.   And the three videos that you may have seen after

18    the show order changed, were they all in dark so that

19    you couldn't see the teardown of the tiger cage?

20    A.   It was dark, but I did see that.

21    Q.   And the floodlights that were shining on the area

22    where Cornbread was performing, you found that you

23    really couldn't see anything that was going on during

24    the performance of Cornbread --

25         THE COURT:  Now you're testifying and not

1  leading.  You've gone from leading to testifying.

2  BY ATTORNEY PIERCE:

3  Q.   Mr. Stipka, it's true, is it not, in those three

4  videos that you may have watched after the show order

5  changed, that you were not able to see any of the

6  details of Cornbread's performance; correct?

7  A.   Yes, the visibility was not that good.

8         THE COURT:  I didn't hear the answer.

9         What was the answer?

10         THE WITNESS:  The visibility was not that

11  good.

12         THE COURT:  All right.  Next question.

13  BY ATTORNEY PIERCE:

14  Q.   Does it bother you as an expert witness that

15  you're relying on what you were told by Mr. Porter?

16  A.   No, it does not bother me.

17  Q.   Do you know who Tabayara Maluenda is?

18  A.   Yes.

19  Q.   You work with him on the red unit; correct?

20  A.   Yes.

21  Q.   You're aware that he had responsibility for animal

22  safety at the time of this incident in December of 2010?

23         ATTORNEY PORTER:  Objection.  There's been

24  no evidence of that.

25         THE COURT:  Has there been, Mr. Pierce?

1          ATTORNEY PIERCE:  I believe that there has,

2      your Honor.  And it's in the contract.  The addendum

3      refers to our responsibility to work under Mr. Tabayara.

4          THE COURT:  This name.

5          What's the name, Mr. Pierce?

6          ATTORNEY PIERCE:  Tabayara Maluenda is

7      mentioned by name in the addendum, our Exhibit 39.

8          THE COURT:  I have it in front of me.

9          What paragraph?

10          ATTORNEY PIERCE:  I have to look.

11          THE COURT:  It's three pages, Mr. Pierce.

12      It can't be that difficult to direct me to where his --

13      I see it in Paragraph 9.

14          ATTORNEY PIERCE:  That's right, your Honor.

15          THE COURT:  All right.  That paragraph

16      doesn't say anything about safety.  It talks about

17      training and daily husbandry; right?  Isn't that what it

18      says?  Training and daily husbandry of such animal

19      species.

20          ATTORNEY PIERCE:  As directed by Tabayara.

21          THE COURT:  It doesn't say anything about

22      safety, does it?

23          ATTORNEY PIERCE:  It says training.

24          THE COURT:  It doesn't say anything about

25      safety.

```
 1                What's the answer to my question?
 2                ATTORNEY PIERCE:  It doesn't say that word
 3      expressly.
 4                THE COURT:  So you put it in and you're
 5      testifying.
 6                So the objection is sustained.  You may ask
 7      him a question about this person, but don't imply things
 8      because that's you introducing evidence.  You had plenty
 9      of opportunity to ask other people.
10                Let's proceed.
11      BY ATTORNEY PIERCE:
12      Q.    Mr. Stipka, were you aware that Mr. Maluenda had
13      responsibilities for animal safety in December of 2010?
14                ATTORNEY PORTER:  Objection.  There's been
15      no evidence of that.
16                THE COURT:  Well, I'll let him answer.
17                THE WITNESS:  No, I'm not aware of that.
18                THE COURT:  Next question.
19      BY ATTORNEY PIERCE:
20      Q.    Did you make any attempt to interview anyone who
21      had worked for the red unit at the time that this
22      happened in December of 2010?
23                THE COURT:  At the time that what happened?
24                ATTORNEY PIERCE:  At the time of the
25      incident involving Cornbread in December.
```

```
1              THE COURT:  All right.

2              THE WITNESS:  No, I did not.

3              THE COURT:  Did you feel it was necessary?

4              THE WITNESS:  No.

5     BY ATTORNEY PIERCE:

6     Q.    Did anyone from Ringling pick up the phone and

7     call you and ask you for your assistance in December of

8     2010?

9              THE COURT:  He wasn't employed in December

10    of 2010.  I assume he was in Czech Republic.

11             Is that right, in 2010 you were in the Czech

12    Republic?

13             THE WITNESS:  I worked with Circus Louis

14    Knie.  So no, I was not in the Czech Republic.

15             THE COURT:  Where were you?

16             THE WITNESS:  In Austria.

17             THE COURT:  Next question.

18    BY ATTORNEY PIERCE:

19    Q.    And it's also your testimony, Mr. Stipka, that

20    Ringling didn't even know about you as an expert in

21    December of 2010; correct?

22             THE COURT:  What he would know about what

23    Ringling knew is not within his ken.  So I'll sustain an

24    objection that should have been made.  It's not -- how

25    could he possibly know what Ringling knew?
```

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          ATTORNEY PIERCE:  He testified to it at his

2    deposition, your Honor.

3          ATTORNEY PORTER:  I move to strike that as

4    inaccurate.

5          THE COURT:  It is stricken.  I'm sure the

6    jury has already disregarded it.

7          Let's complete this cross-examination.

8    BY ATTORNEY PIERCE:

9    Q.    Mr. Stipka, is it your understanding that the only

10   behavioral change that Cornbread exhibited in December

11   of 2010 was his refusal to lie down?

12   A.    Yes.

13   Q.    And given that --

14          THE COURT:  I'll point out, though, that he

15   also answered a hypothetical that included more than

16   that.  He answered a hypothetical that included lying

17   down and popping up.

18          So go ahead.

19   BY ATTORNEY PIERCE:

20   Q.    Given that the ability to see things on the video

21   was so flooded out by the floodlights, would you agree

22   that you were not able to see other characteristic signs

23   of fear that Cornbread may have been exhibiting at the

24   time?

25          ATTORNEY PORTER:  Objection; assumes that

1      they were there to see.

2                   THE COURT:  Overruled.

3                   THE WITNESS:  The visibility was not that

4      good, as I have already stated.  But the first reaction

5      of a scared horse is to run away.  And I did not see any

6      signs of the horse trying to run away -- away from the

7      light.

8                   THE COURT:  Is he finished?

9                   THE WITNESS:  Yes.

10                  THE COURT:  I believe what Mr. Pierce wants

11     to know is could you see on the video whether his

12     eyes -- whether the horse's eyes were wide open?

13                  THE WITNESS:  No, I couldn't see that on

14     that video.

15                  THE COURT:  Is that a sign of fear in a

16     horse?

17                  THE WITNESS:  Yes, it can be.

18                  THE COURT:  And were you able to see on the

19     video the horse's tail swishing?

20                  THE WITNESS:  Yes, I saw that.

21                  THE COURT:  And is that a sign of fear in a

22     horse?

23                  THE WITNESS:  I don't think it has to be a

24     sign of a fear.  Maybe some anxiety or nervousness.

25                  THE COURT:  Assuming that Cornbread had

1     wide-open eyes and had trouble lying down and popped up

2     when he wasn't supposed to pop up and also had his tail

3     swishing, assuming that these were signs of fear and

4     anxiety, could that be overcome by training, in your

5     opinion?

6                    THE WITNESS:  Yes.

7                    THE COURT:  Next question.

8     BY ATTORNEY PIERCE:

9     Q.    The circuses that you had mentioned working for in

10    the country (sic) of Europe have all been one-ring

11    circuses; correct?

12    A.    Yes.

13    Q.    Which means that your experience does not involve

14    in the country (sic) of Europe operating your act while

15    there's a tear-down going right beside you; correct?

16    A.    Yes, that's correct.

17    Q.    And in those situations where you testified that

18    your horses have followed tigers in the same ring,

19    that's a situation where the tigers have come in,

20    they've performed, they've left, and then your horses

21    come in without a teardown in the dark; correct?

22    A.    That's correct.

23    Q.    And in your background and experience, you have

24    not been involved in a circus that has had a tiger act

25    that goes dark on one ring, it's torn down in the dark

1    while a horse act is proceeding in a ring next to it in

2    floodlights; correct?

3    **A.**    I don't have this experience from Europe but I was

4    in the situation here.

5                 THE COURT:  In this country?

6                 THE WITNESS:  Yes, in the United States.

7                 THE COURT:  Next question.

8    BY ATTORNEY PIERCE:

9    **Q.**    Now, you would agree, would you not, Mr. Stipka,

10   that each and every horse is different when it comes to

11   the ability to train that animal?

12   **A.**    Yes.

13   **Q.**    Some are more readily frightened or excitable;

14   correct?

15   **A.**    Correct.

16   **Q.**    And the training needs of those horses will

17   correspondingly vary from one horse to another; correct?

18   **A.**    That's correct.

19   **Q.**    Every horse has fears; correct?

20   **A.**    May have fears, yes.

21   **Q.**    Fear is an instinct; correct?

22   **A.**    Fear is an instinct.  But if your horse trusts

23   you, then this fear is not so intensive.

24   **Q.**    Horses have instinctual fears of tigers; correct?

25   **A.**    Yes.

1    **Q.**    Horses have instinctual fears of loud noises

2    coming out of the darkness; correct?

3    **A.**    Yes.

4    **Q.**    Horses react differently when faced with a fear;

5    correct?

6    **A.**    Yes.

7    **Q.**    Some horses when afraid will take off running;

8    correct?

9    **A.**    Yes.

10   **Q.**    Some of them will rear up or trample on humans

11   that might be near them when they're afraid; correct?

12   **A.**    I never saw the rearing up case.  Usually, they

13   want to run away.

14   **Q.**    And you yourself have personally been involved in

15   somewhere between 10 and 20 personal injuries to your

16   body that you've sustained as a result of interacting

17   with your own animals; correct?

18   **A.**    Yes, light injuries.

19              THE COURT:  What kind of injuries?

20              THE WITNESS:  Light injuries.

21              THE COURT:  What do you mean by "light

22   injuries"?

23              THE WITNESS:  Not big injuries.  Small

24   injuries.  I've never had a broken hand or broken leg.

25   I never had to go to a hospital.  I sometimes had a

1   bruise or so.

2                 THE COURT:  Next question.

3   BY ATTORNEY PIERCE:

4   Q.    And those 10 to 20 personal injuries that you just

5   described were sustained because your animal was

6   frightened; correct?

7   A.    No.

8                 THE COURT:  How much more do you have?

9                 ATTORNEY PIERCE:  Maybe 15.

10                THE COURT:  How long?

11                ATTORNEY PIERCE:  Maybe 15 minutes, your

12  Honor.

13                THE COURT:  All right.  Let's get on with

14  it.

15  BY ATTORNEY PIERCE:

16  Q.    And you would also agree, Mr. Stipka, that even

17  thoroughly trained horses can still be frightened;

18  correct?

19  A.    Yes, that may happen.

20  Q.    It can take years to train one horse to overcome

21  particular fears; correct?

22  A.    I wouldn't say years, but it can take some time.

23  Q.    You personally have been working with a horse for

24  how many months now that was afraid of having acrobats,

25  human beings, over the top of it?

1   **A.**    Yes.

2   **Q.**    How many months?  I took your deposition in July.

3   It was eight months.

4            Are you still working with that same horse?

5   **A.**    I still work -- I'm still working with that horse.

6   But the horse has really no effect on the performance.

7   The problem was just with the entry of the horse in the

8   ring.  During the performance, he's fine.

9            THE COURT:  So the horse now performs?

10           THE WITNESS:  Yes, now performs and has

11  always been performing fine.

12           THE COURT:  Next question.

13  BY ATTORNEY PIERCE:

14  **Q.**    Sometimes horses surprise you as to how much

15  training they are going to take; correct?

16  **A.**    Yes.

17  **Q.**    And sometimes it's not possible for you to predict

18  with accuracy how long training is going to take;

19  correct?

20  **A.**    I can't tell an approximate time how long the

21  training will take.  I cannot tell the exact time, but

22  definitely approximate time.

23  **Q.**    Mr. Stipka, let me ask you this hypothetical:  If

24  you had a long-term contract with an employer and the

25  employer said, "I'm giving you two months to train this

1       horse to overcome a fear or you will lose your

2       contract," how would you react to that?

3               THE COURT:  He's not an expert on react to

4       that.  That's not an appropriate question.

5               ATTORNEY PIERCE:  He's been testifying

6       throughout --

7               THE COURT:  If you want to ask him whether

8       two months would be long enough to give him a

9       hypothetical about this situation and ask him if that

10      would be long enough, you may ask him that.  Not how

11      would he react to that.  That's asking for an opinion

12      about how the plaintiffs reacted to it.  He's not an

13      expert on human reaction.

14              ATTORNEY PIERCE:  He's been testifying

15      throughout --

16              THE COURT:  I told you what you may do.  So

17      the question you've asked and the form you've asked it

18      is inappropriate.  But you certainly may ask a question

19      about -- give him a hypothetical and ask him whether

20      that's a reasonable time, if that's your question.

21              ATTORNEY PIERCE:  I will try and phrase it

22      in that way, your Honor.

23      BY ATTORNEY PIERCE:

24      Q.   Mr. Stipka, let me ask you hypothetically, if you

25      had a long-term contract with an employer and the

1    employer insisted that you be able to train out a fear

2    in two months and the failure to do which would cost you

3    your contract, would that be a reasonable requirement on

4    you?

5              ATTORNEY PORTER:  Objection.

6              THE COURT:  That's not a -- you could ask

7    him whether it could be trained in two months, but not

8    whether the two months is reasonable.  That's for the

9    jury, if the jury believes that there's a two-month

10   restriction.  So you may ask him whether, given the

11   facts, whatever hypothetical you want to give him,

12   provided the facts are in this case, whether two months

13   would be an adequate amount of time in which to train

14   the horse.

15   BY ATTORNEY PIERCE:

16   Q.    Mr. Stipka, assume, please, that you have a

17   long-term contract with an employer, that the employer

18   requires you to train a horse to overcome a fear within

19   two months, would you be able to guarantee performance

20   of that successful outcome in two months?

21   A.    I would definitely try to correct the situation

22   with the horse, but I cannot provide a guarantee for

23   that.

24   Q.    And, in fact, if a requirement of that type was

25   placed on you, you would walk away, wouldn't you?

1        ATTORNEY PORTER:  Objection.

2        THE COURT:  I'll sustain it.

3   BY ATTORNEY PIERCE:

4   Q.    Is there any way that you could guarantee --

5        THE COURT:  He's asked and answered.  He

6   said he couldn't guarantee.

7        Am I incorrect ins that regard?

8        Read back his answer, Mr. Rodriquez, to the

9   previous -- not the previous question, but the one

10  before it.

11        (Record read.)

12        THE COURT:  There you have it.  Let's not

13  waste time with the same question.

14  BY ATTORNEY PIERCE:

15  Q.    Are you aware of any contract that has ever been

16  issued to a circus performer that requires performers to

17  undertake training in a specified time limit?

18        ATTORNEY PORTER:  Objection.

19        THE COURT:  Sustained.

20  BY ATTORNEY PIERCE:

21  Q.    It's true, is it not, Mr. Stipka, that you've

22  never been advised that there is evidence in this case

23  that Ringling imposed a time deadline within which the

24  Donnerts had to train their animals; correct?

25        ATTORNEY PORTER:  Objection.

```
 1              THE COURT:  I'll sustain that.
 2              You may ask him whether he knew that there
 3    was a two-month deadline.  Now, there's a dispute of
 4    fact about that.  That's for the jury to decide.  But
 5    you may ask him whether he was ever told there was a
 6    two-month deadline to train the horse.  But he's already
 7    given you his answers how they relate to his opinion.
 8    Whether he was told that or not is irrelevant, but you
 9    may ask it if you wish.
10    BY ATTORNEY PIERCE:
11    Q.   Mr. Stipka, were you told at any time that the
12    Donnerts had a two-month deadline placed on them within
13    which they had to complete training related to
14    Cornbread?
15              ATTORNEY PORTER:  I'm going to object to the
16    form of the question, your Honor, because the way that
17    it was phrased suggests that that was a fact versus a
18    potential theory.
19              THE COURT:  I'll overrule the objection.  He
20    can answer whether he was ever told that.
21              THE WITNESS:  Can I have the question
22    repeated, please.
23              THE COURT:  Were you ever told that Ringling
24    Bros. -- let me put it this way:  Were you ever told
25    that the Donnerts contend that they were given two
```

1    months in which to train Cornbread to overcome his

2    fears?

3                    THE WITNESS:  No.

4                    THE COURT:  Next question.

5    BY ATTORNEY PIERCE:

6    Q.    Mr. Stipka, would you agree --

7                    THE COURT:  Would that change any of the

8    opinions you've given today if you did have that

9    information?

10                   THE WITNESS:  No.

11                   THE COURT:  Next question.

12   BY ATTORNEY PIERCE:

13   Q.    Mr. Stipka, are you aware that Cornbread

14   experienced a pulled back muscle in late December of

15   2010?

16   A.    Yes.

17   Q.    Would you agree that a horse trainer would be more

18   likely to be even safer once they've already experienced

19   an injury to an animal when they proceed with their

20   follow-up training?

21                   THE COURT:  I'm sorry.  Did you say even

22   safer?

23                   ATTORNEY PIERCE:  I did.

24                   THE COURT:  I'll -- do you have --

25                   ATTORNEY PORTER:  That was my objection.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          THE COURT:  Sustained.

2          ATTORNEY PIERCE:  I will try it in a

3    different way.

4    BY ATTORNEY PIERCE:

5    Q.    Mr. Stipka, would you agree that a horse trainer

6    who has experienced one injury would have their index of

7    suspicion go up so that they had an even higher standard

8    of care to take care of their animals?

9          THE COURT:  First of all, your question

10   suggests that it's the trainer that has the injury.  I

11   don't think you intended that.

12         ATTORNEY PIERCE:  No, not at all.

13         THE COURT:  Well, then try it one more time.

14   BY ATTORNEY PIERCE:

15   Q.    Mr. Stipka, would you agree that a reasonable

16   trainer would adopt a higher standard of care in how

17   they train their animals after one of their animals has

18   sustained an injury?

19   A.    I don't really understand what you mean by

20   "adopting a higher standard of care."

21   Q.    Part of the process of training an animal is to

22   get it to learn; right?

23   A.    Yes.

24   Q.    And part of the process of training an animal is

25   to get the trainer to learn; correct?

1          ATTORNEY PORTER:  Objection.

2          THE COURT:  Getting the trainer to learn?

3          ATTORNEY PIERCE:  That's right, your Honor,

4     getting the trainer to learn from the process.

5          THE WITNESS:  No, I disagree.  The trainer

6     has to know what he's doing.

7     BY ATTORNEY PIERCE:

8     Q.   But if the trainer experiences an injury using a

9     particular procedure, don't you think they should change

10    their procedures?

11         ATTORNEY PORTER:  Objection.  This goes back

12    to the trainer being injured, I think.

13         THE COURT:  Yes, it does.  The question --

14    you're not getting it right.  I guess what you -- you're

15    suggesting that the trainer gets the injury in your

16    question.

17         ATTORNEY PIERCE:  I'm not intending to.  I

18    understand the Court's point, your Honor.

19         THE COURT:  Go ahead.  You may try one last

20    time.

21    BY ATTORNEY PIERCE:

22    Q.   Mr. Stipka, when a trainer has an animal that

23    experiences an injury, would you agree that they would

24    reasonably consider that and heighten their standard of

25    care when they train in the future?

1          ATTORNEY PORTER:  Objection to the

2     heightened standard of care.  I'm not exactly sure what

3     that means.

4          THE COURT:  All right.  I'll overrule the

5     objection.  He can answer if he's able to.  If he can't

6     answer, he can say so.

7          THE WITNESS:  I really do not understand the

8     question.  Standard of care in the stable or what kind

9     of standard of care?

10          ATTORNEY PIERCE:  I'm just going to move on,

11     your Honor.

12          THE COURT:  All right.

13     BY ATTORNEY PIERCE:

14     Q.   Mr. Stipka, you have testified that there might be

15     other possible reasons for Cornbread's behavior, and I

16     want to ask you just a couple of things about that.

17          It's your belief, is it not, sir, that an

18     employer who is aware of possible causes for animal

19     changes should investigate; correct?

20          ATTORNEY PORTER:  Objection.  That's outside

21     the scope of his --

22          THE COURT:  Sustained.

23     BY ATTORNEY PIERCE:

24     Q.   All these multiple causes of injuries that you've

25     identified as possibilities, is there anything that a

1    trainer is supposed to do about them?

2              ATTORNEY PORTER:  I object to the form.  I

3    think he was provided with a hypothetical question.

4              THE COURT:  He's asking whether a trainer

5    should do anything.  I'll let him answer that.

6              Let's move it along.  Go ahead.

7              THE INTERPRETER:  May I ask for the question

8    to be repeated, please.

9              THE COURT:  Repeat the question.

10   BY ATTORNEY PIERCE:

11   Q.    What is it that a trainer should do in light of a

12   change in behavior or an injury?

13   A.    If the animal is injured, then the animal has to

14   rest.  It cannot undergo training.

15   Q.    Is the trainer supposed to report the change in

16   behavior or the injury?

17   A.    Yes, definitely, because it may affect his

18   performance.

19   Q.    And to whom should he report those changes?

20             ATTORNEY PORTER:  Objection.

21             THE COURT:  I'll sustain that.  You have

22   gone way beyond the scope of the -- and I've given you

23   wide, wide latitude, Mr. Pierce.  So finish it up within

24   the scope of the direct examination.  He was offered as

25   an expert to give his opinion as to the particular

1    behavior of Cornbread and what should be done about it.

2    Stick to that.

3                ATTORNEY PIERCE:  Within that scope, your

4    Honor, I don't think there's any more reason for me to

5    ask questions within that scope.  So I will have no

6    further questions.

7                THE COURT:  All right.

8                ATTORNEY PORTER:  I have a few questions.

9                THE COURT:  Mr. Pierce has indicated he has

10   no further questions within the scope of the direct

11   testimony.

12               How long do you anticipate you have?

13               ATTORNEY PORTER:  Not very long sir.  A

14   time?  Five minutes.

15               THE COURT:  All right.  Let's do it.

16                    REDIRECT EXAMINATION

17   BY ATTORNEY PORTER:

18   Q.    You were asked questions about your experience in

19   Europe on a one-ring circus environment.

20               Since you've come to Feld, have you had

21   experience in a three-ring environment?

22   A.    Yes, I do have experience with more rings.

23   Q.    And in your experience, have you presented your

24   animals and trained your animals for presenting in a

25   ring when other things are going on in the dark rings?

1    A.    Yes, it can be put that way.

2    Q.    Mr. Pierce asked you a question that suggested

3    that you had a situation that you had dealt with, and I

4    don't think you for a chance to explain what that was.

5            Can you explain to the jury the situation

6    that you had with a horse who had trouble performing an

7    element either right before the show, I think you

8    described it, right before the act started or --

9            Do you recall the question he asked you?

10   A.    Our performance has two combined elements.  It's

11   aerobatics and horses.

12   Q.    Did you have an issue with one of the horses

13   having a concern with one of the aerialists?

14   A.    In my ring, there is an aerialist above my horses.

15   In the next ring, there are two aerialists in the air.

16   And as soon as I -- I enter with my horses while they

17   are in the air.  As soon as we enter, their performance

18   ends and my performance starts.

19   Q.    Something is happening in another ring while your

20   performance starts.

21   A.    In Ring No. 1, something is happening.

22   Q.    And to the extent your horse had some fear of

23   that, is that something you've been overcome -- you've

24   been able to overcome with training?

25   A.    I'm still working on the horse.  It's still not

1    perfect.  But it is not really doing performance when

2    the horse had a problem.  It was just entering the ring.

3    Once all the floodlights are on us and we start our

4    performance, we have no problems.

5    Q.    You mentioned, I think -- you were asked that the

6    training needs for horses may be very different.

7              Do you recall that series of questions?

8    A.    Yes.

9    Q.    Does it mean that because horses have different

10    needs, that issues can't be overcome?

11    A.    No.  I disagree with that conclusion.  This is an

12    everyday problem that I face day by day.  When I perform

13    liberty horse training, I have six horses in the ring.

14    And every one of them have different training needs.  So

15    it's just our daily bread.

16    Q.    Let me ask a question about the videos that you

17    saw.

18              Do you recall seeing a video where Cornbread

19    performed his act with the lights on while the cage

20    strike was happening?

21    A.    Yes.

22    Q.    Did that give you a sense of the -- Cornbread's

23    act once the lights were out?

24              THE INTERPRETER:  Your Honor, I did not

25    understand the question.  May I have it repeated,

1    please.

2              THE COURT:  Yes.

3    BY ATTORNEY PORTER:

4    Q.    Did watching that video with the lights on give

5    you a sense of Cornbread's act in the videos you watched

6    when the lights were off?

7    A.    I probably -- if the lights were on the horse,

8    I probably could see more reactions of the horse, but I

9    am not sure about it.

10   Q.    Did you ever see Cornbread try and run away?

11   A.    No.

12   Q.    Mr. Pierce asked you about your experience

13   training horses with tigers or acclimating them to

14   tigers.

15             Do you have experience training horses

16   getting them used to other types of animals?

17   A.    Yes, with camels and elephants.

18   Q.    Another question he asked you, he said you'd

19   never -- I think you told him you'd never performed a

20   comedy act; is that right?

21   A.    That's correct.

22   Q.    Is a comedy act anything more than just a series

23   of trucks?

24   A.    No, it is not.

25   Q.    Does the horse have to get the joke in order for

1   it to be a comedy act?

2   **A.**   No.

3          ATTORNEY PORTER:  Thank you, sir.  No

4   further questions.

5          THE COURT:  Let me ask you, Mr. Pierce asked

6   you about a Czech saying.

7          Do you recall that question?

8          THE WITNESS:  Yes.

9          THE COURT:  What was that Czech saying?

10          THE WITNESS:  Whose bread you eat, that

11   person's song you sing.

12          THE COURT:  All right.  And are you

13   singing -- in the opinions that you gave today, are you

14   singing the song of Ringling Bros. because they pay you?

15          THE WITNESS:  No.  Ringling Bros. don't pay

16   me for singing their song.  They pay me for training

17   their horses.

18          THE COURT:  Anything further from either

19   said based on the redirect and the Court's question.

20          ATTORNEY PIERCE:  Just one thing.

21                  RECROSS-EXAMINATION

22   BY ATTORNEY PIERCE:

23   **Q.**   Did they pay you extra today or is your testimony

24   part of your normal duties?

25   **A.**   Part of my normal duties.

1          THE COURT:  All right.  You may step down.

2          Did you have more?

3          ATTORNEY PIERCE:  No.  I wanted to ask that

4     the witness not be excused because I would like the

5     opportunity to call him in rebuttal.

6          THE COURT:  No.  This is your opportunity

7     now.

8          ATTORNEY PIERCE:  Your Honor --

9          THE COURT:  You can't call a witness in

10    rebuttal.  This is an expert witness offered only for

11    expert opinion, not for facts.  So any question you want

12    to ask him, you'd better ask him now related only to his

13    expert opinion.

14         ATTORNEY PIERCE:  The questions I would want

15    to ask you've indicated are outside the scope, and

16    that's why I've indicated --

17         THE COURT:  What questions are those?

18    They're not in rebuttal.  You may want to elicit new

19    facts.  That's not rebuttal.

20         ATTORNEY PIERCE:  There has been -- the

21    testimony I'd want to rebut was their position regarding

22    the need to --

23         THE COURT:  All right.  Let's do it this

24    way.

25         You may step down.

```
1              Ladies and gentlemen, pass your books to the
2     right.  Mr. Wood will collect them and maintain their
3     security.  And I'll hear argument of counsel out of the
4     hearing of the jury.
5              And Mr. Stipka will remain here until I hear
6     Mr. Pierce.
7              Ms. Owensova, thank you, but be sure that
8     you tell Mr. Stipka that he has to remain here until he
9     gets the approval from Mr. Porter to depart.
10             ATTORNEY PORTER:  And she does as well.
11             THE COURT:  And you have to stay as well, of
12    course.
13             THE INTERPRETER:  Thank you.
14             THE COURT:  You may follow Mr. Wood out.
15    Remember to refrain from discussing the matter among
16    yourselves or with anyone.
17             This is, in effect, our luncheon recess.
18    But your sandwiches -- I think you had menus this
19    morning; is that right?
20             But I don't think I set the time at 11:30.
21             12:30?
22             Well, let's see if we can finish the
23    testimony before 12:30, then.
24             Thank you.  You may follow Mr. Wood out.
25             Oh, yes.  I can't give a time when we'll be
```

 1    back, but it will be as soon as I can deal with this

 2    issue.

 3                 (Jury excused at 11:25 p.m.)

 4                 THE COURT:  All right.  Now, you may be

 5    seated.

 6                 Mr. Pierce, of course, as I would assume you

 7    know, rebuttal testimony is to rebut something that the

 8    plaintiffs did not get an opportunity to address in

 9    their case-in-chief.  It is not to elicit new facts.

10    And any questions you want to ask this witness have to

11    be within the scope of his direct.

12                 What is there that you want to ask him that

13    you contend is appropriate rebuttal testimony?

14                 ATTORNEY PIERCE:  The defendant has taken

15    the position as part of their case regarding how to

16    respond to an incident what is an appropriate safety

17    concern, how do you investigate it, is there a

18    responsibility to investigate, does a consultant or an

19    animal professional need to be brought in.

20                 These are matters that this gentleman has

21    expressed his opinion on in his deposition.

22                 THE COURT:  I don't believe that the

23    defendant's raised it.  You raised it in your

24    case-in-chief.

25                 ATTORNEY PIERCE:  And they've raised it in

1    their position as well, your Honor.

2                THE COURT:  They've taken the position that

3    there wasn't a safety issue.

4                What is it that this witness has to offer

5    that you think is appropriate rebuttal?

6                ATTORNEY PIERCE:  Well, I'll summarize his

7    testimony.

8                He has indicated that once the performer

9    advises the employer of a safety issue or potential

10   problems, it is the employer's responsibility to jointly

11   solve the issue with the trainer.

12               THE COURT:  So you knew about this in his

13   deposition.

14               ATTORNEY PIERCE:  I'm summarizing out of his

15   deposition, that is correct.

16               THE COURT:  So you knew about it.  You could

17   you have presented it in your case-in-chief.

18               ATTORNEY PIERCE:  That is theoretically

19   possible, yes.  I could have subpoenaed him, that's

20   right.

21               THE COURT:  All right.  Go on.

22               What else do you have to say about this

23   issue?

24               ATTORNEY PIERCE:  He indicated that it is up

25   to the employer to cooperate and to sort of jointly

1    proceed in the training process with the trainer, create

2    the right environment.  It's a joint undertaking, and

3    that that is an issue that's very important to him and

4    is something that they continue to have apparently

5    weekly meetings discussing that process on the red unit

6    currently.  That's -- he's indicated the degree to which

7    they take that issue, and he's indicated that an

8    employer who is properly addressing safety issues would

9    proceed in this way.

10           THE COURT:  All right.  Mr. Porter.

11           ATTORNEY PORTER:  I would love to see those

12   citations.  Judge, just to give you a little bit of

13   background --

14           THE COURT:  You don't agree with his summary

15   of the testimony.

16           ATTORNEY PORTER:  Not in that way.  My

17   understanding and what I think he's trying to get at is

18   during the course of his deposition -- recall that we

19   had designated Mr. Stipka as an expert witness.  We had

20   provided an expert report.  We had put him up and made

21   him available for a deposition.

22           During the course of that deposition,

23   Mr. Pierce asked what I thought at least were a series

24   of abusive questions that were well outside the scope of

25   the designation.  I made countless objections during the

1    course of the deposition.

2                And I think what he's referring to, although

3    I don't have the citations, so I can't be sure -- I

4    think what he wants to do is ask him the questions that

5    he forced him to answer over my objections.

6                THE COURT:  And they're questions about the

7    meetings and --

8                ATTORNEY PORTER:  I don't -- personally, I

9    don't remember anything about a meeting.  I think some

10   of this is what you ruled on earlier in the motion in

11   limine before the case started about -- the one you had

12   last Friday.

13               Do you recall that motion that Ms. Proctor

14   argued?

15               THE COURT:  Yes.

16               ATTORNEY PORTER:  And you excluded all that

17   stuff.  And I think -- this sounds to me like the same

18   sort of issue.

19               THE COURT:  It doesn't sound to me like

20   that.  It does sound to me different.

21               Mr. Pierce, do you have anything else you

22   wish to say before I rule?

23               ATTORNEY PIERCE:  It had nothing to do with

24   his testimony regarding Paragraph 7C.

25               THE COURT:  I think I agree with you on

1    that.

2              ATTORNEY PIERCE:  And the testimony that I'm

3    attempting to summarize is Pages 108, 109 primarily.

4    There's a reference on Page 106 of his deposition as

5    well.

6              THE COURT:  And you seek to exclude it,

7    Mr. Porter?  You move to exclude it.

8              ATTORNEY PORTER:  Yes, sir.  I think it's

9    outside his designation.  I'm just looking quickly.

10   And, for example, "Do you believe that an employer using

11   good faith to promote animal safety should investigate

12   when a trained animal suddenly starts behaving in an

13   unexpected way?"

14             "Objection; outside the scope of

15   designation, otherwise improper."

16             It goes on like that for pages, and I can't

17   instruct him not to answer.  So ultimately perhaps he

18   gives an answer, but it's outside his designation.  It's

19   not what he was designated to testify about.  If they

20   wanted to put on an expert witness to address these --

21             THE COURT:  Well, they didn't need an

22   expert.  They could have gotten an expert.  But if there

23   were some facts that they learned through this

24   deposition --

25             You may be seated.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          I'm going to sustain the motion to exclude

2    his testimony as rebuttal testimony.  It does not seem

3    to me to be rebuttal testimony.  It seems to me that the

4    plaintiffs want to introduced testimony about what

5    Ringling Bros. does when safety issues are reported in

6    the red unit where he works, something about meetings.

7          All of this is information that Mr. Pierce

8    had long before the trial.  He also raised in his direct

9    case that they thought there was a safety issue and that

10   there was an obligation to investigation.  They asked

11   the plaintiffs on the stand whether any investigation

12   was done.

13         So clearly the plaintiffs thought this was

14   an issue, and they could have subpoenaed witnesses to

15   get this done or do it through discovery, and it was not

16   so done.  This is not rebuttal testimony.  And so I'm

17   going to exclude if on that basis.

18         Now, do you have rebuttal testimony that you

19   wish to offer other than that, Mr. Pierce?

20         ATTORNEY PORTER:  May I interject very

21   briefly?  I don't know if you're asking if I'm closed.

22   If I am, I just want to add --

23         THE COURT:  Yes, I will come to that in a

24   minute.

25         ATTORNEY PORTER:  Thank you, sir.

1           THE COURT:  Do you have rebuttal testimony?

2           ATTORNEY PIERCE:  If you'll give me just a

3     moment to talk to my clients, your Honor.

4           THE COURT:  Oh, yes, of course, you may do

5     that.

6           Oh, well, if you're going to go out, I'm

7     going to recess.  I'll give you a few-minutes' recess,

8     Mr. Pierce, so that you can discuss it with them.

9           Now, remember rebuttal testimony does not

10    give the plaintiffs an opportunity to repeat what

11    they've already said.

12          Do you understand that?

13          ATTORNEY PIERCE:  Yes, your Honor.

14          THE COURT:  That's a waste of everybody's

15    time, and that's not what rebuttal is about.  Rebuttal

16    is to address specific issues that they did not address,

17    that did not come up until the defense case.

18          Yes, Mr. Porter.

19          ATTORNEY PORTER:  The only thing that I

20    wanted to point out to your Honor is -- and I don't want

21    to predict what Mr. Pierce is going to do, but I suspect

22    that what he may be looking to do is some sort of expert

23    testimony to rebut Mr. Stipka.  There certainly was no

24    rebuttal designation that was ever provided --

25          THE COURT:  They can't introduce expert

1    testimony now.

2              ATTORNEY PORTER:  Thank you.

3              THE COURT:  Let me -- when you discuss it,

4    if you feel that you wish to offer any rebuttal

5    testimony, I want you to disclose it in detail to

6    Mr. Porter so that I can deal with any objection to it

7    before I get the jury in and we hear it.  But you

8    understand that the standard is a stringent one.  This

9    isn't an opportunity to repeat matters that were covered

10   in the direct case.  It's only an opportunity to address

11   new matters that they didn't have an opportunity to

12   address before.

13             ATTORNEY PIERCE:  I do understand.

14             THE COURT:  Court stands in recess for ten

15   minutes.

16             (Court recessed at 11:35 p.m.)

17             (Court called to order at 11:47 p.m.)

18             THE COURT:  Mr. Pierce, do you have rebuttal

19   testimony that you wish to offer?

20             ATTORNEY PIERCE:  No, your Honor.  I'm all

21   right.

22             THE COURT:  What are the two exhibits?

23             ATTORNEY PORTER:  Defendant's Exhibits 81

24   and 82.  They were the video and the audio of the

25   altercation on December 18th.  We argued about them

1    previously and --

2              THE COURT:  We saw it here.

3              ATTORNEY PORTER:  I just --

4              THE COURT:  All right.  I'll admit it.

5              ATTORNEY PORTER:  -- neglected to offer

6    them.

7              THE COURT:  All right.  Now, I'm going to

8    have the jury brought in, tell them that ends the

9    testimony in the case.  Then I'm going to let them go to

10   lunch.  I'm going to ask them to return by 1:30.  I want

11   to give you all an opportunity to have some lunch, too.

12   And we'll probably go back in court for closing

13   arguments at 2:00, but I anticipate that from 1:30 to

14   2:00 we'll do an instructions conference.

15             And I will prepare a group of instructions

16   for you to review, to consult with one another.  I'll go

17   through all of that.  Let me release the jury first, and

18   I'll have some instructions for you as well on what you

19   need to do for exhibits.

20             Bring the jury in, please.

21             (Jury impaneled at 11:48 a.m.)

22             THE COURT:  Ladies and gentlemen, thank you

23   for your patience.  The lawyers are working hard to

24   expedite this matter.  And I think we -- and we have now

25   completed the testimony in the case.  We now have some

1    other legal matters to do, and then we'll have closing

2    arguments and final instructions.

3            And so we'll have a very long lunch hour in

4    which we, the lawyers and I, can get all of that done.

5    And then we will be prepared to proceed with closing

6    arguments and final instructions on the law, and then

7    you'll be permitted to retire and deliberate on your

8    verdict.

9            Thank you for your patience.  I assure you

10   that the lawyers and I ARE doing everything we can to

11   move matters along.  Again, during the luncheon recess,

12   I made arrangements for you to have sandwiches.  I hope

13   they're satisfactory to you.  If not -- I don't

14   anticipate that we will reconvene until no earlier than

15   1:30.  So you need not be back.  If you wish to go out,

16   you may do so.  1:30.

17           Thank you for your patience and your

18   attention.  You may follow Mr. Wood out.  Remember

19   during the recess to refrain from discussing the matter

20   among yourselves or with anyone or undertaking any

21   investigation, electronically or otherwise.  You may

22   follow Mr. Wood out.

23           (Jury excused at 11:50 a.m.)

24           THE COURT:  All right.  You may be seated.

25           Now, what we have to do is this:  First of

1    all, I'm going to hear argument on the Rule 50 motion,

2    then I'm going to recess the matter for you all to have

3    lunch, and then I'll set a time for return, at which

4    time I'll rule on the Rule 50 matter.

5          I will also make arrangements for you to

6    pick up a package of instructions to read them.  And

7    then if you have objections to the instructions, either

8    what's included or what's omitted based on what you've

9    submitted or anything else, then you are to review those

10   with opposing counsel.

11         Because when I meet with you and you assert

12   an objection as to something that's been included or

13   omitted, I want to hear informed argument.  So I want

14   you to tell the other side what your objection is, what

15   it's based on, what authority you're relying on to give

16   them an opportunity to be able to respond to it

17   effectively.

18         And then I think the earliest we can get

19   that done is to reconvene -- reconvene at 1:30.  At

20   1:30, I will rule on the Rule 50 matter.  And then, if

21   appropriate, I will go on to make sure that you have

22   time to review the package of instructions which I'm

23   working on and then to have the instructions conference,

24   and then we will have closing arguments and the Court's

25   final instructions.

1              How long do you think you need for closing

2    argument, Mr. Pierce?

3              ATTORNEY PIERCE:  I would say about

4    20 minutes, your Honor.

5              THE COURT:  Mr. Porter?

6              ATTORNEY PORTER:  I agree with that.

7              THE COURT:  Well, that's -- those are

8    reasonable times.

9              All right.  Mr. Porter, I'll hear from you.

10             This is a motion for judgment as a matter of

11   law, is it, under Rule 50?

12             ATTORNEY PORTER:  Yes, sir.

13             THE COURT:  Well, you understand that under

14   Rule 50, you need to give me -- you need to be somewhat

15   specific and give me the authorities that you're relying

16   on.

17             In fact, the specific term is a motion for

18   judgment as a matter of law may be made at any time

19   before the case is submitted to the jury.  The motion

20   must specify the judgment sought and the law and facts

21   that entitle the movant to the judgment.

22             Go ahead, sir.

23             ATTORNEY PORTER:  Yes, sir.  I started as

24   argument.  We had a bench conference before.

25             THE COURT:  I gave you an opportunity.

1           ATTORNEY PORTER:  And to recap that, the

2   main issue here is that we have a fundamental

3   difference -- threshold instance issue about what's

4   going on here.  There's a contract that Feld entered

5   into with these Donnerts that required them to act as

6   directed.  And there's simply been no testimony that

7   Feld did anything to breach that contract.  There's no

8   evidence of any wrongful conduct on the part of Feld

9   whatsoever.

10          The only evidence is that there was a

11  disagreement about how this act ought to go forward.

12  The evidence is that the show order changed.  There were

13  problems.  There's no evidence that Feld ever complained

14  of the problems.  There's no evidence that Feld ever put

15  an ultimatums on them.

16          Instead, the evidence was that they said

17  they were not going to perform.  Feld tried to work

18  through some options with them.  All those options were

19  rejected.  After they were rejected, Feld reasonably

20  believed that they had grounds pursuant to the contract

21  to terminate the plaintiffs for failure to act as

22  directed.

23          THE COURT:  Now, what provision of the

24  contract do you rely on in saying that?

25          ATTORNEY PORTER:  There are three

1    provisions:  There's a provision in the contract --

2    really two in the contract, one in the lease, and then

3    one in the addendum that speaks to the plaintiffs'

4    obligation to act as directed.

5         The first one is in --  I'm looking at

6    Defendant's Exhibit 1.  It's really Plaintiffs' 27,

7    which is the contract.  Let me pull my notes from

8    somewhere else.  Court's indulgence for one moment.

9         Paragraph 1, the provision there reads --

10   not 1A or B, but this is 1 primary.  It says, "The

11   employer hereby agrees to employ the act under the

12   supervision, direction, and control of the employer."

13        And then 1A on that same page says, "During

14   the employment period, as directed by the employer,

15   employee agrees to appear and perform one or both of

16   those horse-riding acts that are referenced in the

17   contract."

18        B continues on and says, "In the event" --

19   gives Feld the right to transfer them.  That's not

20   really the issue in this Rule 50 motion.  The lease

21   issue, which is Plaintiffs' Exhibit 28 --

22        THE COURT:  The lease is connected to the

23   contract, isn't it?

24        ATTORNEY PORTER:  It is.

25        THE COURT:  If there's a breach of the

1   contract, there automatically a breach of the lease.

2           ATTORNEY PORTER:  Right.  And what I was

3   going to point out to you, your Honor, is that there's

4   similar language in the lease that requires these

5   plaintiffs to act as directed.

6           THE COURT:  All right.  And then in the

7   addendum, it's Paragraph --

8           ATTORNEY PORTER:  8.

9           THE COURT:  8.  14.1 of the employment

10  agreement is revised.

11          ATTORNEY PORTER:  Yes, sir.

12          THE COURT:  All right.  And that says -- go

13  ahead.

14          ATTORNEY PORTER:  That says that, "The

15  employee understands that if it fails to perform in a

16  first-class professional manner, disrupts or impedes

17  employer's creative and production value and direction

18  of the production in any way either through action or

19  failure to comply with employer's instruction or if

20  employee otherwise conducts himself/herself in a manner

21  unsatisfactory or detrimental to the reputation or

22  standards of the employer including, but not limited

23  to" -- I'll do a "..." there - "is grounds for

24  termination."

25          THE COURT:  Now, am I correct that distilled

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1   to its essence, your position is that the contract,

2   especially the addendum, makes clear that the sequence

3   in which the show is put on, artistic content and

4   sequence, is within the control -- sole control of the

5   circus?

6               ATTORNEY PORTER:  Yes, sir.

7               THE COURT:  And your view is that when you

8   changed the sequence, you had no obligation to change it

9   again at the request of the plaintiffs.

10              ATTORNEY PORTER:  Yes, sir.

11              THE COURT:  And, in your view, because the

12  circus had the exclusive right to control the sequence

13  of the show, that under this Paragraph 14.1 revised,

14  Paragraph 8 of the addendum, that the circus had the

15  right under the contract to terminate the plaintiffs.

16              Is that your position distilled?

17              ATTORNEY PORTER:  Yes, sir.  And I would add

18  to that that when the circus went to the Donnerts and

19  gave them options after they refused to perform, they

20  still continued to try and work with them.  And Again,

21  the Donnerts --

22              THE COURT:  I understand that, but I'm just

23  looking at the legal -- that's your position, and you're

24  saying that there isn't any evidence.  Now, I think

25  we'll hear -- Mr. Pierce, am I correct that you're

1    arguing that there's -- that your argument is not any --

2    that there's a breach of good faith and fair dealing?

3              ATTORNEY PIERCE:  That's certainly part of

4    it, yes.

5              THE COURT:  Well, what -- can you point to

6    me the provision in the contract that you say was

7    violated or breached by the circus?

8              ATTORNEY PIERCE:  Well, I'll start with the

9    Court's question first.

10             In the employment contract itself, I think

11   that you have to read that document in theory with the

12   lease.  So...

13             THE COURT:  Is this the issue that -- which

14   part of the lease do you think does that?  Let me have

15   the lease up here, please.

16             Wait a minute.  I have them both here.

17             What provision of the lease are you relying

18   on?

19             ATTORNEY PIERCE:  Paragraph 7C.

20             THE COURT:  All right.  What is -- you're

21   saying that the defendant's breached -- the defendant

22   breached 7C of the lease.

23             ATTORNEY PIERCE:  That's correct.

24             THE COURT:  Now, as I read 7C, it imposes

25   duties on the lessor.  But then at the end, it says,

1    "Lessee agrees to work with lessors to facilitate

2    compliance."

3              ATTORNEY PIERCE:  That's correct.

4              THE COURT:  And you're saying what, that

5    there's evidence that they didn't work with the

6    lessee -- lessor?

7              ATTORNEY PIERCE:  Absolutely.  Yes.

8              THE COURT:  What else do you contend amounts

9    to a breach?

10             ATTORNEY PIERCE:  In addition to this?

11             THE COURT:  Yes.  Because I may rule that

12   that doesn't say what you say it does.  Contracts are

13   interpreted by the Court.  But go on.  What else do you

14   rely on?

15             ATTORNEY PIERCE:  There's an implied duty of

16   good faith in each contract, and it has a slight

17   difference from the wording that appears here in

18   Paragraph 7C.  But an implied duty of good faith gets to

19   the same place.

20             THE COURT:  All right.  Now, you submitted

21   an instruction to that effect, and you cited a number of

22   authorities.

23             ATTORNEY PIERCE:  I did.

24             THE COURT:  It won't surprise you to learn

25   that I've looked at those.  And it won't surprise you to

1    learn that I don't think they stand significantly -- let

2    me see that list.

3                   Do you have his list?

4                   What I wanted to call to your attention --

5    well, let me do them anyway.  You cited Schreier against

6    VBR, a Circuit -- Virginia Circuit Court case.  I've

7    read that.  It doesn't recognize a duty.  It's about

8    at-will employment only.

9                   You might argue, I think from that case as I

10   looked at it, that essentially what that case says is

11   there isn't an implied duty of good faith and fair

12   dealing in an at-will employment, and you might argue

13   that, "Well, from that you can infer that there is in

14   other kinds of contracts."

15                  But I have looked everywhere for a Virginia

16   Supreme Court case saying there is a duty of good faith

17   and fair dealing implied in every contract.  There

18   are -- that duty certainly arises in other states.  But

19   can you cite to me a Supreme Court of Virginia case that

20   says that?  The *Paul Business Systems* case that you

21   cited doesn't say that.  Neither does *Wards Equipment*.

22                  ATTORNEY PORTER:  Your Honor, I included in

23   that the authority that I'm aware of that I regarded as

24   relevant to the topic.

25                  THE COURT:  All right.  Let me cite a case

```
1    to you that you can go downstairs and read, because I

2    think you all have access to the law library downstairs.

3              It's open, isn't it, Mr. Wood?

4              THE MARSHAL:  Yes, sir.

5              THE COURT:  All right.  Look, if you will,

6    at -- although I'm not sure you can get this since it's

7    recent.  There is a May 2nd, 2013 case, Stony Glen, LLC

8    against Southern Bank & Trust Company.  It's a district

9    case from the Eastern District of Virginia, Norfolk

10   Division.  And it says as follows.  And there are

11   citations in there to others, but I want you to go look

12   at this, Mr. Pierce, because I think the cases you cited

13   don't answer the question.  And I've looked, and I don't

14   find one.

15             You did not submit anything, Mr. Porter.

16             ATTORNEY PORTER:  No, sir.  We had this

17   issue, you may recall, at the 12(b)(6) issue you on

18   whether or not there's a duty of good faith and fair

19   dealing in these contracts.  And you ruled that it

20   certainly can't rewrite the contract themselves.

21             THE COURT:  Right.

22             ATTORNEY PORTER:  I was -- quite frankly, I

23   thought that issue had been resolved by you when we

24   dealt with it the first time.

25             THE COURT:  Even in cases -- there are lots
```

1    of -- there is a statutory provision in Virginia for the

2    Uniform Commercial Code that includes a duty of good

3    faith and fair dealing.  And there are cases construing

4    that that say very clearly, "But the implied duty of

5    good faith and fair dealing cannot change the duties in

6    the contract."  All it does is say that a duty that is

7    imposed by the contract must be done in good faith, and

8    that's in the UCC area.

9            But I want you go and read this, Mr. Pierce.

10   It says, "The United States Court of Appeals for the

11   Fourth Circuit has consistently held that Virginia does

12   not recognize an implied duty of good faith and fair

13   dealing in common law contracts."  And then it cites a

14   number of cases.

15           The first case it cites is an unpublished

16   Fourth Circuit case which said that in Virginia every

17   contract contains an implied covenant of good faith and

18   fair dealing.  And so there are some cases that don't

19   recognize it.

20           Well, let's assume for argument's sake right

21   now that there's an implied faith -- duty of good faith

22   and fair dealing in this contract.  Mr. Pierce, let's

23   assume that, because I may yet conclude that.

24           Now, what is it -- what provision of the

25   contract did they not perform in good faith?  You see,

1     it doesn't add new obligations.  For example, it doesn't

2     mean that your client has the power to change the

3     sequence of the show.  What is it that you contend is

4     the obligation that they did not perform in good faith?

5             ATTORNEY PIERCE:  I have two parts to that,

6     your Honor.

7             The first part is largely building on what

8     you've already heard.  7C, to the extent that it doesn't

9     lend itself to its own duty of good faith, because the

10    phrase that appears at the end of 7C is -- has some

11    relationship to a measure of good faith.  Set that

12    aside.

13            We take the position, your Honor, that there

14    are multiple places in these --

15            THE COURT:  You're not going to -- I'm not

16    interested in general.  I said which provisions.  You

17    said 7C.

18            What else did they not do in good faith?

19            ATTORNEY PIERCE:  One moment, your Honor.

20            THE COURT:  All right.

21            ATTORNEY PIERCE:  There's an introductory

22    phrase to 7C itself.  It's illustrative of the point I

23    want to make.

24            THE COURT:  I asked you which -- show me in

25    the contract which provisions that impose duties on the

1    circus that you think apply in an implied duty of good

2    faith and fair dealing.  Because you don't get extra

3    duties.  You admit -- in fact, one of the cases you

4    cite, you can't expand the duties or rewrite the

5    contract using the implied duty of good faith and fair

6    dealing; isn't that right?

7              ATTORNEY PIERCE:  It is correct as you have

8    phrased that, your Honor.

9              THE COURT:  So all I'm seeking, because I

10   have to make a decision, you told me 7C, and you've told

11   me that 7C says the lessee agrees to work with lessors

12   to facilitate compliance, and that's compliance with

13   safety is the paramount concern to lessee as it relates

14   to animals, the public, and lessee's animal care and

15   other staff.

16             Lessors -- that's your clients -- will take

17   all necessary steps to ensure such level of safety.  All

18   right.  I understand that.  And that the lessee agrees

19   to work with the lessors to facilitate compliance.

20             And you're saying that they didn't act in

21   good faith to work with lessors to facilitate compliance

22   with safety as your client sought and that, as I

23   understand the testimony, the problem with that -- and

24   this is the crux of the Rule 50 question, Mr. Pierce --

25   is your client said in their testimony, Mr. Donnert did,

1    that the only solution was to change the order of the

2    show.  And I think he said, in answer to a question I

3    asked, that Cornbread would never do it.

4            So the amount of time given really was

5    irrelevant.  He was never going to do it.  The only

6    solution was changing the order of the show.  It's a

7    stretch to say that good faith -- implied duty of good

8    faith and fair dealing requires that when the contract

9    unambiguously says that it's the circus' power to direct

10    the content and order of the show.  But you've told me

11    about 7C.

12            What else do you have?

13            ATTORNEY PIERCE:  Your Honor, I want to use

14    7C to go in a slightly different direction, though.  The

15    introductory passage of 7C says that the lessee, Feld,

16    has safety as its paramount concern.

17            THE COURT:  No.  It sales lessors.

18            Are you talking about some -- other than 7C?

19    It says lessors also acknowledge.

20            ATTORNEY PIERCE:  Lessors shall acknowledge

21    that --

22            THE COURT:  No, also acknowledge that.

23            And who is the lessors?

24            ATTORNEY PIERCE:  We are.

25            THE COURT:  Right.

1          ATTORNEY PIERCE:  But let me finish that

2     sentence.

3          "Safety is of paramount concern to lessee."

4     To say that -- and I need to bridge into another part of

5     my argument.  But to say that I think means that you've

6     got to proceed in good faith, that that was actual -- a

7     factual --

8          THE COURT:  Well, that depends on -- that

9     depends on whether there's an implied duty of good faith

10    and fair dealing.

11         What other provision other than 7C do you

12    rely on?

13         ATTORNEY PIERCE:  Your Honor, I believe that

14    there are similar types of references --

15         THE COURT:  I don't want what you believe.

16    I asked for specific provisions.

17         ATTORNEY PIERCE:  That's sufficient to make

18    my argument.  So I'll --

19         THE COURT:  All right.  Now, Mr. Porter, why

20    do you think that the implied duty of good faith and

21    fair dealing issue was resolved at the 12(b)?  I don't

22    recall making any ruling that there was or was not an

23    implied duty of good faith and fair dealing.

24         ATTORNEY PORTER:  It was a ruling not made

25    with respect to this particular provision of the lease.

1    It was with respect to the rubber mats.  One of the

2    issues in the original complaint was they claimed that

3    Feld had an obligation to put down certain rubber mats,

4    and --

5            THE COURT:  But I dealt with that on the

6    terms of the lease, not dealing with an implied duty of

7    good faith and fair dealing.

8            ATTORNEY PORTER:  That was the argument that

9    was made.  The argument that was made was that -- we

10   took the position that the lease required them to --

11           THE COURT:  I understand that.

12           ATTORNEY PORTER:  Yes, sir.

13           THE COURT:  It wasn't -- I didn't rule on

14   whether there was or was not an implied duty of good

15   faith and fair dealing.  I ruled that that matter of

16   mats, as I recall, was their problem, not yours; right?

17           ATTORNEY PORTER:  You did.

18           THE COURT:  That's doesn't mean -- that's

19   just -- that can be the same ruling whether there's an

20   implied duty of good faith and fair dealing or not.

21           ATTORNEY PORTER:  Right, except their

22   argument was that you had to --

23           THE COURT:  I haven't ruled on whether there

24   is or isn't.

25           Do you have any authority as to whether in

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    Virginia there is an implied duty of good faith and fair

2    dealing?

3              ATTORNEY PORTER:  It's our position that

4    there is not an implied duty of good faith and fair

5    dealing.

6              THE COURT:  All right.  Then I want you to

7    be sure you read this case.

8              ATTORNEY PORTER:  I will do that.

9              Do you have the citation?  You gave the --

10             THE COURT:  2013 WL 1897111.  It's Stony

11   Glen against Southern Bank & Trust.

12             ATTORNEY PORTER:  Do you know if there's

13   access to -- I'll figure that out.

14             THE COURT:  I don't know.

15             ATTORNEY PORTER:  I don't know either.

16             THE COURT:  So I think that's the central

17   issue I have to decide.

18             ATTORNEY PORTER:  Could I address the lease,

19   the 7C argument?

20             THE COURT:  Yes.

21             ATTORNEY PORTER:  There are two parts, I

22   think, to this, your Honor, with respect to this implied

23   safety argument that they're making.  And one is that I

24   don't think that the lease supports the obligation that

25   they're suggesting that it does.

```
 1              And I think that to read it in a way that
 2     they're asking you to read it would, in fact, be
 3     creating -- would be modifying the contract, which I
 4     think the law is fairly clear that you can't do.  An
 5     implied duty of good faith and fair dealing can't change
 6     the contract.
 7              And if you look at 7, you can't just start
 8     with 7C, you've got to start back with 7A to put the
 9     paragraph in context.  Because what 7A says is it says,
10     "Lessors acknowledge there are international and U.S.
11     federal, state, and local laws and regulations governing
12     animals including, but not limited to, their
13     transportation, housing, care, health status, husbandry,
14     and treatment."
15              It goes on to say, "Lessors agree that
16     lessors," Donnerts, "shall -- and shall cause the acts,"
17     meaning their acts, "to at all times throughout the term
18     comply with all such laws as well as lessee's current
19     policies."
20              Then if you take that to C, what C is
21     talking about there, Judge, when it says that lessee
22     agrees to work with lessors to facilitate compliance,
23     that paragraph is saying that Feld will work with the
24     Donnerts to comply with the U.S. federal, state, and
25     local laws and their own policies.
```

```
 1              So to read into 7C a generic obligation that

 2      Feld has an obligation to work to promote the safety of

 3      their acts would be changing the contract.

 4              The second part to that, Judge, is even

 5      assuming that may be the case, the undisputed evidence

 6      here is that Feld did work with them.  Feld worked with

 7      them.  They offered them options.

 8              The interesting thing about this case is

 9      there's no dispute primarily about the options that were

10      presented.  The only issue is whether or not there was a

11      deadline put on them.

12              So once the act refused to work, Feld

13      offered them options to train, try and make this thing

14      work.  That's working together.  That's evidence they at

15      least tried to work together.  But I think you need not

16      get that far because the compliance referred to in 7C

17      relates to compliance with U.S. federal, state, and

18      local regulations.

19              THE COURT:  All right.  Anything else?

20              ATTORNEY PORTER:  No, sir.

21              THE COURT:  What's your response,

22      Mr. Pierce?

23              ATTORNEY PIERCE:  First, regarding the

24      construction of Paragraph 7 in the lease, Paragraph 7A

25      as a subpart talks about two categories of standards, if
```

1    you will.  One are laws, affirmative organic laws, as

2    well as company internal policies regarding handling.

3    That's the sum and substance of 7A, and that's why 7A

4    stands as a whole.

5            In another location in Paragraph 7C, the

6    scope of Paragraph 7C is something completely different.

7    The scope of Paragraph 7C is safety obligations.  That's

8    a different phenomenon.  It's not even included in the

9    scope of Paragraph 7A.  That's why there's two

10   paragraphs on these separate topics.

11           And the language that we're relying on only

12   appears in and only relates to the obligation of Feld to

13   help facilitate compliance with safety obligations.  It

14   doesn't have any bearing on 7A.  There's no internal

15   pointers that would lead you back to that construction.

16   7C stands on its own.  That paragraph -- that phrase at

17   the end of it modifies it.

18           Next point, your Honor, the language that

19   appears at the introduction of 7C, you will see very

20   comparable language in Paragraph 14H of the employment

21   contract.  I only bring that up to say that they both

22   say the employer has adopted utmost safety as being

23   important to them.

24           And I think that if they represent in a

25   contract a fact like that, then they have a

1    responsibility, have a good faith responsibility to live

2    up to that.

3              Next point, your Honor.

4              THE COURT:  14 what?

5              ATTORNEY PIERCE:  H.

6              THE COURT:  All H says is employee

7    understands that the health, safety, and welfare of the

8    animals are of the utmost importance to employer.

9              How does that relate to this case?

10             ATTORNEY PIERCE:  I think it has a

11   representation by them that, in fact, that is the

12   position that they've adopted.

13             THE COURT:  Are you going to take the

14   position that that provision entitles the plaintiffs to

15   control the order of the acts?

16             ATTORNEY PIERCE:  It's --

17             THE COURT:  Yes or no?

18             ATTORNEY PIERCE:  I'm going to answer no as

19   you've phrased the question.

20             THE COURT:  All right.  Then I don't see

21   the -- because I don't think it does.  It doesn't give

22   them the power to control.  See, that's what I keep

23   coming down to.

24             If Cornbread couldn't do it, that's the

25   problem of the plaintiffs.  If Cornbread couldn't do it

1    the way they wanted it done and it's in the exclusive

2    power of the circus to control the order of the acts,

3    then they can't perform their contract.

4              ATTORNEY PIERCE:  Except that --

5              THE COURT:  And I don't know why you threw

6    in the stuff about injury.  If the horse can't do it,

7    then they can't do the act.  Then they ought not to get

8    paid for it under the contract unless they have a

9    substitute horse, which they had, that didn't work out.

10             ATTORNEY PIERCE:  Your Honor, if I can

11   bridge to a related concept.

12             THE COURT:  Yes.

13             ATTORNEY PIERCE:  In our Proposed Jury

14   Instruction 18 -- and although I didn't itemize

15   individual authorities, to the effect is *Spotsylvania*

16   *County vs. Seaboard Surety*, 243 Virginia 202 at Pages

17   209 and -10.

18             THE COURT:  All right.  And what does that

19   stand for?

20             ATTORNEY PIERCE:  They stand for the notion

21   that a party, in this case Feld, cannot take conduct

22   that prevents us from performing our obligations under

23   the contract.  And how that applies in our scenario is

24   we have affirmative safety obligations under this

25   contract.  If they impose requirements on us that

1    prevent us from performing the safety obligations that

2    we have agreed to take on, they fall within this --

3            THE COURT:  So your view is that by changing

4    the order of the shows, they rendered it impossible for

5    your client to perform; is that right?  Yes or no?

6            ATTORNEY PIERCE:  Effectively.  I don't

7    think it's necessary to phrase it as impossible because

8    I don't think that legal principle gets that far, but I

9    would say yes.

10           THE COURT:  What does the legal principle

11   say?

12           ATTORNEY PIERCE:  If they prevent us from

13   being able to perform.  We have a Hobson's choice to

14   make.  We've got to go one way or the other.  If we go

15   one way, we're going to violate the safety provision.

16   And if we go the other way, they're going to say we

17   violate --

18           THE COURT:  What do you mean violate the

19   safety provision?

20           ATTORNEY PIERCE:  Somebody is going to get

21   hurt.  It's an accident waiting to happen.

22           THE COURT:  All right.  Anything -- all

23   right.  Mr. Porter, you want to respond?

24           ATTORNEY PORTER:  I don't know if you want

25   to hear further on the argument from Paragraph 14H or if

1    you're satisfied with that.  But I don't think that

2    imposes the obligation that they're suggesting.

3         As you've noted, it says that the Donnerts

4    understand that safety is important to the employer.

5    And then again, if you read the whole paragraph, it

6    incorporates the Paragraph 16 material, which is the

7    animal rights material and federal regulations.

8         As to the point he last made about how we

9    prevented performance, I'm not really quite sure how I

10   understand that.

11        THE COURT:  Well, what he's saying is that

12   by changing the order of the show, then given the

13   plaintiffs' view of the safety considerations, it

14   prevented them from performing.

15        ATTORNEY PORTER:  But that's not a violation

16   of a right in the contract.  We were allowed to control

17   the order of the show.  The performers had no right to

18   do so.  They can either perform as they're directed to

19   perform or they don't.

20        THE COURT:  That's the crux of the Rule 50

21   motion.

22        ATTORNEY PORTER:  Right.

23        THE COURT:  Because the evidence in this

24   case is precisely that.

25        All right.  I think I'll rule on this at

1    1:30 and then deal with the instructions if it's

2    appropriate to do so at that time.

3                ATTORNEY PORTER:  Yes.

4                THE COURT:  You gave me one case to read on

5    preventing performance.

6                Anything else you want to call my attention

7    to, Mr. Pierce, any other authorities?

8                ATTORNEY PIERCE:  If you could give me a

9    moment.  I cited to the model pattern instructions.

10   There are four or five annotations to that.  I could

11   make them available if you like, but it would take me a

12   minute to get the page out.

13               THE COURT:  What good is that going to do me

14   if it isn't something that's focused on the arguments

15   that I've heard?

16               ATTORNEY PIERCE:  It's focused on the legal

17   principle behind the jury instruction that I've now

18   argued to you.

19               THE COURT:  All right.  Whatever case you

20   have, let me have it.

21               ATTORNEY PIERCE:  Okay.

22               THE COURT:  And Mr. Porter as well.

23               Do you have any cases you want me to look

24   at?

25               ATTORNEY PORTER:  No, sir.  If I could

1    impose upon the Court -- and I hate to do this -- the

2    Westlaw site, I think we're going to have a lot of

3    trouble getting down in the library.  I don't have a

4    Westlaw account.  I want to be responsive to your

5    request that we review that case.  I want to be

6    prepared.  But I'm not quite sure that I can do it given

7    what I got.

8              THE COURT:  All right.  I'll deal with that.

9              ATTORNEY PORTER:  Okay.

10              THE COURT:  I understand that.

11              Yes.

12              ATTORNEY PIERCE:  It's going to take five or

13    ten seconds to get the page out.  If somebody would be

14    available after court adjourns, I'll hand that up.

15              THE COURT:  Are they listed on your proposed

16    instructions?

17              ATTORNEY PIERCE:  No.  I only cited to the

18    pattern number.  I have the actual pattern here.

19              THE COURT:  Which ones is it that you --

20    because some of those are irrelevant to this case.  I'm

21    not going to give instructions on offer and acceptance.

22    That's silly.

23              ATTORNEY PIERCE:  My Proposed Jury

24    Instruction 18 has the pattern number and --

25              THE COURT:  18?  And 18 is the one that --

1   is that the *Spotsylvania* case that you cited?

2              ATTORNEY PIERCE:  It is.

3              THE COURT:  What's the citation to it again?

4              ATTORNEY PIERCE:  243 Virginia 202.

5              THE COURT:  Is there a Southeast 2nd to it?

6              ATTORNEY PIERCE:  There is, but I didn't

7   write it down.

8              THE COURT:  243 Virginia?

9              ATTORNEY PIERCE:  Correct.

10             THE COURT:  What page number?

11             ATTORNEY PIERCE:  202, Pinpoint Cite 209 and

12  -10.

13             THE COURT:  And the style of the case?

14             ATTORNEY PIERCE:  It's a Virginia Supreme

15  Court case.

16             THE COURT:  The style.  What's the name of

17  the case?

18             ATTORNEY PIERCE:  I'm sorry.  *Spotsylvania*

19  *County vs. Seaboard Surety*.

20             THE COURT:  All right.  I'll look at that.

21             Anything else, Mr. Pierce?

22             ATTORNEY PIERCE:  I don't believe so.

23             THE COURT:  I'll recess.  We'll reconvene at

24  1:30.  And I have in mind your problem.

25             ATTORNEY PORTER:  And sir, do I understand

1    that before we reconvene at 1:30, we're going to get

2    from you --

3              THE COURT:  No, you won't get it until then.

4              ATTORNEY PORTER:  Okay.

5              THE COURT:  But you'll get my ruling, and

6    then you'll get the package, and then you'll have to

7    proceed.

8              ATTORNEY PORTER:  Thank you, sir.

9              THE COURT:  Court stands in recess.  You'd

10   better take the time to have lunch.

11             ATTORNEY PORTER:  Thank you, sir.

12             (Court recessed at 12:25 p.m.)

13             (Court called to order at 1:35 p.m.)

14             THE COURT:  All right.  The matter is before

15   the Court on a motion for judgment as a matter of law

16   with respect to, I assume, both of the remaining claims,

17   the breach of contract claims for both the breach of the

18   employment contract as -- together with the addendum and

19   the lease agreement.

20             It seems to me that the parties agree that

21   if there's a breach of the employment agreement and

22   addendum, there's a breach of the lease agreement.  If

23   there's not a breach of the employment agreement, there

24   isn't a breach of the lease agreement.

25             ATTORNEY PORTER:  We made an argument that

1    they're separate, but you've already ruled on that

2    issue, so we're not raising that issue again.

3              THE COURT:  All right.  Now, I'm going to

4    continue to take the Rule 50 motion under advisement as

5    the rule permits.  I have very significant doubts about

6    whether there really is an issue for the jury in this

7    case, but I'm going to let it go to the jury with one

8    exception:  I am going to grant the judgment as a matter

9    of law with respect to any argument made in connection

10   with Paragraph -- I inadvertently left the lease.  But

11   I'm going to grant the motion for judgment as a matter

12   of law with respect to the claim for breach of contract

13   with respect to a certain provision of the lease that I

14   have construed.

15             It makes -- it's important to note that

16   ordinarily the construction of a written contract is a

17   matter for the Court alone.  Many cases provide for

18   that, including *American Insurance Company against*

19   *Damascus Lumber* at 139 Virginia.  If the terms of the

20   contract are clear and unambiguous, the Court alone must

21   construe the contract, the cases clearly provide.  And

22   in such a case, it's improper to submit the contract to

23   the jury for interpretation.

24             And I think this portion that I'm referring

25   to is clear and unambiguous.  And I am going to grant

1    the motion with respect to that provision, which I'll

2    come to in a moment.

3             Where a contract is clear and unambiguous,

4    no extrinsic evidence becomes admissible, and no

5    extrinsic evidence was introduced with respect to any

6    ambiguity relating to the intent of the parties at the

7    time or anything of that sort.

8             So the construction of this provision of the

9    contract is a question of law for the Court alone.  This

10   provision is Paragraph 15, which says that at the end --

11   oh, it says in the middle that lessors have the sole

12   responsibility and control of the manner, the means, and

13   the sequence of performing the services relating to this

14   lease.

15            My ruling is that that does not extend to

16   the order or sequence of the show.  In other words, no

17   argument could be made because I construe that to mean

18   that the manner, means, and sequence of performing

19   services related to the lease means services related to

20   the lease, which isn't the order and artistic content of

21   the show.  It's the animal husbandry, the housing, the

22   feeding, and so forth of the animals.  That's what's --

23   that's what that means.

24            And as I said, I've cited substantial

25   authority that it's for the Court to construe.  I think

1    it's clear and unambiguous.  There wasn't any evidence

2    submitted as to the intent of the parties at the time

3    that somehow that extended to the order of the show.  It

4    didn't.  Never was -- it's just not in the plain and

5    unambiguous language, nor is anything that I read in the

6    employment contract or addendum supportive of that.  It

7    all contradicts that.

8          That's the problem I'm having with the Rule

9    50 motion.  I think it clearly and unambiguously leads

10   to the circus as the sole and exclusive control of the

11   artistic content, which includes the order of the show.

12   That's part of the artistic content of the show.

13         Now -- but I'm going to allow the matter to

14   go to the jury on instructions which I will provide to

15   you in just or couple of minutes in which I think the

16   essential argument is that the plaintiff claims the

17   contracts were breached because the contracts have an

18   implied duty of good faith and fair dealing and that the

19   plaintiff contends that the -- they raised a safety

20   issue and that the defendant did not act in good faith

21   with respect to resolving that.  The plaintiff -- the

22   defendant says they did.

23         I'm going to make clear to the jury that the

24   implied duty of good faith and fair dealing does not add

25   any duties.  It merely applies to duties that are

1      already in the contract and requires those duties to be

2      performed in good faith.

3              The reason I'm having difficulty with the

4      Rule 50 is that I think the order of the show -- they're

5      not required to change the order of the show.  They

6      can -- "they," meaning the circus, can have the order of

7      the show in whatever order they want.  But -- and I'll

8      reserve that until the end after there's a verdict if

9      it's necessary to do so.

10             But here I think the argument of the

11     plaintiffs is that they had an obligation to work with

12     us in good faith, and that included changing the order

13     of the show.  Because the testimony was clear that that

14     was the only remedy, at least for -- I keep forgetting

15     the horse's name.

16             Fruitcake?

17             ATTORNEY PORTER:  Cornbread.

18             THE COURT:  It's Christmas.  Thanksgiving.

19     Corn read.  That's Thanksgiving, too.

20             And that's essentially the plaintiffs'

21     argument, that, "They had a duty to negotiate in good

22     faith.  What they offered us wasn't evidence of good

23     faith."  And I think the defense argument is that they

24     did.  It was good faith.

25             The problem is -- with the plaintiffs' case,

1    as I see it, is I don't believe there is any implied

2    duty of good faith and fair dealing to change the order

3    of the show.  But I'm going to submit the case to the

4    jury, and we'll see.  That's the only basis, I think, on

5    which the jury might find for the plaintiffs, but we'll

6    see.  I could be wrong.  And it may be that the jury

7    will find for the defendant, in which case all of this

8    is obviated.

9         Now, I've ruled on Rule 50 by granting the

10   motion for judgment as a matter of law with respect to

11   the breach of contract argument that rests on

12   Paragraph 15 of the lease.  That is in favor of the

13   defendant.  There is no argument based on that.  And I

14   have deferred ruling on it for the time being.

15        All right.  Any questions, Mr. Pierce or

16   Mr. Porter, on that?

17        ATTORNEY PIERCE:  No, your Honor.

18        ATTORNEY PORTER:  No, sir.

19        THE COURT:  And I did make some

20   arrangements, but I understand you made your own

21   arrangements and got the case.  It isn't that case that

22   I would rely on.  It's the cases cited in there that I

23   would find -- that I found probably point to the

24   conclusion that in Virginia, there is an implied duty of

25   good faith and fair dealing.  It hasn't been stated in

1   quite the emphatic, affirmative way that one would hope

2   and expect the Supreme Court to do one way or the other.

3          I'm old enough when I can remember that it

4   was black letter law that there wasn't such a duty in

5   Virginia, that the implied duty of good faith and fair

6   dealing didn't exist.

7          Now we're in an age of some doubt about it

8   and ambiguity about it.  But I think on the whole, I'm

9   prepared to recognize it here.  But as I said, I have

10  serious concerns under Rule 50 as to whether such an

11  implied duty of good faith and fair dealing would ever

12  require the circus to change the order of the show,

13  because that would contradict the employment contract

14  which clearly, I think, provides that -- or confers that

15  duty and that power on the circus.

16         All right.  Now, I'm going to take a recess.

17  In about two minutes, I hope that a package of

18  instructions will be presented to you.  I want you to

19  read those instructions quickly, and then I want you to

20  confer, if you have objections with each other, to

21  advise each other of the objections and the bases for

22  those.  And then I will reconvene -- I'll reconvene very

23  quickly unless you need more time.  You can tell

24  Mr. Wood if you do.  I intend to convene at about five

25  minutes after 2:00.  And then we'll proceed with your --

1    I'll deal with your objections, if you wish to add an

2    instruction, subtract an instruction, or change.

3            Now, if you agree to a change, I'll ask for

4    that first.  Because I'm likely to acquiesce in any

5    agreed change or revision.  They're fairly

6    straightforward.  They're fairly simple.  There's no

7    dispute about whether the contracts exist or whether

8    they're valid.

9            It's silly.  Some of you submitted

10   instructions on consideration.  That's silly.  We don't

11   need anything like that.  It just confuses matters.  The

12   sole question presented is whether the termination was

13   for cause or not.  And if I've omitted an instruction,

14   you can provide it or you can argue for it.

15           And I have a jury verdict form as well,

16   which I'll ask Mr. Wood to provide that to you as well

17   when I recess.

18           All right.  Court stands in recess for

19   15 minutes, and I will have the instruction package

20   brought out to you promptly.

21               (Court recessed at 1:48 p.m.

22               (Court called to order at 2:00.)

23           THE COURT:  Do you need a few more minutes?

24           ATTORNEY PORTER:  It would be helpful, I

25   think.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

```
1              THE COURT:  Let me ask this:  Do you have --
2    for the videos, do you have a copy of the videos on a
3    thumb drive or something?
4              ATTORNEY PORTER:  We have a copy of ours on
5    a thumb drive.
6              Do you have a copy of yours?
7              ATTORNEY PIERCE:  I only have the full set.
8    I haven't deleted the ones that weren't admitted.
9              THE COURT:  All I want is the admitted
10   exhibits.
11             Do you have a thumb drive or a copy of the
12   admitted exhibits?
13             ATTORNEY PROCTOR:  Would you like us to put
14   them on one together?
15             THE COURT:  I beg your pardon?
16             ATTORNEY PORTER:  We have ours on one thumb
17   drive.  We can add his to ours and give you one thumb
18   drive.
19             THE COURT:  Is yours a separate exhibit,
20   Mr. Pierce?
21             ATTORNEY PIERCE:  They were separate, yes.
22             THE COURT:  What I want you to do -- can you
23   put them now on a thumb drive together, one thumb drive?
24             ATTORNEY PORTER:  Yes, sir.
25             THE COURT:  The gentleman right behind is
```

1    the expert who will take that thumb drive, and he will

2    ensure that the jury has the proper machinery with which

3    to watch it.

4              Now, are the exhibits denominated by number

5    or anything on the thumb drive?

6              ATTORNEY PORTER:  Yes, sir.

7              ATTORNEY PIERCE:  Mine are.

8              THE COURT:  Can you make sure yours is,

9    too, Mr. Pierce?

10             ATTORNEY PIERCE:  Mine are, yes.

11             THE COURT:  Now, how do we ensure that -- I

12   want to ensure that the only exhibits that the jury gets

13   are the ones that I have actually admitted.  I can't do

14   that, neither can the deputy clerk.  Counsel are the

15   only -- you all are the only ones who can determine

16   that.  So when you give the thumb drive to --

17             Can you check it up here, Lance?

18             MR. BACHMAN:  Yes.  I can get the computer

19   and meet you in chambers.

20             THE COURT:  I will look at it, too.  But I

21   want you all to be able to confirm to me that what's on

22   this single thumb drive with the numbers is all that's

23   been admitted and something more.  And give that -- you

24   don't need to stay, I guess, Lance.  Give it to Mr. --

25             MR. BACHMAN:  I'll go get the laptop

1    computer.

2              MR. BACHMAN:  Yes, sir.

3              THE COURT:  And give it to Mr. Wood as

4    quickly as you can.

5              MR. BACHMAN:  Yes, sir.

6              THE COURT:  How much time should we give,

7    10, 15 minutes or what?

8              ATTORNEY PORTER:  I think 10 minutes is

9    fine.

10             THE COURT:  All right.  We'll reconvene for

11   the instructions conference in 10 minutes and proceed.

12             Court stands in recess.

13             (Court recessed at 12:03 p.m.)

14             (Court called to order at 12:15 p.m.)

15             THE COURT:  All right.  Let's begin.

16             The instructions are in a package of three

17   parts:  Standard opening, standard closing, and

18   substantive instructions.  The standard opening

19   instructions extend from Page 1.  You'll see the numbers

20   at the page at the bottom.  1 to -- through Page 21.

21             Now, let me ask to begin with, with respect

22   to Pages 1 through 21, are there any agreed-upon

23   changes?

24             ATTORNEY PORTER:  The only question I have

25   is on 8, you had some markings on the version you gave

1    us.  I take it that that's coming out.

2              THE COURT:  Well, wait a minute.

3              My question was are there any agreed-upon

4    changes in 1 through 21?

5              ATTORNEY PIERCE:  There are no agreed, and

6    there are no issues with it either.

7              THE COURT:  All right.  Now, what was the

8    writing on the bottom that you asked about?

9              ATTORNEY PORTER:  On Page 8, the version we

10   have has two brackets relating to stipulations.

11             THE COURT:  Oh, all right.

12             Do you see those, Mr. Pierce --

13             ATTORNEY PIERCE:  I did.

14             THE COURT:  -- the ones that Mr. Porter is

15   calling my attention to?

16             I had planned to omit those because there is

17   no stipulation or judicial notice.

18             ATTORNEY PORTER:  I thought that was the

19   point that you were making.  I wasn't sure it was clear.

20             THE COURT:  There is.

21             Any objection to striking that, Mr. Pierce?

22             ATTORNEY PIERCE:  No.

23             THE COURT:  All right.  Those will be

24   stricken.  Anything you can do to shorten it and clarify

25   it.

1          Now, we start with the substantive

2    instructions which on 21 and extend through 2- -- or

3    extend through 3- -- 33.

4               ATTORNEY PORTER:  34.

5               THE COURT:  33 or 34.

6               Now, let's take that.  First, are there any

7    agreed-upon changes?  And then I'll go and ask you

8    whether there are any objections to what's included or

9    what's omitted.

10              ATTORNEY PORTER:  I think the only

11   agreed-upon change is the one to Page 25, material

12   breach of contract.

13              THE COURT:  Yes.

14              ATTORNEY PORTER:  I think we both thought

15   that that maybe didn't fit in well with the other

16   instructions.  There's no other reference to material

17   breach in the instructions, I don't believe.

18              THE COURT:  All right.  Where is it?

19   Page what?

20              ATTORNEY PORTER:  25.

21              THE COURT:  25.

22              And what are you asking?

23              ATTORNEY PORTER:  Material breach is not

24   otherwise referenced in any of the instructions, so a

25   definition of material breach might be confusing.

1           THE COURT:  I can strike "material."

2           Is that what you're asking?  That would make

3   it --

4           ATTORNEY PORTER:  That would work.

5           THE COURT:  Any objection to striking

6   "material," Mr. Pierce?  That only benefits you.

7           ATTORNEY PORTER:  I mean, that was my

8   original point with this.  I don't think this applies,

9   this instruction at all.

10          THE COURT:  Why not?

11          ATTORNEY PORTER:  Well, it's defining

12  material breach.

13          THE COURT:  It's defining a breach.

14          ATTORNEY PORTER:  I think it's defining a

15  material breach.

16          THE COURT:  That's what's at issue, is

17  whether or not there's a breach.  It seems to me I have

18  to give an instruction on what is a breach.  And I take

19  your point about the word "material" not appearing

20  anywhere else.  Strike "material."  And what is a breach

21  of a contract?  It's failing to do something the

22  contract requires, isn't it?

23          ATTORNEY PORTER:  Yes, sir.

24          THE COURT:  Any objection to striking

25  "material," Mr. Pierce?

1          ATTORNEY PIERCE:  No, your Honor.

2          THE COURT:  Mr. Porter, any objection to

3     striking the word "material"?

4          ATTORNEY PORTER:  Well, if we're going to

5     use this instruction, I'd prefer the version you --

6          THE COURT:  What instruction would you offer

7     that defines what a breach is?

8          ATTORNEY PORTER:  Well, I thought that some

9     of the other instructions dealt with the contract

10    itself, and I thought -- when I read it, I thought

11    material breach was out of place.

12         THE COURT:  Well, I'll strike the word

13    "material."  But now -- because I don't know where else

14    a breach is defined.  Can you point that to me?  Because

15    I certainly don't want to have repetitive instructions.

16    But if you've got somewhere else where breach is

17    defined, then I will pay attention to that.

18         ATTORNEY PORTER:  I think that

19    Instruction 23 defines the elements of the breach, and

20    it would be my thought that that's sufficient without

21    the definition of material breach.

22         THE COURT:  The elements of a breach?

23    That's what the title says.  I'm not going to read them

24    the title.  But all it says is, "Did the defendant, by

25    terminating plaintiffs, breach" -- that's really what --

1    the argument you're making is you don't need a

2    definition of breach if -- I take it the parties can

3    agree that termination without any cause would be a

4    breach.

5              ATTORNEY PORTER:  Yes, sir.

6              THE COURT:  Well, I'm going to overrule your

7    objection.  I'm going to give the instruction as I have

8    it omitting the word "material."

9              Now, any other objections to the substantive

10   instructions?  Let's start with the first page.  Any

11   change on --

12             ATTORNEY PORTER:  26, sir.

13             THE COURT:  26.

14             Anything before 26, Mr. Pierce?

15             ATTORNEY PIERCE:  Yes, your Honor.  On

16   Page 22 --

17             THE COURT:  Yes.

18             ATTORNEY PIERCE:  -- if this was merely

19   intended to be a summary or overview --

20             THE COURT:  Yes.

21             ATTORNEY PIERCE:  -- then I don't have any

22   objection.

23             THE COURT:  That's all it is.

24             ATTORNEY PIERCE:  Okay.

25             THE COURT:  I'm giving them a summary.

1          ATTORNEY PORTER:  I have an objection to 22

2    that also relates -- it's the same issue with 26, and

3    that's to the instruction -- it says, "A party to a

4    contract who prevents the other party from performing

5    his obligation under a contract has breached the

6    contract."

7          THE COURT:  Yes.

8          ATTORNEY PORTER:  That comes from the form

9    instruction in Virginia, but there's a big alert.  And

10   we have the case here that goes with it that says that

11   if you're permitted to do such -- take such an action,

12   and here we're permitted to change the show order, it's

13   not a proper instruction.

14          Have I articulated that well?

15          THE COURT:  Yes, you've said it.  It's the

16   same thing I said about the Rule 50 motion.

17          I think that's right.

18          ATTORNEY PORTER:  I have the case here that

19   stands for that proposition.

20          THE COURT:  Well, it's common sense.

21          ATTORNEY PORTER:  Right.

22          THE COURT:  It's common sense.  And I

23   understand that.  It's what I said; that if -- as I

24   concluded thus far, if the circus has the power, the

25   right under the contract to change the order, then

```
1    impossibility doesn't -- there's no prevention that

2    comes into play, but that's wrapped up with the Rule 50

3    motion.

4              ATTORNEY PORTER:  Okay.  My point on that is

5    I just think that it -- well, I think it's not the right

6    instruction for the jury.  It's also cumulative in the

7    sense that it's in two places.

8              THE COURT:  Where is it in another place?

9              ATTORNEY PORTER:  It's in the summary of

10   facts.

11             THE COURT:  Yes, but that's just their

12   contention.  Now I'm instructing them on the law.  SO

13   it's not cumulative.

14             ATTORNEY PORTER:  Okay.  Yes, sir.

15             THE COURT:  Let me just reiterate what I

16   said to be unmistakably clear.

17             My difficulty with the Rule 50 motion

18   with -- the reason I have difficulty in granting it at

19   this time -- I may grant it ultimately -- I think it is

20   clear that the circus has the right to alter the order

21   of the acts, and it seems to me that put in the context

22   of this case, that means people have to accommodate that

23   new order.

24             And here it seems there was evidence that

25   Cornbread couldn't do it.  Get another horse.  That's
```

1    what's required.  There's no immutable law that says

2    that a comedy act can't come when this comedy act was

3    supposed to be put on.

4            So I'm not sure that impossibility is -- or

5    that that does prevent employment.  You know, there was

6    another horse.  They didn't produce him until late.  He

7    wasn't show-ready, as the testimony indicated.  But as

8    you would point out, Mr. Porter, you gave them time to

9    make him show-ready.

10           In any event, your point is well-taken, but

11   it goes to Rule 50.  I agree with your point that it is

12   the law of Virginia that if the contract permits an

13   action, that action can't be relied upon as a basis for

14   the party claiming that the action prevented

15   performance.

16           Let me say beyond that.  If, as I may

17   ultimately conclude, the circus has the power under the

18   contract to control the order of the show, then

19   decisions it makes about the order and the artistic

20   content, which is part of the order, that's what you

21   have to do.

22           And there isn't any evidence that it

23   couldn't be done.  There was evidence that Cornbread

24   wasn't able to do it very well, but there isn't any

25   evidence that it couldn't be done.  They weren't asking

1    the horse to jump over the moon or to recite Julius

2    Caesar in Latin or something like that.  There was

3    really no -- no -- nothing that the circus required that

4    rendered it impossible.

5              What the instruction says is that they

6    prevented them from performing the contract.  Your point

7    is, Mr. Porter, that if they have the right to do it

8    under the contract, that can't be a basis for

9    prevention.  I agree with that, and that may be what I

10   rule in Rule 50 at the end.  But for now, I'm going to

11   give it.

12             ATTORNEY PORTER:  Yes, sir.

13             THE COURT:  Mr. Pierce, do you have a view

14   you want to express?

15             ATTORNEY PIERCE:  On that issue?

16             THE COURT:  Yes.

17             ATTORNEY PIERCE:  No.  You're where I would

18   want you to be, so I don't have anything to add to that,

19   your Honor.

20             THE COURT:  Do you have anything to say

21   about if you do get a verdict, it sounds like I might go

22   the other way?  But I'll give you a chance to address it

23   at that time.

24             ATTORNEY PIERCE:  I would think that would

25   be a good thing.

```
 1              THE COURT:  But you're going to have to do
 2    it immediately.
 3              ATTORNEY PIERCE:  Today, you mean?
 4              THE COURT:  Whenever there's a verdict.  If
 5    there's a verdict in favor of the plaintiffs, I'm going
 6    to rule on Rule 50 today.
 7              All right.  Any other changes to the
 8    substantive instructions?  What I did, Mr. Porter, was
 9    to overrule your objection to the instruction on
10    Page 26.  Your objection to the instruction on Page 26
11    is that it's contrary to the evidence.
12              ATTORNEY PORTER:  Yes, sir.
13              ATTORNEY PIERCE:  Your Honor, I have one
14    last one, and that's on Page 27.
15              THE COURT:  Yes.
16              ATTORNEY PIERCE:  The first sentence is
17    fine.  We -- I just want to reserve my objection.  I
18    don't believe --
19              THE COURT:  27.
20              ATTORNEY PIERCE:  Page 27.
21              THE COURT:  All right.  What's the
22    objection.
23              ATTORNEY PIERCE:  The second sentence.
24              THE COURT:  What does it say?  "If, on the
25    other hand, you find plaintiff did not prove that
```

1    defendant breached the employment contract, it follows

2    that defendant did not breach the lease."

3             ATTORNEY PIERCE:  Right.

4             THE COURT:  Really?  What's the breach if he

5    didn't -- if there -- aren't they tied together?

6    There's no way that if he -- they don't have an

7    obligation to continue doing all the things under the

8    lease if they terminate them correctly?

9             ATTORNEY PIERCE:  Well, maybe my issue is

10   there's a matter of interpretation that goes into this.

11   Because those two documents are coterminous, they need

12   to be construed together.  So saying that if there is no

13   breach in the employment contract when they're going to

14   be construed together, jointly, I think that may be

15   where my issue is.

16             I don't think it necessarily follows, that

17   second sentence, because they are to be construed

18   together, and one has meaning with the other.  They were

19   issued at the same time.  They were signed at the same

20   time.  There's no magical divide.

21             THE COURT:  If there's no breach of the

22   employment agreement, can there be a breach of the

23   lease?

24             ATTORNEY PIERCE:  I think there can, your

25   Honor.

```
 1              THE COURT:  No, there cannot.

 2              ATTORNEY PIERCE:  I'll preserve my

 3    objection.  I understood that's where you were going.

 4              THE COURT:  Do you see any way if there's --

 5    if there isn't a breach of the employment contract, that

 6    there can be a breach of the lease?

 7              ATTORNEY PORTER:  No, sir.

 8              THE COURT:  Now, it is true, as Mr. Pierce

 9    points out, that they are to be read together; right?

10              ATTORNEY PORTER:  Well, there are two

11    agreements that were signed at the same time, and

12    there's language that, as you've highlighted, says that

13    a breach of one is a breach of the other.  I don't, by

14    and large, dispute what you're saying.

15              THE COURT:  Let me ask you this:  Suppose

16    Mr. Pierce argues to the jury that, "Look, this

17    paragraph in the lease," Paragraph 7C, I think it was,

18    "suppose there's a" -- he argues there was a breach of

19    the good faith and fair dealing with respect to that

20    provision.

21              Now, if they prove that, I don't see how the

22    termination could conceivably have been warranted;

23    right?

24              ATTORNEY PORTER:  Correct.

25              THE COURT:  So there would have to be a
```

1   violation of both, Mr. Pierce.  There couldn't be a

2   violation of the employment agreement without there also

3   be -- without it also including the lease.  And if you

4   don't show that the employment agreement was violated,

5   there can't be a violation of the lease.

6           If your argument somehow persuades the jury

7   on Paragraph 7C, that means that the termination was not

8   appropriate; right?

9           ATTORNEY PIERCE:  Which is exactly where I

10  intended to go and why I raised my objection.

11          THE COURT:  And that would be a violation of

12  the employment agreement, wouldn't it?

13          ATTORNEY PIERCE:  I think so because they're

14  coterminous.  And as long as I can argue that --

15          THE COURT:  "Coterminous" just means at the

16  same time.  I don't think coterminous really answers the

17  question.  They're inextricably intertwined.

18          ATTORNEY PIERCE:  Agreed.

19          THE COURT:  Any other objections that I

20  should consider, Mr. -- let me ask Mr. Pierce first.

21  Any other objections?

22          ATTORNEY PIERCE:  I've made my points, your

23  Honor.  No.

24          ATTORNEY PORTER:  No, sir.

25          THE COURT:  All right.  Now, we will have

1    the jury --

2              ATTORNEY PIERCE:  Your Honor, I made a

3    mistake, and I apologize.  I just want to preserve that

4    the point I just raised has consequences for the verdict

5    sheet.

6              THE COURT:  All right.  Let's go to the

7    verdict form.

8              What's your objection to the verdict form?

9              ATTORNEY PIERCE:  In Question No. 1, I think

10   the conjunctive "and" is problematic because I don't

11   think I have to prove a breach of all three of those

12   things.

13             THE COURT:  Well, the contract and the

14   addendum are together, the employment contract.  They're

15   one agreement.  They're not two agreements.  They're one

16   agreement.

17             ATTORNEY PORTER:  And the addendum wraps in

18   the lease.

19             THE COURT:  Right.  So I don't see how -- if

20   you prove that they breached that provision in the

21   lease, which I am generously and perhaps mistakenly

22   allowing you to argue, if you prove that, then the

23   termination wasn't proper, was it?

24             ATTORNEY PIERCE:  That's our position, yes.

25             THE COURT:  So they are all together.  It is

1    "and."

2              ATTORNEY PIERCE:  I still think it's the

3    disjunctive "or."

4              THE COURT:  It can't be.  It can't be.

5    There can't be separate -- in other words, if you went

6    to No. 2, if you found that there was a breach of the

7    lease agreement, you didn't find there was a breach of

8    the employment agreement, that wouldn't make any sense,

9    would it?

10             ATTORNEY PIERCE:  As to that piece of it,

11   yes.

12             THE COURT:  All right.  Well, I think I

13   understand your point maybe even a little better than

14   you do.  It doesn't matter whether it's conjunctive or

15   disjunctive.  The fact of the matter is that the

16   argument you wish to make about 7C, if you prevail in

17   that argument, it necessarily means that there has been

18   a breach of the employment agreement.

19             ATTORNEY PIERCE:  Okay.

20             THE COURT:  And the employment agreement and

21   the addendum are not separate agreements.  It's one

22   agreement.  And as Mr. Porter pointed out, the addendum

23   also wraps in the lease.  They're all really one

24   agreement.

25             All right.  Anything else, Mr. Pierce?

1          ATTORNEY PIERCE:  No, your Honor.

2          THE COURT:  Mr. Porter.

3          ATTORNEY PORTER:  No, sir.

4          THE COURT:  All right.  Now, have you

5    provided Mr. Bachman with the --

6          MR. BACHMAN:  Your Honor, they're in here

7    now, the exhibits.

8          THE COURT:  And so you're ready -- when the

9    jury retires after I instruct them, can you take that in

10   and --

11         MR. BACHMAN:  Yes, I can take that in.

12         THE COURT:  They're not required to listen

13   to it or watch it, but they may do as they wish.

14         Now, I'm going to have the jury brought in.

15   I will give you -- we'll move the podium, Mr. Wood.

16         MR. BACHMAN:  Did you want to review the

17   exhibits on the thumb drive, your Honor?

18         THE COURT:  Have you all seen the thumb

19   drive?

20         MR. BACHMAN:  Defendant's Exhibit 81.

21   Defendant's Exhibit 82.

22         THE COURT:  The record reflect that we're

23   all looking at it right now.  And what I want to know

24   from counsel is whether the thumb drive now makes --

25   makes clear that Exhibits -- and they can select the

1    exhibit number and look at it.  I don't need to see the

2    actual exhibit.

3            ATTORNEY PORTER:  Yes from the defendant's

4    side.

5            (Conferring.)

6            ATTORNEY PIERCE:  I believe that to be the

7    case.

8            THE COURT:  All right.  Just for idle

9    curiosity, pick one of them for me, would you, please,

10   Mr. Bachman.  Let's see what it looks like.

11           MR. BACHMAN:  (Complied).

12           THE COURT:  Enough.  Now, I want you to do

13   thing.

14           MR. BACHMAN:  Turn that down?

15           THE COURT:  Well, I don't think I admitted

16   it, but I don't think we heard the audio.

17           ATTORNEY PORTER:  We did hear the audio for

18   the altercation.  We tried to get the audio to work, and

19   we had a technical problem.

20           THE COURT:  Are the parties in agreement

21   that the exhibits with the audio are admitted?

22           ATTORNEY PORTER:  Yes, sir.

23           THE COURT:  So when you take it inside to

24   the jury room, Mr. Bachman, they can hear and see

25   things, but you can show them how to turn it down.

1          MR. BACHMAN:  Will do.

2          THE COURT:  You all may think it's funny,

3    but I would have difficulty even with instructions doing

4    it.

5          MR. BACHMAN:  Your Honor, may I just leave

6    this here and have Teresa or somebody contact me and

7    come back up?

8          THE COURT:  Yes.  You're excused.

9          The podium has been moved.  And you've got

10   about 20 minutes, each of you.  You want to reserve

11   about five for your rebuttal -- or you do.

12         ATTORNEY PIERCE:  Yes.

13         THE COURT:  You've got 15 and 5.  Let's have

14   the jury brought in.

15         (Jury impaneled at 2:37 p.m.)

16         THE COURT:  All right.  First, let me thank

17   you for your patience.

18         Now we're ready to proceed with closing

19   arguments.  Closing arguments are not evidence, but

20   they -- the lawyers are entitled to now summarize and

21   interpret the evidence as they see it for you.  If any

22   difference should appear to you from what -- any

23   difference between the evidence as they recall it and

24   the evidence as you recall it, it is your recollection

25   that controls.

```
 1              Also, the parties have been informed about

 2     the instructions, the rules of law that I will give to

 3     you following their instructions (sic).  So they're not

 4     proceeding in ignorance of what I'm going to instruct

 5     you.  And they're permitted to refer to it.

 6              But if any difference appears to you between

 7     what they say the law is and what I tell you the law is,

 8     then you must be guided by what the Court tells you is

 9     the law.

10              Now, these arguments will be about -- no

11     more than 20 minutes in length.  The plaintiff has an

12     opportunity to make the opening argument, plaintiffs do,

13     because the plaintiffs have the burden of proof in this

14     matter.  And then the defendants will have their closing

15     arguments.  And then the plaintiffs have an opportunity

16     for rebuttal because the plaintiffs have the burden of

17     proof.  And the rebuttal will be very brief, whatever is

18     left over of the 20 minutes.

19              And following that, I will give you

20     instructions on the law, which should take me about

21     20 minutes.  And then you'll be permitted to retire and

22     deliberate on your verdict.

23              Thank you for your patience and your

24     attention.

25              Mr. Pierce, are you ready to make your
```

1    closing argument?

2              ATTORNEY PIERCE:  I am, your Honor.

3              THE COURT:  All right.  You may proceed.

4              ATTORNEY PIERCE:  Thank you, your Honor.

5              Good afternoon, and thank you so much for

6    all the careful attention that you've spent and taken

7    out of your lives for the past three days.  We know your

8    time is valuable, and we very much appreciate that

9    you've been here.

10             Let me make a comment about my clients.  My

11   clients are who they are.  They are real people, regular

12   people.  They work hard.  They're fiery.  They're

13   passionate.  They're colorful.  They fight for --

14             THE COURT:  Your opinion about your clients

15   is not appropriate.

16             ATTORNEY PIERCE:  They're the types of

17   individuals who stand up for their animals.  And this

18   case will ultimately turn on, I suggest, three basic

19   things:  Your word is your bond, do what you say, and

20   actions speak louder than words.  And I'll come back to

21   those.

22             In this case, as you will hear from the

23   judge shortly, we're proceeding under a breach of

24   contract; that we had an employment agreement, and with

25   that was a lease.  And in that document are certain

1    things.  And you're going to have a chance to go through

2    that in a while.

3                But the parts of it that are especially

4    important and I will highlight for you, Paragraph 14 of

5    the employment agreement contains multiple provisions

6    related to safety, related to discipline, related to

7    termination.  And in the various subparagraphs

8    associated with Paragraph 14, you will see a number of

9    things that are important.

10               For example, we can be disciplined,

11   terminated if animal safety is not of the utmost

12   importance to us.  We can be terminated if we fail to

13   report our concerns with animal safety.  We can be

14   terminated if animal safety is not treated as a

15   paramount concern or if we fail to treat animal safety

16   with utmost importance.  And that we must control animal

17   safety or animal conduct in order to avoid animal or

18   staff safety issues.  Over and over again.  Starts in

19   Paragraph 14, and then it continues again in

20   Paragraph 16 in the employment agreement.

21               The second document, the lease, which was

22   signed --

23               THE COURT:  I think you'd also -- there is

24   an addendum, and it revises Paragraph 14.  So you need

25   to know that.

```
1          Next question -- or next argument.  You may
2     proceed.
3          ATTORNEY PIERCE:  In the lease, there are
4     some additional paragraphs that I want to highlight to
5     you, Paragraph 7B and Paragraph 7C.
6          Paragraph 7B begins by setting the stage
7     saying that staff and animal safety is paramount to both
8     parties, but it ends with a very important phrase.  It
9     indicates in that final phrase that the Ringling company
10    will work with my clients in order to promote safety
11    compliance.
12         So in that paragraph, it lays out certain
13    obligations.  And it very importantly ends by saying
14    they'll work with us in order to be able to accomplish
15    what those safety objectives are.
16         THE COURT:  Although this wasn't brought
17    out, so that you're clear about this, ladies and
18    gentlemen, "lessors" means the plaintiffs.  "Lessee"
19    means the circus.  In other words, they're leasing the
20    animals.
21         ATTORNEY PIERCE:  And you will see in
22    Paragraph 9 of the lease there's a final reference that,
23    once again, we can be terminated if we fail to provide
24    for appropriate animal safety.
25         In the addendum, as your Honor has
```

1    indicated, we see again a probationary period reference,

2    and we see a termination in Paragraph 8 of the addendum.

3    And it's in hopeless conflict.  It says in Paragraph 8

4    that they can terminate us if we disrupt the creative

5    element or if we fail to abide by the safety

6    requirements in Paragraph 14.  Can't have it both ways.

7    This case has brought that home.  Some times are going

8    to conflict.  But yet in Paragraph 8, as they drafted it

9    and submitted it to us, that's how it stands.  They can

10   terminate us one or the other.

11          Now, let me talk now about the breach in

12   this case and what it is that Ringling did wrong and why

13   they failed to allow their word to be their bond and,

14   more specifically, how is it that they did or did not

15   work with us in order to maintain safety as the utmost

16   concern for both of us, for the Donnerts and for the

17   Ringling organization.

18          Well, in this case, we have an animal,

19   Cornbread, who has exhibited during a fairly short

20   period of time a dramatic change in his behavior.  He

21   went from being just fine -- everybody agrees that

22   everything was just fine -- the show order changes, and

23   pretty much overnight all these consequences start

24   flowing.  And you heard lots of testimony about signs of

25   fear, how Cornbread began to exhibit these signs, and it

1   was increasing during even that short period of time.

2   He was exhibiting them in an even stronger way so that

3   by the time we get to December 28th, you will have

4   available for your review the videos that were displayed

5   either partially or fully earlier.

6          But in the December 28th video -- that's

7   Plaintiffs' Exhibit 7P -- Cornbread defecated four times

8   during that filming, during that video, and stood up at

9   least three times.

10          THE COURT:  Do you have an objection?

11          ATTORNEY PORTER:  Yes, sir.  I think this is

12   his interpretation of the video.  I think it's up to the

13   jury to make this determination for themselves.

14          THE COURT:  All right.  Go on.

15          ATTORNEY PIERCE:  And the point being that

16   he's demonstrating fear.  And what does a fearful animal

17   do?  What does a fearful horse do?  Well, according to

18   Mr. Stipka, they take off running.  What is the

19   consequence of that?  You saw on the videos they can --

20   there's people out there.  There's wiring out there.

21   There's open portals.  There are entryways where the

22   public goes.

23          If that horse takes off running, somebody's

24   going to have a consequence.  If he gets off the edge of

25   the mat, as you go around the concrete that you can see,

1    that's a slip hazard.  If that horse takes off running,

2    there will be consequences associated with that and

3    safety concerns.

4           Furthermore, a horse that's fearful can

5    knock people down.  They can roll over them.  Cornbread

6    can take his 2,000-pound body and roll over the top of

7    David while he's there on the ground next to him.  He

8    can bite, kick, trample, on and on.  Those are very real

9    concerns.

10          If safety truly is say what you mean, if

11   safety truly is the utmost concern, we don't need to

12   wait for an accident.  When David Donnert told you this

13   was an accident waiting to happen, we don't need to wait

14   for the accident.  We need to be able to identify,

15   interceded, take appropriate action before it becomes a

16   problem.

17          So what did we do?  We reported it to the

18   company, to multiple individuals:  Mr. Murillo, Nicole

19   Feld, David Kiser.  David Kiser, very interestingly,

20   talks about having received reports several times a day

21   from the Donnerts.  It was an ongoing issue.  But yet

22   when you contrast that with the owner, Nicole Feld, the

23   only thing that she was prepared to testify or

24   acknowledge was when Robi came and got in her face,

25   basically, and confronted her during the preshow.

1              But it was an ongoing concern, reporting it

2       to Alice Vargas, the animal superintendent, Jessica

3       Hyman, the veterinarian assistant, having a discussion

4       with Tabayara Maluenda.  Lots of folks were brought in

5       on this.

6              And if there there's anything that you can

7       conclude regarding the Donnerts, they're not bashful.

8       They're going to make their point of view known.  Yet we

9       have this hear no evil, see no evil.  "Well, it was no

10      big deal.  There wasn't even a safety concern.  No

11      problem whatsoever."

12             We proceeded as we saw necessary.  We

13      reached out to individuals in the industry that we

14      regarded as experienced and knowledgeable, tried to

15      benefit from their suggestions.  We took the steps that

16      we could, training issues, acclimation issues, Vicks

17      VapoRub, Fabuloso in the carpet.  But it wasn't solving

18      the problem.  The problem was actually getting worse.

19             And now we reach a point where Cornbread

20      actually sustains an injury as a result of this.  He

21      comes up out of there and winds up stepping on David's

22      thigh as a result of trying to get up prematurely before

23      David had released him.  This was a very real safety

24      concern.  And Bear Claw, the replacement horse,

25      demonstrates essentially the same conduct, the same

1    anxiety when he's placed in the same situation.

2            Now, even though the are on notice, what is

3    it that the Feld individuals do?  Well, they don't reach

4    out to a qualified trainer.  They don't do an

5    investigation.  They don't even have a qualified trainer

6    on staff.  They don't get any expert input.  And for a

7    sophisticated company, they don't even have any

8    documentation.  They weren't talking with the Donnerts.

9    They weren't saying, "Hey, where are we going?  We want

10   to counsel you on this."  They got nothing.

11           In fact, the only documentation in this case

12   was written by Robi Donnert.  The only documentation in

13   this case is the e-mail that he bothered to send on

14   January the 3rd.  It happened.  It's real.  There are

15   some very important phrases that are embedded in this

16   e-mail.  And it may not be the easiest paragraph to read

17   but there are statements in there that are very

18   important.

19           He talks about how he had now received a

20   document from the SurgiCare clinic where Cornbread had

21   gone, and he's indicating, "We hope that your veterinary

22   staff is going to brief you, bring you up to date on

23   what's happening."

24           You also heard David Donnert saying that he

25   had turned over a copy of that same document to Jessica

1    Hyman, the veterinarian assistant.  So it's in their

2    hands, and they're aware of it.  It goes on from there

3    to say some additional very important things.

4              "This is not safe.  Our animals are going to

5    get hurt.  We need to do something.  Please work with

6    us," which is exactly what Paragraph 7C says that they

7    were going to do, that they were going to work with us.

8              When you read this e-mail, is safety

9    paramount in Robi's mind?  Is that what's driving him to

10   send that?  Is that the concern that he's acting out on?

11             Even after he sends that to the owner,

12   Nicole Feld, how does Ringling respond?  They don't

13   consult with anybody.  They don't have an investigation.

14   They don't have any more documentation.  How would you

15   respond?  How would a reasonable person respond as an

16   employer?

17             THE COURT:  Did you say, "How would you

18   respond?"

19             ATTORNEY PIERCE:  I tried to retract that.

20             THE COURT:  That is an improper argument.

21   It is stricken.

22             ATTORNEY PIERCE:  You're correct, your

23   Honor.

24             THE COURT:  I know I'm correct.

25             ATTORNEY PIERCE:  I tried to rephrase that

1    on the draw.

2              How would a reasonable person respond under

3    those circumstances?  An employee has come in and says,

4    "I have a safety concern."  Nicole Feld's response was

5    to immediately fire off two e-mails on the safety issue

6    to the company lawyer.  Why?  What do those actions say?

7    How do they speak louder than words.  She never actually

8    responded to us.  That was the last contact between

9    them.

10             She sends those two e-mails, and the next

11   day the Donnerts are disinvited from showing up to the

12   photography session.  A promotional brochure is going to

13   be prepared that they would have been in if they were

14   going to be part of the act on a go-forward basis.

15   They're disinvited.  They're not in there.  The

16   handwriting is on the wall.  The decision's been made.

17             We also noted Vinicio Murillo is also

18   sending e-mails back and forth with the company lawyer

19   before meeting with us.  The handwriting is on the wall.

20             Did they listen to our concerns?  No.  And

21   the reason why they didn't listen to our concerns, the

22   reason why they didn't reach out and ask us to come in

23   and talk to us is because they already knew what our

24   concerns were.  We'd already been telling them for 10 or

25   12 or 14 days what the concerns were.  They already knew

1    them, and they already knew the severity or the extent

2    to which they were taken.

3           And their version is they wanted a meeting

4    to determine our intentions, not to address the safety

5    concern, which we had just -- the only piece of

6    documentation that occurred is that e-mail.  We had

7    documented safety concerns, and that wasn't even the

8    purpose of the meeting.  The purpose of the meeting was

9    to find out what our intentions were.

10          And miraculously, the contents of that

11   e-mail, according to them, never even came up.  We sent

12   it out less than 24 hours earlier.  And the status of

13   Cornbread, what the discharge summary said, what was

14   going on with safety concerns, according to them, none

15   of that came up.  But it was the hot news 24 hours

16   earlier that led to the series of e-mails to the company

17   lawyer, but it doesn't even come up in the conversation?

18          The options that they wind up presenting are

19   so poorly explained, they don't even bother to say,

20   "Hey, we're going to give you unlimited training time on

21   the company dime.  We're going to allow you to do your

22   job."  They don't bother to say that.  Does that make

23   sense?

24          And why would anyone in their right mind

25   walk away from unlimited training on a company dime to

1    learn your job?  Why?  Doesn't make any sense.  Doesn't

2    make any sense to Mr. Murillo either, but yet he didn't

3    say anything.  He didn't say -- grab them by the ear,

4    "Guys, what are you doing?  Why are you walking away

5    from this sweetheart deal?"  And the reason why he

6    didn't do that is because it was never offered to them.

7         And watch the disagreement between David

8    Kiser and Mr. Murillo.  According to David Kiser and

9    Mr. Murillo, our response was either we wanted to be

10   bought out -- that's one of them -- and the other one

11   says, "No, we want to go back to the gold unit."  So

12   they can't even agree on what it is that they say we

13   were presenting to them as part of our position.

14        And Mr. Murillo says he was surprised that

15   we turned down that option, unlimited training on the

16   company dime.  He didn't do anything about it.  He

17   didn't ask for -- ask them to take action or think about

18   it.  He said, "No.  Enough is enough."

19        Was that working with us?  Was that -- under

20   their own version, under their own testimony, had they

21   fulfilled their responsibilities?  Is their word their

22   bond?  Are they working with us to address the safety

23   concern?

24        Now, you will hear shortly a jury

25   instruction that will talk about the significance of

1   preventing one party from being able to perform its

2   obligations.  And in this case, the Donnerts had to make

3   a choice.  They had what amounted to a Hobson's choice.

4   It was a no-win situation for them.  They had to choose

5   between keeping their animal from getting hurt, which

6   they regarded as a matter of time, and abiding by the

7   employer's instructions for how to proceed.

8          How are you going reconcile them?  They

9   couldn't even reconcile it because Paragraph 8 puts

10  those two notions in conflict in the addendum.  Still,

11  we never got an explanation.  We never got documentation

12  as to how the process was firing.  Rather, we were fired

13  abruptly without any further significant discussion.

14  Does that sound like a company that's working with

15  somebody as they promised that they would do?

16          And their version is, "Well, we just wanted

17  to get away.  We just wanted to walk."

18          Why would we want to do that?  Tiffany had

19  now joined her husband Robi as part of the show.  It was

20  a significant contract.  They had an abiding interest in

21  establishing a relationship with the Ringling folks.

22  And --

23          THE COURT:  You're at 18 minutes.

24          ATTORNEY PIERCE:  Thank you, your Honor.

25          With that being said, let me just see if I

1    can preserve just a little bit.

2            They are the ones who dwelled on why is it

3    that we were trying to get away.  That wasn't our case.

4    Our case was, "You didn't do what you said you would

5    do."  They are the ones who spent all the time talking

6    about whether or not we had tired.

7            So is this a case where safety is about

8    utmost importance or is it a case of safety unless it's

9    utmost importance until it's inconvenient.

10           For damages, I'll reserve what little time I

11   have left, and I'll talk about damages shortly.

12           THE COURT:  No, you don't have that option.

13   Anything that you don't mention in your argument they

14   don't have to respond to.

15           ATTORNEY PIERCE:  Under the contract, $700 a

16   week for 96 weeks for two people is a little over

17   $134,000.  Under the rental agreement, $600, 96 weeks,

18   two people is a little over $115,000.

19           And these -- I'll rest with that, your

20   Honor.

21           THE COURT:  All right.  Well, you've used

22   your 20 minutes, but I'll allow you a couple of minutes.

23   But this will give you two extra minutes, Mr. Porter.

24           You may proceed.

25           ATTORNEY PORTER:  Thank you, sir.

1           Good afternoon, and thank you for your

2    attention over these last three days.  I know sometimes

3    it gets long in here with the lawyers, and we do

4    appreciate your time.  And on behalf of me and my

5    colleague Laurie Proctor, Vinicio Murillo, and the Feld

6    organization, we do really thank you for your time and

7    attention.  As Judge Ellis says, public service is one

8    of the most important things you can do, and we do thank

9    you.

10          When we started this three days ago, we

11   talked about safety.  We talked about safety, that their

12   claim is that this is all about safety.  But you heard

13   during the evidence over the last three days that there

14   are lots of other reasons why something like this could

15   have happened.

16          Now, why are they going to safety?  Well, I

17   submit to you that safety is the hook here.  Because if

18   you look at the contracts, there's no basis for any

19   other argument for them to make.  The contracts are

20   clear.  And I want to talk about the contracts.

21          I told you at the beginning that you'd get

22   an opportunity to see the contracts in this case, and

23   you will when you go back into the jury room.  You look

24   at the contracts.  They're Plaintiffs' Exhibit 27, 28,

25   and 39.  The first one, the employment contract,

1    Paragraph 11 speaks to the fact that the employees have

2    to work under the supervision, direction, and control of

3    the employer.  1A says that they have to work as

4    directed by the employer.  1B talks about how they have

5    the sole discretion to move these employees around.

6           If you move to the lease, it also in

7    Paragraph 2A says that they have to act in a manner as

8    lessee determines in the show.  And as Judge Ellis

9    mentioned, sometimes there's some confusion in the lease

10   because the lessors are the Donnerts.  They're the ones

11   who are leasing the animals to Feld.  Feld is the

12   lessee.

13          And then if you look at the addendum, that's

14   the third piece of the puzzle.  It's clear when it says

15   that if the employee fails to perform in a first-class

16   professional manner or disrupts or impedes or violates

17   the employer's instruction, they can be terminated.

18          So these documents make it plain that Feld

19   had the right to terminate these folks for cause.  So

20   the plaintiffs searched these documents, scoured the

21   documents because they have to find something upon which

22   they can base this claim that they had justification not

23   to do their job.

24          We'll talk about the evidence on that in a

25   minute.  But what they point to is this Section 7C of

1    the lease.  And they look at 7C and they see there's a

2    safety obligation.  We had these obligations to report

3    the safety issues.

4           Now, Feld was the first one to tell you that

5    they were interested in safety concerns.  Safety

6    concerns were important to them.  They want to hear

7    about safety concerns.  But look at the provision that

8    these plaintiffs are relying on.

9           If you read the provision and you look at

10   the whole paragraph, not the little sound bites they'd

11   like you to take out of there, you'll see that what it

12   talks about is complying with federal laws and

13   regulations and that Feld will help them comply with any

14   federal laws or regulations with respect to safety that

15   they have to maintain as animal owners.  That's not what

16   they're saying here.  They're saying something

17   different.  They're stretching, stretching what the

18   safety issue is.

19          The important point for you all to think

20   about when you go back into that jury room, because it's

21   their burden to prove that Feld somehow breached this

22   contract, is what did Feld do that was wrongful?  What

23   did Feld do that was wrongful?

24          Well, I submit to you that if you look at

25   the evidence here and you look at the evidence about how

1    Feld felt about these plaintiffs, what was the evidence?

2    The evidence is they found them.  They liked their act.

3    They brought them to the gold unit.  They thought they

4    did really well on the gold unit.

5             As a result, they wanted to take them to the

6    red unit, which was a bigger production.  They were

7    interested in these people.  They wanted them around.

8    They paid them more money to go to the red unit even

9    though contractually they weren't required to.  When

10   they got to the red unit, they put them in the center

11   ring.  That's a big deal to performers.

12            They also took the comedy act.  It wasn't

13   just a one-act performance like it was in the gold unit.

14   It was a common thread or theme through the entire show.

15   Feld wanted these folks around.  And when the plaintiffs

16   said, "We're not going to perform," what did Feld do?

17            They said, "Well, let's try and work through

18   this.  Let's come up with some options to make this

19   work."  Rejected.  What did Mr. Kiser say after they had

20   left?  The show was not as good without the Donnerts.

21   They wanted these people there.  What did Feld do that

22   was wrongful?

23            Now take a look at it from the Donnerts'

24   perspective.  What was the evidence about what they

25   thought of Feld?  Well, they came to the gold unit.  It

1    seemed like they were happy there.  They were told about

2    the move, and they said, "We don't want to go.  We have

3    friends here.  We like it here.  It's a smaller

4    environment.  It's friendlier, less work, fewer

5    performances.  You don't have to travel as far.  We

6    don't want to go anywhere.  We have our own horse

7    compound here.  We don't have to relate to other people.

8    There's not as much management.  We don't like that so

9    much."

10           So Mr. Murillo comes to talk to them.  They

11   blow him off.  Comes again.  "We're not leaving."  He

12   says, "Even if you make me leave" -- this is what Robi

13   Donnert testified.  He said, "Even if you make me leave,

14   I'm going to go there.  I'm going to present this act.

15   I'm not training the horses.  I'm not doing anything."

16           You know, they're in an employment

17   situation.  Is that an appropriate way for an employee

18   to talk to an employer?  What does Feld do?  They work

19   with them.  They give them more money.  They bring the

20   wife onboard.  They do as much as they can to make this

21   work.

22           So then they come to the red unit.  Were

23   they happy to be there?  Remember David's testimony?

24   "We drove all night.  They weren't even ready for us."

25   Immediately, he starts having disagreements with the

1    producer.

2              You'll see the video that will be back there

3    with you.  You'll have a chance to take a look at it.

4    What does he say?  "I don't even want to be here

5    anymore."  This is before the show order had even

6    changed.  Remember what he said about being on the red

7    unit?  You know, it's sort of a big deal.  "I don't

8    care.  I've seen better."

9              The show order changed.  They never even

10   tried before they started complaining.  Never even

11   tried.  Again, was Feld acting wrongfully or was it the

12   Donnerts?  Put it into a more typical context, an

13   employment context, not the circus environment.  Say an

14   employee is working in a small satellite office of a

15   corporation.  They get reassigned to a bigger officer.

16   Could that employee just say, "I'm not going" and expect

17   to keep their job?

18             If an employee was assigned a project, could

19   they just say, "I'm not going to do that.  No way."

20   Feld kept working with them.  Feld kept working with

21   them.  Again, back to the 7C, this lease provision that

22   they're relying on when they say that Feld agreed to

23   work with the lessors in some way.  You judge the

24   evidence.  You look at what happened here.

25             Did Feld try and help these people?  Did

1    they pay they more money?  Did they give them what they

2    wanted?  When they decided they wanted to leave, did

3    they give them options that seemed to make sense?

4              There's one thing about these option that's

5    interesting here, is no one disagrees what the options

6    were.  The only somewhat issue of dispute is the length

7    of the training, whether or not they were going to get

8    two months.

9              Okay.  Well, there's no Hobson's choice

10   here.  Mr. Pierce says, "It's a Hobson's choice.  We

11   either have to do something that's unsafe or we have to

12   leave."  I submit that there's a third option.  They

13   could try.  They could try.  Feld's giving them the

14   opportunity to have practice time.

15             Now, whether it was two months -- and we

16   submit that it wasn't -- the testimony on that was, "We

17   didn't think it would take that long.  We thought they'd

18   take this offer.  We thought they'd work with us.  We

19   wanted them around.  And so long as it was progressing

20   and they were doing well, we'd keep working together."

21             There's no Hobson's choice.  They didn't

22   try.  They said, "No.  Change the show order or we ain't

23   working."  Is that an appropriate thing for an employee

24   to do?

25             Now, let's talk about the safety issue

1    again.  And again, just because they say it's a safety

2    issue doesn't make it one.  What did Feld say?  They

3    said, "We saw what happened.  We observed what was on

4    the floor.  We saw that Cornbread was having trouble.

5    We don't dispute that Cornbread had some trouble.  We

6    dispute whether it was a safety issue or not."

7         And when you're back in that jury room, you

8    can see those videos.  You can take a look at them and

9    you can decide whether or not there was any sort of a

10   safety issue.

11        You heard a lot of, "Well, maybe there could

12   be a trampling.  Maybe the horse could run away.  Maybe

13   it could bite, it could kick, it could scream, it could

14   do all sorts of things."  Was there any evidence at all

15   that anything like that ever happened?  No.

16        If you look at the videos, the first one

17   that you'll see -- I think it's Defendant's 82.  This is

18   the one that comes right after the show order had

19   changed.  And that's the one where the lights are one.

20   That's an important one to look at because it gives you

21   a sense of what's going on on the whole floor while this

22   act is being presented.

23        And I submit what you'll see is you'll see

24   the horse coming in.  You'll see the tigers leaving.

25   You'll see the cage going up, and you'll see the horse

1    coming out and starting to perform.  Remember, that's

2    the Donnert 2 part.  That was always there.  That was

3    always part of the act.

4            The cages are up.  The horse continues on to

5    the comedy act.  You'll see people sweeping the floor,

6    and then gone.  Minutes go by.  Minutes go by.  Minutes

7    go by.  The horse is doing fine.

8            What happens on that very first performance

9    after the show order is changed?  He laid down just

10   fine.  I asked David.  I said, "How's he doing?  How'd

11   he do on that?"

12           He said, "He's doing pretty good."  Very

13   first performance after the show order had changed.  We

14   showed the second video.  That was two days later.  This

15   one was done with the lights down.  I asked him, "How

16   did it go?"

17           "He looked pretty good."  This is two

18   performances after the show order had changed.

19           Now, did Cornbread start having some

20   problems?  Perhaps he did.  Were there other reasons for

21   it?  He hadn't performed in a long time.  New

22   environment.  There was some testimony that he was

23   injured.  He had also had some problems before lying

24   down on the floor.

25           Remember, the very first time the Donnerts

1    worked with this horse back in Fort Myers when they

2    bought the act from someone else, they couldn't get the

3    horse to lay down.  Is that a safety issue that we see

4    here?  I submit to you that it's not.

5          And the issue of the noise itself, you'll

6    recall the testimony about what happened at the gold

7    unit.  Cornbread's act followed a motorcycle act.  A

8    motorcycle act.  Vroom, vroom.  A motorcycle act.  What

9    did David say he did?  He said he took the horse over,

10   he got the horse used to the motorcycle, and the horse

11   performed fine.

12         What was the evidence of what David did to

13   acclimate the horse in this case when he got to the red

14   unit?  Nothing.  Nothing.  He said it wasn't worth his

15   time to practice.  Didn't do it.  Did he take the horse

16   over with the cage going up and down?  Did you hear any

17   evidence that he tried to do anything like that?

18   Nothing.  He didn't try.  Didn't want to be there.

19         The issue with the tigers on the floor and

20   the scent of the tigers, now initially there's been --

21   there were some questions or some testimony about the

22   horses and the tigers being together.  You probably

23   heard more of that than you ever cared to hear.  But one

24   thing is perfectly clear.  These horses and tigers were

25   never together.  The tigers are out; the horse was in.

1          Now, what did Robi say?  He said, "I cured

2     that problem.  I used the Vicks.  I had no trouble."

3     And the dispositive point on that is the one time, the

4     one time, when they articulate this safety issue -- they

5     didn't do it at all in winter quarters when they were

6     down there.  Remember, Robi testified that Nicole gave

7     him his (sic) card and said, "Call me or send me an

8     e-mail any time you have any trouble."  Were there any

9     e-mails?  No.  He knew how to reach her.  He had sent

10    her plenty of e-mails before.

11         He sends one after winter quarters.  What's

12    the issue that he raises?  Anything about tiger scent?

13    No, you won't find it there.  It's the sound of the cage

14    strike.  This is a horse that got used to performing

15    after a motorcycle.

16         Another thing I'd ask you to take a look at

17    when you view these videos is look at what's going on in

18    the background.  I agree with Mr. Pierce that some of

19    these videos are hard to see.  They get washed out a

20    little bit with the lights.  But you can see in the

21    shadows what's happening.

22         But the other thing that you can see is look

23    around at the people who are watching.  There's some

24    stage crew people down there.  No one is concerned about

25    anything that's happening on the floor that looks

1    dangerous.  If there was a safety issue, if there was a

2    biting or a trampling or a stomping or running away, do

3    you think someone would react perhaps?  I think so.

4           The other thing is David never stopped any

5    show and said, "We've got a problem here.  Look, this is

6    what's happening.  Look at this safety issue."  It just

7    didn't happen.  Feld was doing everything it could to

8    resolve the problems.  They raised the issue of the

9    tiger cage strike.  They tried to solve it.  They raised

10   the issue of the scent.  Robi said he solved it.

11          Feld's position on this was that there was

12   no safety issue.  This was a reacclimation issue or it

13   was a retraining issue.  And Feld was willing to give

14   the Donnerts time to do this.  These are animals.  These

15   are circus animals.  They're not robots.  They're not

16   going to do the same thing every single time.  And

17   issues are going to come up during the course of a

18   performance.

19          You know, these animals -- and Cornbread was

20   a -- he had been performing in circuses for a long time.

21   He had been with Feld for a period of time.  And I

22   submit that when you go to a circus, it's not like a

23   symphony; right?  These horses are performing on a floor

24   with children eating ice cones and waving around things

25   with lights and the like.  He never had any trouble.  He

1    performed just fine.

2          So that begs the question why did they want

3    to leave?  Why didn't they take the options?  Feld can't

4    tell you why they didn't take the options.  They can

5    tell you that they were there.  The Donnerts agree that

6    the options were what they were.

7          Well, they didn't like it on the red unit.

8    They wanted to go back to gold.  And what happened on

9    the gold unit when they didn't get their way?  They

10   pushed.  They pushed.  They pushed.  They held out.

11   They fought.  It took Mr. Murillo two and a half months

12   before he could get them in a room.

13         When he finally got them in a room, they

14   avoided him.  They finally worked out a deal.  I submit

15   that's what was going on here.  "If we push and we push

16   and we push and we fight and we fight and fight, we're

17   going to get what we want.  Back to gold.  That's what

18   we want.  That's where we want to be."

19         These Donnerts weren't fired.  There was

20   never a threat of any firing.  Feld just asked that they

21   try.  They worked with them at every stage to try and

22   get these folk to perform.  They came up with options

23   that are reasonable, that were appropriate, that would

24   have solved the issue and allow the performance to go

25   on.

1          Feld had no choice but to fire these people

2     for cause at the end.  They would not perform.  They

3     would not act as directed.  And I ask that you enter a

4     verdict in favor of the defendant.

5          THE COURT:  All right.  Mr. Pierce, you have

6     just a couple of minutes.

7          ATTORNEY PIERCE:  I appreciate that, your

8     Honor, and I will attempt to comply.

9          THE COURT:  You will comply.

10          ATTORNEY PIERCE:  Yes.

11          THE COURT:  I will ensure that.

12          But go ahead, sir.

13          ATTORNEY PIERCE:  Thank you.

14          Robi Donnert said that when he came to that

15     meeting on January 4th, Vinicio looked him in the eye

16     and said, "The Felds are tired of you."  That's how they

17     acted as well.  This was very abrupt, very precipitous.

18     And where did it leave Feld?  It left Feld with a $3400

19     windfall because the Donnerts collectively represented

20     $3400 in overhead to them that they no longer had to pay

21     for.  The salaries for three individuals were

22     immediately resolved for them.

23          Now, a couple of the highlights I want to

24     mention to you, the judge is going to talk to you about

25     their responsibility to proceed in good faith, to carry

1    out their responsibilities under the contract.  And

2    that's why I spent the time that I did, because I want

3    you to appreciate that contracts have significance.

4    They have consequences.

5            And one of them is that you have to do what

6    you say you're going to do, and you have to really try.

7    You have to show good faith to do that.  And in this

8    case, why is it when Mr. Porter says, "There was a third

9    option.  They could have tried," what they were told

10   was, "You have two months."

11           "Well, what if we can't get the job done in

12   two months?"

13           "You're done."

14           They knew that there was no way, just like

15   Mr. Stipka could not guarantee a result.  And they

16   walked away from there thinking that the discussion was

17   continuing.  They didn't resolve -- they didn't think

18   that this discussion was over.  They understood from

19   Mr. Murillo that there was going to be attempt to reach

20   out to a third party, and they were actually still

21   waiting for that discussion to move forward so that they

22   could have additional input from someone who would be

23   respected by both sides and give them the benefit of

24   whatever additional insight they might have.

25           THE COURT:  Bring it to an end.

1          ATTORNEY PIERCE:  Okay.  So this was not a

2     situation where we thought that we were going to just

3     pack it up and walk away.  This was a situation where we

4     were still, even to the end, attempting to work with

5     them.

6          Thank you very much.

7          THE COURT:  All right.  Ladies and

8     gentlemen, now that you've heard the arguments of

9     counsel, it becomes -- and the evidence, it becomes my

10    duty to give you instructions as to the law applicable

11    to this case.  All of the instructions given to you by

12    the Court, those given to you at the beginning of the

13    trial, those given to you during the trial, and these

14    final instructions, must guide and govern your

15    deliberations.

16         Now, you won't have these instructions in

17    writing.  What you will have is a tape-recording of

18    them, if you wish to hear it.  You're not required to

19    listen to it again, but you will have that.  And the

20    reason for it is that what I have and what I use is not

21    in a form that you would find anything other than

22    inscrutable.  So I have the tape-recording.

23         Now, it is your duty as jurors to follow the

24    law as stated by the Court and to apply the rules of law

25    given to you by the Court to the facts as you find them

1    from the evidence in the case.  And counsel have quite

2    properly referred to some of the governing rules of law

3    in their arguments.  But as I told you before, if any

4    difference appears to you between the law as stated by

5    counsel and the law stated by the Court in these

6    instructions, you must, of course, be governed by the

7    Court's instructions.

8            Now, nothing I say in these instructions is

9    to be taken as an indication that I have an opinion

10   about the facts of the case or what that opinion is.

11   It's not my function to determine the facts.  It is

12   yours.

13           You're not to single out one instruction

14   alone as stating the law, but must consider the

15   instructions as a whole.  And neither are you to be

16   concerned with the wisdom of any rule of law stated by

17   the Court regardless of what you -- regardless of any

18   opinion you may have as to what you think the law ought

19   to be.  It would be a violation of your sworn duty as

20   jurors if you ignore the law as I give it to you in

21   these instructions and apply some other law.  It would

22   also be a violation of your sworn duty as jurors of the

23   facts to base a verdict upon anything but the evidence

24   in the case.

25           Now, you've been chosen as jurors for this

1    trial in order to evaluate all of the evidence received

2    and to decide each of the factual questions presented by

3    the allegations brought by the plaintiffs.

4         In deciding the issues presented to you for

5    decision in this trial, you must not be persuaded by

6    bias, prejudice, or sympathy for or against any of the

7    parties in this case or by public opinion.  You

8    shouldn't be influenced by a person's race, color,

9    religion, national ancestry, or sex.

10        Justice through trial by jury must always

11   depend upon the willingness of each individual juror to

12   seek the truth as to the facts from the evidence

13   presented to all jurors and to arrive at a verdict by

14   applying the same rules of law given to you by the

15   Court.

16        Now, this case should be considered and

17   decided by you as a case or an action between persons of

18   equal standing in the community, of equal worth, and

19   holding the same or particular stations of life.  A

20   corporation is entitled to the same fair trial at your

21   hands as a private individual.

22        All persons, including corporations,

23   partnerships, and are other entities, stand equal before

24   the law and are to be dealt with as equals in a court of

25   justice.  And when a corporation is involved, of course,

1    it may act only through natural persons as its agents or

2    employees.  And in general, any agent or employee of a

3    corporation may bind the corporation by his or her acts

4    and declarations made while acting within the scope of

5    that person's employment; that is, the scope of

6    authority delegated to him by the corporation or within

7    the scope of his or her duties as an employee of the

8    corporation.

9            Now, as I told you, the burden in this case

10   is on the plaintiffs in a civil action to prove every

11   essential element of his or her claim by a preponderance

12   of the evidence.  If the proof should fail to establish

13   any essential element of plaintiffs' claim by a

14   preponderance of the evidence in the case, the jury

15   should find for the defendant as to that claim.

16           To establish by a preponderance of the

17   evidence means to prove that something is more likely so

18   than not so.  In other words, a preponderance of the

19   evidence in the case means such evidence as when

20   considered and compared with that opposed to it has more

21   convincing force and produces in your minds belief that

22   what is sought to be proved is more likely true than not

23   true.  The rule does not, of course, require proof to an

24   absolute certainty since proof to an absolute certainty

25   is seldom possible in any case.

1          In determining whether any fact in issue is

2     been proven by a preponderance of the evidence, you may,

3     unless you've been otherwise instructed, consider the

4     testimony of all witnesses who testified regardless of

5     who may have called them, all exhibits received into the

6     record as evidence and -- regardless of who produced it,

7     and all facts which may have been admitted or

8     stipulated.  There haven't been any stipulations.

9          Now, there's nothing particularly different

10    in the way that a juror should consider the evidence in

11    a trial from that in which any reasonable person would

12    treat any very important question that must be resolved

13    by examining facts, opinions, and evidence.

14          You're expected to use your good sense in

15    considering and evaluating the evidence in the case for

16    only those purposes for which it has been received and

17    to give such evidence a reasonable and fair construction

18    in the light of your common knowledge of the natural

19    tendencies and inclinations of human beings.  And keep

20    constantly in mind that it would be a violation of your

21    sworn duty to base a verdict upon anything other than

22    the evidence received in the case and the Court's

23    instructions.

24          As I told you at the outset, generally

25    speaking there are two types of evidence from which a

1    jury may find the facts of the case:  There is direct

2    evidence and circumstantial evidence.

3              Direct evidence is testimony, for example,

4    of an eyewitness.

5              The other is indirect or circumstantial

6    evidence, proof of a chain of circumstances pointing to

7    the existence or nonexistence of certain facts.

8              As a general rule, the law makes no

9    distinction between direct and circumstantial evidence,

10   but simply requires that the jury find the facts in

11   accordance with a preponderance of all the evidence in

12   the case, both direct and circumstantial.

13             Now, unless you were otherwise instructed --

14   and I don't recall that there was a contrary

15   instruction -- the evidence in the case consists of the

16   sworn testimony of the witnesses regardless of who

17   called them, all exhibits received into evidence,

18   regardless of who may have produced them, and all

19   facts -- there were no admissions or stipulations or

20   judicial notice, so I'm going to omit that.  So the

21   evidence in the case is the witnesses' testimony and the

22   exhibits, regardless of who produced the witnesses or

23   the evidence.

24             Statements and arguments of counsel, as I

25   told you at the outset, are not evidence in the case.

1    If a lawyer asked a witness a question that contains an

2    assertion of fact, you may not consider the assertion as

3    evidence of that fact.  The lawyers' statements are not

4    evidence.  Only the answers are evidence.

5         The lawyers, from time to time, may have

6    referred to certain facts that came out in the evidence.

7    And as I've previously told you, if any -- if your

8    recollection of the facts is different from that of the

9    lawyers', your recollection controls because you're the

10   sole judges of the facts.

11        Any evidence as to which an objection was

12   sustained by the Court and any evidence ordered stricken

13   by the Court must be entirely disregarded.  And

14   anything, of course, that you may have seen or read or

15   heard outside the courtroom is not evidence and must be

16   disregarded.

17        You're to consider only the evidence in the

18   case.  But in your consideration of the evidence, you're

19   not limited to do the bald statements of the witnesses.

20   You're not limited to the bald statements of the

21   witnesses.  You're not limited solely to what you see

22   and hear as the witnesses testify.  You're are permitted

23   to draw from the facts that you find have been proven

24   such reasonable inferences as you feel are justified in

25   light of your experience and common sense.  Inferences

1    are simply deductions or conclusions that reason and

2    common sense lead the jury to draw from the evidence

3    received in the case.

4              Now, as I told you at the outset, with

5    respect to all forms of evidence properly considered by

6    you, you, as the jurors, are the sole judges of the

7    credibility of the witnesses and the evidence and the

8    weight their testimony deserves.  You may be guided by

9    the witness's appearance and conduct or by the manner in

10   which the witness testifies or by the character of the

11   testimony given or by evidence to the contrary of the

12   testimony given.

13             You should carefully examine all the

14   testimony given, the circumstances under which each

15   witness has testified, and every matter in evidence that

16   tends to show whether a witness is worthy of belief.

17   Consider each witness's intelligence, motive, and state

18   of mind and demeanor and manner while on the stand.

19   Consider the witness's ability to observe the matters as

20   to which he or she testified and whether he or she

21   impresses you as having an accurate recollection of the

22   matters.  Consider also any relation each witness may

23   bear to either side of the case, the matter in which

24   each witness might be biased or affected by the verdict,

25   and the extent to which, if at all, each witness is

1     either supported or contradicted by other evidence in

2     the case.

3            Now, inconsistencies and discrepancies in

4     the testimony of a witness or between the testimony of

5     different witnesses may or may not cause you to

6     discredit such testimony.  Two or more persons

7     witnessing an incident or a transaction may simply see

8     or hear it differently.  An innocent misrecollection,

9     like failure of recollection, is not an uncommon

10    experience.

11           As I get older, that becomes truer and

12    truer.

13           In weighing the effect of the discrepancy,

14    always consider whether it pertains to a matter of

15    importance or an unimportant detail and whether the

16    discrepancy results from innocent error or intentional

17    falsehood.  And after making your own judgment, you will

18    give the testimony of each witness the weight you think

19    it deserves.  And in short, you may accept or reject the

20    testimony of any witness in whole or in part.

21           Now, a witness may be discredited or

22    impeached by contradictory evidence or by evidence that

23    at some other time the witness has said or done

24    something or has failed to say or do something that is

25    inconsistent with the witness's present testimony.

1            If you believe any witness has been

2    impeached and thus discredited, it is your exclusive

3    province to give the testimony of that witness such

4    credibility, if any, as you think it deserves.

5            If a witness has shown knowingly to have

6    testified falsely concerning any material matter, you

7    have the right to distrust such witness's testimony in

8    other particulars.  And you may reject all the testimony

9    of that witness or give it such credibility as you think

10   it deserves.  And an act or omission in this regard is

11   knowingly done if done voluntarily and intentionally and

12   not because of mistake, accident, or other innocent

13   reason.

14           Now, the weight of the evidence in this case

15   is not necessarily determined by the number of witnesses

16   testifying as to the existence or nonexistence of a

17   fact.  You may find that the testimony of a smaller

18   number of witnesses as to any fact is more credible than

19   the testimony of a larger number of witnesses to the

20   contrary.

21           Also, the law doesn't require any party to

22   call as witnesses all persons who may have been present

23   at any time or place involved in the case or who may

24   appear to have some knowledge of the matters in issue in

25   this trial, nor does the law require any party to

1    produce as exhibits all papers and things mentioned in

2    the evidence in this case.

3         Now, the Rules of Evidence ordinarily do not

4    permit witnesses to testify as to their own opinion or

5    their own conclusions about issues in the case.  An

6    exception to this rule exists as to those witnesses who

7    are described as expert witnesses.  An expert witness is

8    someone who, by education or by experience, may have

9    become knowledgeable in come technical, scientific, or

10   very specialized area.  Such knowledge or experience may

11   be of assistance to you in understanding some of the

12   evidence or in determining a fact.  An expert witness in

13   that area may state an opinion as to relevant and

14   material matters in which he claims to be an expert.

15        You should consider the expert opinion

16   received in evidence in this case -- there was one

17   expert -- and give each opinion such weight as you may

18   think it deserves.  You should consider the testimony of

19   an expert witness just as you consider the testimony of

20   any other witness.

21        If you should decide that the opinion of an

22   expert witness is not based on sufficient education or

23   experience or if you conclude that the reasons given in

24   support of the opinion are not sound or if you should

25   conclude that the opinion is outweighed by other

1    evidence in the case, you may disregard the opinion in

2    part or in its entirety.  As I've told you several

3    times, you the jury are the sole judges of the facts in

4    this case.

5           Now, as you heard, a language other than

6    English was used during the trial, and an interpreter

7    was used.  You are to consider that evidence provided

8    through the official interpreter.  Although some of you

9    may know the non-English language -- Czech in this

10   case -- used, it is important that all jurors consider

11   the same evidence.  Therefore, you must base your

12   decision on the evidence presented in the English

13   interpretation by the interpreter.  You must ignore any

14   different meaning of the non-English words.

15          I simply assumed that nobody here spoke

16   Czech.

17          THE JUROR:  I understand some.

18          THE COURT:  I beg your pardon?

19          THE JUROR:  I said I understand some.

20          THE COURT:  But you've understood, then, the

21   instruction that you're --

22          THE JUROR:  Yes, sir.

23          THE COURT:  In fact, I couldn't always hear

24   the Czech answers anyway.

25          Now, during the course of the trial, I

1    occasionally asked questions of a witness.  Do not

2    assume that I hold any opinion on the matters to which

3    my questions may have related.  The Court asked

4    questions to clarify matters, not to help one side or

5    hurt another.  Remember at all times you as jurors, as

6    I've said several times, are the sole judges of the

7    facts.  And it's the duty of the Court to admonish

8    attorneys who out of zeal for the cause of his or her

9    client, does something which is not in keeping with the

10    Rules of Evidence or procedure.  You're to draw no

11    inference against the side to whom an admonition of the

12    Court was addressed during the trial of this case.

13              And as I've told you several times now --

14    I'll simply repeat it -- if any reference by the Court

15    or by counsel to matters of testimony or exhibits

16    doesn't coincide with your own recollection of that

17    evidence, it is your recollection that must control

18    during your deliberations and not the statements of

19    Court or counsel.

20              Now, this case involves two contracts:  The

21    employment contract and its addendum and the lease

22    between Plaintiffs Roberts and David Donnert and

23    Defendant Feld Entertainment.

24              Plaintiffs contend that these contacts were

25    breached when the employment contract was terminated by

1    defendant without cause.  Defendant denies that the

2    contracts were breached and instead contends that the

3    plaintiffs were terminated for cause.

4              Specifically, defendant contends that under

5    the employment contract and addendum and the lease,

6    defendant -- no.  Specifically, the defendant contends

7    that under the employment contract and addendum, that

8    the defendant had the sole control of the show's

9    artistic content, production, direction, and that

10   plaintiffs' contracts were terminated when they refused

11   to perform as directed.

12             Plaintiffs contend that the change in the

13   order of the show prevented plaintiffs from performing

14   the contracts.

15             Defendant denies that the change in the

16   order of the show prevented plaintiffs' performance and

17   contends that it provided plaintiffs option to continue

18   performing under the contract.

19             The parties don't dispute that the two

20   contracts, the lease which includes the addendum and the

21   employment contract and addendum -- the lease,

22   employment contract, and addendum, no one disputes that

23   they're valid contracts between the parties.

24             The dispute in this case focuses on two

25   issues:  Did the defendant by terminating plaintiffs

1    breach the contracts between the parties?  And, if so,

2    what is the amount of plaintiffs' damages?  On these

3    issues, the plaintiffs have the burden of proof.

4              Both parties to a contract have a duty of

5    good faith and fair dealing to act as they promised.

6    Such a duty of good faith and fair dealing is implied in

7    every contract.  Each contracting party is entitled to

8    assume that the other party intends to perform the

9    contract in good faith.

10             But the duty of good faith and fair dealing

11   does not add any duties to the contract not already

12   contained within the terms of the contract, nor does it

13   change or subtract any duties from the contract.  It is

14   simply a duty to act in good faith according to the

15   terms of the contract.

16             A breach of the contract occurs if a party

17   fails to do something which that party is bound to do

18   according to the contract and which is so important and

19   central to the contract that the failure to -- failure

20   defeats the very purpose of the contract.

21             A party to a contract who prevents the other

22   party from performing its obligations under a contract

23   has breached the contract.

24             Let me have the parties at the bench very

25   quickly.

```
 1            (Sidebar.)

 2            THE COURT:  I omitted to mention this in my

 3    review with the parties on this particular instruction.

 4    It seems to me a fair instruction would say that a party

 5    to a contract who prevents the other party from

 6    performing its obligations under a contract has breached

 7    the contract.  However, a party does not breach a

 8    contract if the party is exercising a right that party

 9    has under the contract.  That was what my intention was.

10    That would accord with the argument you made and the

11    case you cited.

12            Any objection to my telling them that?

13            ATTORNEY PIERCE:  No.

14            THE COURT:  All right.  I will do so.

15            (End of sidebar.)

16            THE COURT:  Let me repeat that instruction.

17            THE REPORTER:  Excuse me.

18            THE COURT:  This is not a typical reporter.

19    He's reported in world championships all over the world

20    and has placed as high as third or fourth.

21            Is that correct?

22            THE REPORTER:  That is correct.

23            THE COURT:  He goes all over the world.

24    Last time, I think he was in Thailand or Switzerland.

25    At least that's what he tells me.
```

1           Let me repeat that last instruction for

2     clarification.

3           A party to a contract who prevents the other

4     party from performing his obligations under a contract

5     has breached the contract.  But a party does not breach

6     the contract if the party exercises a right it has under

7     the contract.

8           If you find that plaintiffs prove that

9     defendant breached the employment contract, it follows

10    that defendant also breached the lease.  If, on the

11    other hand, you find that the plaintiffs did not prove

12    that defendant breached the employment contract, it

13    follows that defendant did not breach the lease.

14          In other words, if there's no breach of the

15    lease, there's no breach of the employment contract.  If

16    there is a breach of the lease or the employment -- you

17    can't breach one without breaching the other.  And if

18    you don't find a breach of either, you can't find a

19    breach of the other.

20          Any objection to that, Mr. Pierce?

21          ATTORNEY PIERCE:  None other than what we've

22    discussed before.

23          THE COURT:  All right.  Mr. Porter?

24          ATTORNEY PORTER:  No, sir.

25          THE COURT:  Now, there is a ruling that I

1    have made.  Paragraph 15 of the lease agreement states

2    that, "This lease shall not be construed to create a

3    partnership or joint venture between lessee," that's the

4    defendant here, "and lessor," that's the plaintiff here.

5    "And for purposes of this lease, the parties are

6    independent contractors.  Lessors have the sole

7    responsibility to -- and control the manner, means, and

8    sequence of performing the services related to this

9    lease."

10          Now, I've ruled that the provision of the

11   lease -- this provision of the lease does not give the

12   plaintiffs control over the production or direction of

13   the show, including the show's sequence, order, or

14   artistic content.

15          Instead, the provision provides the

16   plaintiffs have sole responsibility and control over the

17   manner, means, and sequence of performing the lease

18   services, which include animal husbandry, care, daily

19   upkeep, and transportation for the plaintiffs' horses.

20          If you find your verdict for the plaintiffs,

21   then they're entitled to recover as damages all of the

22   losses they sustained that are a natural and ordinary

23   result of the breach that they have proved by the

24   greater weight of the evidence.

25          The burden is on the plaintiffs to prove by

1    the greater weight of the evidence that they sustained

2    each item of damage they claim.  They're not required to

3    prove the exact amount of the damages, but they must

4    show sufficient facts and circumstances to permit you to

5    make a reasonable estimate of them.  If the plaintiffs

6    fail to do so, they cannot recover for that item.

7              The plaintiffs have a duty to minimize --

8    minimize or mitigate their damages.  If you find that

9    the plaintiffs did not act reasonably to mitigate or

10   minimize their damages and that as a result the damages

11   were greater than if they had acted to mitigate them,

12   then plaintiffs cannot recover the amount by which the

13   damages were increased.  If plaintiffs did act to

14   minimize or mitigate their damages, the amount

15   plaintiffs received as a result of their attempts to

16   mitigate must not be awarded as damages.

17             The burden is on defendant to prove by the

18   greater weight of the evidence that the plaintiffs

19   failed to minimize their damages and to prove by the

20   greater weight of the evidence the amount by which the

21   damages were increased as a result.  The duty to

22   minimize is required only when it can be performed with

23   minor expense.  Where only a breach of contract and no

24   actual damage has been proved, nominal damages may be

25   recovered.

1          Now, the fact that I've instructed you as to

2     the proper measure of damages should not be taken or

3     considered by you as indicating any view of mine as to

4     which party is entitled to your verdict in this case.

5          Instructions as to the measure of damages

6     are given for your guidance only in the event that you

7     should find in favor of the plaintiffs from a

8     preponderance of the evidence in this case in accordance

9     with all of the other instructions given to you.

10          Now, you must not base your verdict, as I've

11     said earlier, upon sympathy, bias, guesswork, or

12     speculation.  Your verdict must be based solely on the

13     evidence and the Court's instructions.

14          The verdict must represent the considered

15     judgment of each juror.  In order to return a verdict,

16     therefore, each juror must agree thereto.  In other

17     words, your verdict must be unanimous.

18          It is your duty as so jurors to consult with

19     one another and to deliberate with a view to reaching an

20     agreement if you can do so without violence to your

21     individual judgment.  You must each decide the case for

22     yourself, but do so only after an impartial

23     consideration of all the evidence in the case with your

24     fellow jurors.

25          And in the course of your deliberations, do

1    not hesitate to reexamine your own views and to change

2    your opinion if convinced it's erroneous.  But do not

3    surrender your honest conviction as to the weight or

4    effect of the evidence solely because of the opinion of

5    your fellow jurors or for the mere purpose of returning

6    a verdict.  Remember at all times you are not partisans.

7    You are judges, judges of the facts of the case.  And

8    your sole interest is to seek the truth from the

9    evidence in the case.

10            Now, during your deliberations, you must not

11   communicate or provide any information to anyone by any

12   means about this case.  You may not use any electronic

13   device or media such as -- and here is the long list.

14   I'm not going to go through it unless there's an

15   objection -- cell phones, smart phones, any electronic

16   device or means, Facebook.  I don't even know what some

17   of these things are.  LinkedIn and the like.  Don't do

18   any of that.  Don't conduct any research about this case

19   until I have your verdict.  Even afterwards, if you look

20   for me on Facebook, you will be disappointed, I hope.

21            Now, when you retire to the jury room,

22   you'll select one of your number to act as your

23   foreperson.  The foreperson will preside over your

24   deliberations and will be your spokesperson here in

25   court.

1           A form of the verdict has been prepared for

2     your convenience, and I will review that with you now.

3           May I have a copy of that, please.

4           The verdict is a two-page document.  At the

5     top of the first page is the style of the case; that is,

6     the name of the case.  And beneath that it says,

7     "Verdict Form."  And then there's a question.  It

8     states, "Do you find that plaintiffs have proved by a

9     preponderance of the evidence that defendant breached

10    the employment contract, the addendum to the employment

11    contract, and/or the lease?"  It says "and the lease."

12    But if there's a breach of any of them, there's a breach

13    of all of them.

14          And then you have an opportunity to say,

15    yes, the plaintiff has proved that by a preponderance

16    or, no, the plaintiff hasn't.

17          If your answer to Question 1 is no, then

18    you're done.  Complete -- sign the form, and you're

19    done.  You don't have to answer Question 2, which

20    relates to damages.

21          If your answer is yes, you must answer

22    Question 2, which is, "What amount of damages, if any,

23    has Plaintiff David Donnert proved by a preponderance of

24    the evidence was caused by defendant's breach of the

25    employment contract, and what amount of damages, if any,

1  has David Donnert proved by a preponderance of the

2  evidence was caused by defendant's breach of the lease?"

3  Then the same two questions are asked with respect to

4  Robert Donnert.

5          And after that, there's a place for you to

6  fill in the foreperson's printed name, a signature, and

7  a date.  And when you have -- you'll take this form

8  with you into the jury room.  It will be provided by

9  Mr. Wood.

10         And when you have reached your unanimous

11  agreement as to your verdict, you'll have the foreperson

12  fill it in, date it, and sign it setting forth the

13  verdict on which you unanimously agreed, and then return

14  with your verdict to the courtroom.

15         Now, it's proper to add the caution that

16  nothing in these instructions and nothing in any form of

17  the verdict prepared for your convenience is meant to

18  suggest or to convey in any way or any manner what

19  verdict I think you should reach.  What the verdict

20  shall be, as I told you at the outset, is your sole and

21  exclusive duty and responsibility.

22         Now, if it becomes necessary during your

23  deliberations to communicate with the Court, you may

24  send a note signed by the foreperson or by one or more

25  of you.  And put the date and the time by it.

1          No member of the jury should ever attempt to

2     communicate with the Court by any means other than a

3     signed writing, and this Court will never communicate

4     with any member of the jury on any subject touching on

5     the merits of the case otherwise than in writing or

6     orally here in open court.

7          I may communicate with you on administrative

8     matters like how much longer you wish to deliberate or

9     anything of that sort.  I'll do that through Mr. Wood.

10    With respect to the merits of the case, I won't

11    communicate with you other than in writing or orally

12    here in open court.

13         And you'll note from the oath about to be

14    taken by Mr. Wood, the court security officer, that he,

15    too, as well as all other persons, are forbidden to

16    communicate in any manner with any member of the jury on

17    any subject touching the merits of the case.  And bear

18    in mind, also, that you're never to reveal, not even to

19    the Court, how the jury stands numerically or otherwise

20    on the questions before you until after you have reached

21    your unanimous verdict.

22         You may administer the oath to Mr. Wood.

23         (Marshal sworn by clerk.)

24         THE COURT:  Now, I'm going to release you so

25    that you may begin your deliberations.  Now you won't

```
 1   hear the familiar litany about refraining from

 2   discussing the matter, because now is the time when you

 3   must do precisely that.

 4            But don't do it just yet.  Once I release

 5   you and you go into the room -- keep your books, because

 6   now you'll need to keep them.  It will take a few

 7   minutes for Mr. Wood to collect the tape recorder, the

 8   verdict form, the exhibits, and bring them in to you.

 9            In addition, also a computer will be brought

10   in.

11            And I don't see Mr. Bachman.

12            You can show them, can't you, Bill?

13            THE MARSHAL:  Yes.

14            THE COURT:  Mr. Wood will show you how to

15   operate this machine.  If you want -- we're going to

16   bring in exhibits.  You're not required to look at every

17   exhibit or any exhibit.  You're not required to view

18   these videos.  But you may if you wish to.  They're on

19   there, and I think there's an index.

20            Is there not on this, Mr. Pierce,

21   Mr. Porter?

22            ATTORNEY PORTER:  There is, sir.

23            THE COURT:  All right.  So you can -- it

24   sounds like I know what I'm saying, but I really don't.

25   Click on it.  I'm not a computer person, as you may have
```

1    gathered.  And you will be able to see the video if you

2    wish to.  You're not required to.  And you may

3    deliberate as long or as little as you'd like.

4         But don't begin the process of deliberation

5    until Mr. Wood has brought in all of the exhibits, the

6    verdict form, the tape recorder, and this computer.  And

7    once he has brought all of that in and perhaps shown you

8    how to access the video clips, once he's done that and

9    left and the door closes, you may then begin your

10   deliberations.

11        Let me have counsel very quickly one final

12   time at the bench.

13        (Sidebar.)

14        THE COURT:  Apart from the objections

15   preserved in the instruction conference, has the jury

16   been fully and fairly instructed?

17        ATTORNEY PIERCE:  They have.

18        ATTORNEY PORTER:  Yes, sir.

19        THE COURT:  Now, does either party wish the

20   alternate to be stricken?

21        ATTORNEY PIERCE:  No.

22        ATTORNEY PORTER:  No, sir.

23        THE COURT:  We'll proceed.  Thank you.

24        (End of sidebar.)

25        THE COURT:  Now, ladies and gentlemen, you

1    may go into the jury room, and we'll start the process

2    of getting everything in to you as quickly as possible.

3              Mr. Wood, do we also have soft drinks in the

4    fridge back there?

5              THE MARSHAL:  Yes, sir.

6              THE COURT:  So you may want to use the time

7    to get a soft drink or something.  Remember, you may not

8    deliberate, that is, you may not discuss the matter

9    among yourselves, unless the door is closed and all

10   seven of you are there.  In one of you has to use the

11   facilities, you must cease talking about the case until

12   all seven of you are present.  You may deliberate as

13   long or as little as you wish.  It's entirely up to you.

14             You may follow Mr. Wood out.

15             (Jury excused to deliberate at 3:59 p.m.)

16             THE COURT:  Now, I want counsel to go back

17   to counsel table to ensure that there's agreement that

18   the proper exhibits are going back.

19             (Pause in proceedings.)

20             THE COURT:  The index is just of the

21   exhibits that have been admitted; is that correct?

22             ATTORNEY PORTER:  On the video?

23             THE COURT:  Yes.

24             ATTORNEY PORTER:  Yes, sir.

25             THE COURT:  All right.  Then I'm going to

1    recess.  Again, if there's any dispute about what's

2    going to be taken back and given to the jury, you may

3    advise Mr. Wood.  And I'll return and deal with any

4    dispute.  But if you'll deal with the deputy clerk so

5    that we can get the exhibits back there as promptly as

6    possible -- you may be seated -- and we'll proceed.  And

7    I'll figure out later -- I'll inquire of the jury how

8    long they wish to deliberate.  I don't know whether

9    they'll reach a decision today or whether it will extend

10   into tomorrow.  I just don't know.

11            Anything further at this time, Mr. Pierce,

12   Mr. Porter?

13            ATTORNEY PORTER:  No, sir.

14            ATTORNEY PIERCE:  No.

15            THE COURT:  Ms. Proctor?

16            ATTORNEY PROCTOR:  No, your Honor.

17            THE COURT:  Court stands in recess.

18            (Court recessed at 4 o'clock.)

19            (Court called to order at 5:40 p.m.)

20            THE COURT:  I have a question from the jury.

21   I'll read it to you, then I'll have Mr. Wood, the court

22   security officer, show it to counsel at the podium.  You

23   may each look at it.

24            It says, "(After being fired) what replaced

25   the (juggling/horse act) act in the center ring?  Did it

1    include animals, also?" signed David Link, 5:35 p.m.

2    Eastern Standard Time.

3              I thought it was Daylight Saving.

4              ATTORNEY PORTER:  I think it is.

5              THE COURT:  What's EST?

6              ATTORNEY PORTER:  Eastern Standard Time.

7              THE COURT:  11/14/13.

8              All right.  Mr. Wood, let counsel read this,

9    and then I'll tell you what answer I propose to give and

10   then let you indicate whether you have any objection to

11   that answer.

12             (Counsel conferring.)

13             THE COURT:  All right.  Here's the answer

14   that I intend to give:  I will tell the jury in response

15   to this question after reading it -- I will say, "You

16   must decide the case on the basis of the evidence

17   presented.  Now, in that regard, I will tell you that

18   the parties in this case, after the filing of this case,

19   engaged in a period of discovery where they had an

20   opportunity to ask each other whatever might be relevant

21   to the case.  And then the parties make their own

22   determination as to what evidence they wished to offer,

23   what they considered to be relevant.  And you must

24   decide the case on the basis of the evidence as it was

25   presented."

1          Any objection, Mr. Pierce?

2          ATTORNEY PIERCE:  No, your Honor.

3          THE COURT:  Mr. Porter?

4          ATTORNEY PORTER:  No, sir.

5          THE COURT:  Have the jury brought in,

6     please.

7          (Jury impaneled at 5:43 p.m.)

8          THE COURT:  All right.  You may be seated.

9          Ladies and gentlemen, I have a note from you

10    posing a question.  I will read the note, and then I

11    will provide you with the answer orally.

12          "(After being fired) what replaced the

13    (juggling/horse act) act in the center ring?  Did it

14    include animals, also?" signed David Link, 5:35 p.m.

15    EST --

16          By the way, I think it's EDST:

17          -- "EST, 11/14/13."

18          The answer is as follows:  You must decide

19    the case on the evidence presented.  Now, I will tell

20    you that after the case was filed, the parties had an

21    opportunity for a period of time to engage in discovery

22    where they were able to ask -- each party asked the

23    other party questions and obtained information, and then

24    the parties decide what evidence they wish to present at

25    trial.  In other words, they make determinations as to

1    what evidence they think is relevant for the trial.  And

2    now you must decide the case based on that evidence.

3              All right.  I thank you.  You may return and

4    continue your deliberations.

5              (Jury excused to deliberate at 5:45 p.m.)

6              THE COURT:  And I'll have the note made a

7    part of the record.

8              THE CLERK:  Yes, your Honor.

9              THE COURT:  All right.  Court stands in

10   recess.

11             (Court called to order at 6:35 p.m.)

12             THE COURT:  All right.  The jury wishes to

13   return tomorrow.  So I'm going to instruct them in that

14   regard.

15             Have the jury brought in, please.

16             (Jury impaneled at 6:33 p.m.)

17             THE COURT:  All right.  You may be seated.

18             Ladies and gentlemen, I'm advised that you

19   wish to return tomorrow.  So I'm going to excuse you

20   this evening.

21             Now, when you get home again, you will have

22   to resist the temptation to discuss this matter with

23   anyone.  Don't allow anybody to speak to you about it.

24   Don't you speak to anybody.  Don't do anything on

25   telephones or more sophisticated equipment.  Don't do

1    anything at all in terms of investigating this case.

2    Don't look up anything in books or anything else.  Put

3    the matter out of your mind, and I'll see you tomorrow

4    morning at 9:30.  And I'll reconvene you.

5               There will be other matters going on in the

6    courtroom, but I'll make time to reconvene you.  We'll

7    take the roll, and then permit you to continue and

8    deliberate on your verdict in there.  There will be

9    other matters going on in the courtroom.

10              All right.  You may follow the court

11   security officer out.  All of the matters in the jury

12   room will be locked up.  Mr. Wood will take care of

13   that.

14              (Jury excused at 6:35 p.m.)

15              THE COURT:  All right.  This matter is

16   recessed until tomorrow at 9:30.

17              (Court adjourned at 6:35 p.m.)

18                        ---

19

20

21

22

23

24

25

```
1                        CERTIFICATE

2

3            I, MICHAEL A. RODRIQUEZ, an Official Court

4   Reporter for the United States District Court, in the

5   Eastern District of Virginia, Alexandria Division, do

6   hereby certify that I reported by machine shorthand, in

7   my official capacity, the trial proceedings had in the

8   case of ROBERT DONNERT, et al., v. FELD ENTERTAINMENT,

9   INCORPORATED.

10

11           I further certify that I was authorized and

12  did report by stenotype the trial proceedings in said

13  case, and that the foregoing pages, numbered 1 to 198,

14  inclusive, constitute the official transcript of said

15  proceedings as taken from my machine shorthand notes.

16

17           IN WITNESS WHEREOF, I have hereto subscribed

18  my name this   13th    day of   March        , 2013.

19

20

21

22                                    /S/
                     _____
                     Michael A. Rodriquez, RPR/CM/RMR
23                          Official Court Reporter

24

25
```